UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRAVIER PRODUCTIONS, INC., and WOODY ALLEN,<br><br>                Plaintiffs,<br><br>   – against –<br><br>AMAZON CONTENT SERVICES, LLC, and AMAZON STUDIOS, LLC,<br><br>                Defendants. | Case No. _____<br><br><br>**COMPLAINT** |

Plaintiffs Gravier Productions, Inc. ("Gravier") and Woody Allen (together with Gravier, "Plaintiffs"), by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, bring this Complaint against Defendants Amazon Content Services, LLC ("Amazon Content") and Amazon Studios, LLC ("Amazon Studios" and, together with Amazon Content, "Amazon"), and allege as follows:

## NATURE OF THE CASE

1.    Woody Allen is one of the most critically acclaimed, iconic, and successful filmmakers in the history of motion pictures. Mr. Allen has made more than 50 films, earning honors and accolades around the world and generating substantial international box office receipts. Mr. Allen's combination of critical and commercial success as a writer and director for over five decades is unparalleled in the film industry. Seeking to capitalize on Mr. Allen's international stature, talent, and track record, Amazon—a technology giant but Hollywood novice—sought to develop its nascent entertainment studio by entering into a series of deals with Mr. Allen and his company, Gravier, promising to finance and distribute his future films and to be his "home" for the rest of his career.

2.     In June 2018, however, Amazon backed out of the deals, purporting to terminate them without any legal basis for doing so, while knowing that its actions would cause substantial damage to Mr. Allen, Gravier, investors and the artists and crew involved in making the films. Amazon has tried to excuse its action by referencing a 25-year old, baseless allegation against Mr. Allen, but that allegation was already well known to Amazon (and the public) before Amazon entered into *four separate deals* with Mr. Allen—and, in any event it does not provide a basis for Amazon to terminate the contract.  There simply was no legitimate ground for Amazon to renege on its promises.

3.     Accordingly, Mr. Allen and Gravier bring this action for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment arising from Amazon Content's repudiation of the parties' Multipicture Acquisition Agreement and four individual motion picture license agreements.[1]

4.     As detailed below, Amazon Content entered into the Allen Film Agreements in an effort to build and promote Defendants' film business through a highly-publicized association with Mr. Allen.  In exchange for a grant of licenses to distribute at least four motion pictures written and directed by Mr. Allen (the "Allen Films"), Amazon Content agreed, among other things, to: (i) finance the Allen Films, (ii) make minimum guaranteed payments to Gravier totaling between $68 and $73 million, (iii) pay Gravier additional amounts based on the success of the Allen Films, and (iv) distribute the Allen Films widely.

5.     Immediately after entering into the agreements, Mr. Allen and Gravier undertook to produce the first of the four Allen Films, titled *A Rainy Day in New York*.  After Plaintiffs

---

[1]   As used herein, the term "MAA" means the Multipicture Acquisition Agreement; the "Single Picture Agreements" or "SPAs" means the four individual motion picture license agreements; and the "Allen Film Agreements" means the SPAs and the MAA collectively.

completed the film—which was produced with Defendants' full knowledge—Amazon Content simply refused to make its guaranteed payment and purported to terminate the Allen Film Agreements in their entirety.  Defendants knew full well that Amazon Content had no valid basis in law or fact for its purported termination.  Despite repeated requests from Plaintiffs, Defendants have not identified any provision in any of the Allen Film Agreements giving Amazon Content the right to terminate—and, in fact, no such provision exists.  In short, after Defendants used Mr. Allen to promote and build Amazon Studios' standing as a full-fledged film studio, they discarded him, repudiated the Allen Film Agreements, and refused to honor their commitments to him or Gravier.

## THE PARTIES

6.      Gravier is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

7.      Mr. Allen is an individual citizen and resident of New York, New York.  Mr. Allen is the President of Gravier.

8.      Amazon Content is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Santa Monica, California.

9.      Amazon Studios is a limited liability company organized and existing under the laws of the State of California, with its principal place of business in Santa Monica, California.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     This Court has personal jurisdiction over Amazon Content because Amazon Content "consent[ed] to the [] jurisdiction and venue of the federal [] courts located in New York

3

County, New York with respect to any claims, suits or proceedings arising out of or in connection with [the Allen Film] Agreement[s]." *See* MAA ¶ 9(k); SPAs ¶ 25(iv).  This Court has personal jurisdiction over both Defendants because they have substantial, continuous, and systematic contacts with the State of New York and have availed themselves of the privilege of conducting activities in the State, including by transacting business within the State and contracting to supply goods or services in the State.  In addition, Defendants have committed the acts giving rise to this action in this District, including by contracting with Plaintiffs, who are located in this District, promising to distribute Plaintiffs' films in this District, and breaching contracts with Plaintiffs, causing injury within this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this litigation occurred in this District, because Defendants are subject to personal jurisdiction within New York, and because the parties to the Allen Film Agreements "consent[ed] to the [] jurisdiction and venue of the federal [] courts located in New York County, New York with respect to any claims, suits or proceedings arising out of or in connection with [the Allen Film] Agreement[s]." *See* MAA ¶ 9(k); SPAs ¶ 25(iv).

## WOODY ALLEN'S ICONIC CAREER AS A FILM WRITER AND DIRECTOR

13.     Woody Allen is a world-renowned filmmaker.  His historic career has earned him international recognition, commercial success, and critical acclaim.  He began his career in the 1950s, writing comic material and scripts for television and publishing several books of short humor pieces.  By the 1960s, Mr. Allen had achieved major success in television and also as a stand-up comedian.

14.     Mr. Allen then turned his focus to motion pictures, working as a writer, director, and actor.  In all, Mr. Allen has written and/or directed more than 50 feature films, including such iconic works as *Annie Hall*, *Take the Money and Run*, *Bananas*, *Love and Death*, *Manhattan*,

*Crimes and Misdemeanors*, *Hannah and Her Sisters*, *Match Point*, *Midnight in Paris*, and *Blue Jasmine*.  Mr. Allen's films have generated more than $1.25 billion in worldwide box office receipts.

15.     Mr. Allen has won numerous awards, honors, and accolades for his work.  He personally has been nominated for 24 Academy Awards and won four times:  Best Original Screenplay for *Annie Hall* (1977), *Hannah and Her Sisters* (1986), and *Midnight in Paris* (2011), and Best Director for *Annie Hall*, which also won Best Picture.  Mr. Allen's awards include a Career Golden Lion at the Venice Film Festival in 1995; the Lifetime Achievement Award from the Directors Guild of America in 1996; the BAFTA Fellowship in 1997; the Honorary Palme d'Or at the Cannes Festival in 2002; and the Golden Globe Cecil B. DeMille Award in 2014.  Many actors also have won prestigious awards for their roles in Mr. Allen's films, including Diane Keaton, Cate Blanchett, Penelope Cruz, Dianne Wiest, and Mira Sorvino, each of whom won an Academy Award for either Best Actress or Best Supporting Actress for her performance.

16.     In 2001, Mr. Allen founded Gravier to serve as the production company for his films.  Gravier's films have achieved substantial commercial and critical success.  Since 2001, Gravier has produced 12 films, including *Midnight in Paris*, *Vicky Cristina Barcelona*, and *Blue Jasmine*.  Gravier's films have generated more than $625 million in worldwide box office receipts and earned numerous Academy Award, BAFTA, and Golden Globe nominations and awards.

## DEFENDANTS SEEK TO LAUNCH A FILM DISTRIBUTION COMPANY

17.     Amazon Content and Amazon Studios are both wholly-owned subsidiaries of Amazon.com, Inc. ("Amazon.com"), which was founded in 1994 as an online bookstore. Amazon.com later expanded into selling a broad range of goods online to consumers and, in 2006, began offering third-party television shows and films for online viewing through its website.  In 2010, Amazon.com founded Amazon Studios to develop television shows and movies.  Amazon

Studios began merely as a website that allowed the general public to upload scripts and sample movies, and to vote on each other's works.  Lacking the ability to produce or distribute films on its own, Amazon Studios entered into an exclusive first-look deal with Warner Bros. for the potential production of motion pictures from among the works submitted to its website.

18.     Amazon Studios began to distribute some television programs in 2010.   In December 2014, it entered into a deal with Mr. Allen to finance a program titled *Crisis in Six Scenes* for its fledgling streaming service.  The series generated significant publicity due to Mr. Allen and the talent appearing in the series, such as Miley Cyrus, Rachel Brosnahan, and Elaine May.  However, by 2015 Amazon Studios still had not produced or theatrically distributed a single original motion picture.

19.     In 2015, Amazon.com, Amazon Studios, and Amazon Content embarked on an effort to develop a full-fledged motion picture studio, announcing that Amazon Studios wanted to "expand[ its] production efforts into feature films" with a "goal [] to create close to 12 movies a year" and to be "synonymous with films that amaze, excite, and move [Amazon.com's and Amazon Studios'] fans, wherever customers watch."  *See* January 19, 2015 Press Release, "Amazon to Produce Original Movies for Theaters, Prime Instant Video" (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=2008551).

20.     Amazon Studios, in conjunction with Amazon Content, sought to launch its motion picture studio by agreeing to a deal with Mr. Allen and capitalizing on an association with the world-renowned filmmaker.  In February 2016, Defendants entered into their first film deal with Mr. Allen and Gravier by acquiring rights to distribute Mr. Allen's film *Café Society*, with Lionsgate Entertainment acting as a sub-distributor because Defendants did not have the ability to distribute a film theatrically at that time.  Only one month later, in March 2016, *Café Society* was

6

selected to open the 2016 Cannes Film Festival.  *Café Society* proved to be a critical success and generated approximately $44 million in worldwide box office receipts.  Defendants' association with Mr. Allen and the success of *Café Society* jump-started Amazon Studios' nascent film business, generating both revenue and significant publicity and goodwill.  For example, a May 11, 2016 article in the Los Angeles Times called the selection of *Café Society* to open the Cannes Film Festival "a landmark moment for Amazon and the man driving its ambitions to make entertainment a major draw to its Internet commerce site."  *See* "How Amazon's Hollywood chief scored a landmark deal with Woody Allen," Los Angeles Times, May 11, 2016 (*available at* http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-amazon-roy-price-20160510-snap-story.html).  Amazon Studios and Amazon Content have since continued to benefit from their role as a distributor of *Café Society* and their association with Mr. Allen and Gravier.

21.     As *Café Society* was beginning its successful worldwide release, on July 22, 2016, Amazon Content and Gravier entered into their second film deal, for the Mr. Allen-written and directed film, *Wonder Wheel*.  As part of their effort to grow and legitimize Amazon Studios' film business, Defendants decided to release *Wonder Wheel* domestically as Amazon Studios' first self-distributed film.  To generate publicity for Amazon Studios, Defendants trumpeted the deal, announcing on July 27, 2017 that, starting with the December 2017 release of *Wonder Wheel*, Amazon Studios finally would become its own self-distributing film company.  *See* "Amazon Moves Into Self-Distribution With Woody Allen's 'Wonder Wheel,'" Variety, July 27, 2017 (*available at* https://variety.com/2017/film/markets-festivals/amazon-self-distribution-woody-allen-wonder-wheel-1202508413/).  Defendants' ability to launch their standalone film business with a film written and directed by Mr. Allen generated tremendous publicity for Defendants.

*Wonder Wheel* also was selected for the opening night of the New York Film Festival, which garnered further publicity for Defendants.

22.     Defendants' association with Mr. Allen, and the prestige generated by that association, were critical in quickly establishing Amazon as a legitimate player in Hollywood.  The goodwill and notoriety from their highly-publicized relationship with Mr. Allen and Gravier were substantial factors in Defendants' successful establishment of their film business, which increased the value of the companies and generated significant revenue.  Amazon Studios and Amazon Content promoted their association with Mr. Allen and Gravier, and their related ability to distribute prestigious films theatrically, as a hallmark of Amazon Studios' brand identity and business model, and as an instrumental component in distinguishing Amazon Studios from competitors.

## THE PARTIES ENTER INTO AGREEMENTS GRANTING AMAZON CONTENT EXCLUSIVE LICENSES TO FOUR ALLEN FILMS

23.     Prior to entering into a relationship with Defendants, Mr. Allen had successfully and independently financed and produced his and Gravier's films for more than 20 years.  To induce Mr. Allen and Gravier to abandon their successful practice and enter into a multi-picture relationship with Defendants, Defendants promised long-term, guaranteed financial, promotional, and distribution commitments for Mr. Allen and Gravier's films, including a commitment to a robust theatrical release for each of the Allen Films.  Specifically, the then head of Amazon Studios, Roy Price, urged Mr. Allen and Gravier to cut ties with their long-standing financial backers, and told Mr. Allen that Defendants wanted to be the "home" for Mr. Allen's films for the remainder of his career and that Amazon Studios would release all Mr. Allen's future films.  In reliance on these commitments, Mr. Allen and Gravier severed ties with existing, long-standing

financial backers, who would have been willing to continue financing Mr. Allen and Gravier's films.

24.     As of August 29, 2017, Gravier, Mr. Allen, and Amazon Content entered into the Multipicture Acquisition Agreement.  *See* Ex. A (MAA).  The purpose of the MAA was for Gravier to "grant certain exclusive rights in the United States and Canada to two theatrical feature films by Woody Allen . . . and certain exclusive, worldwide rights to the next two films filmed by Allen." MAA, Preamble.  Gravier also granted Amazon Content "options [] to acquire two further films filmed by Allen on a worldwide basis, for six films total."  *Id*.  In connection with entering into the MAA, Mr. Price called Mr. Allen "one of the most dynamic and compelling filmmakers of our time," and stated that he was "excited to further [Amazon Studios'] content development slate with Woody's high-quality and engaging works."

25.     Upon information and belief, as Defendants had done with *Café Society* and *Wonder Wheel*, Defendants intended to release the Allen Films under the Amazon Studios name, while executing the MAA in the name of Amazon Content.

26.     Pursuant to the MAA, Gravier "license[d] two Picture[s]" to Amazon Content for domestic release in 2018 and 2019 (the "2017 Allen Film," a/k/a *Rainy Day in New York*, and the "Untitled 2018 Allen Film," respectively) "on the terms set forth in the [SPAs]" as modified by the MAA.  *See* MAA ¶ 4.

27.     On the effective date of the MAA, August 29, 2017, *A Rainy Day in New York* and the Untitled 2018 Allen Film each were "deemed to be licensed pursuant to a new agreement … on the same form as the [parties' prior] Wonder Wheel Agreement, but with the changes set forth [in the MAA]."  MAA ¶ 1.  Each of these new agreements—the "Rainy Day Agreement" and "2018 Allen Film Agreement"—constitutes "an independent, standalone agreement, and all of the

terms with respect to [the Rainy Day Agreement and 2018 Allen Film Agreement are] as set forth in [their SPA] as modified" by the MAA. *Id.*

28.    In exchange for Gravier's grant of an exclusive license to Amazon Content to release *A Rainy Day in New York* domestically, Amazon Content agreed, among other commitments, to: (1) pay Gravier a minimum guarantee of $9,000,000 (*see* MAA ¶ 4(a)(ii)); (2) pay Gravier certain additional amounts based on the success of the film (*see, e.g.*, Rainy Day Agreement ¶¶ 7(B) & 9(i)); and (3) theatrically release *A Rainy Day in New York* for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release" (*see* MAA ¶¶ 3(a) & 4(c); Rainy Day Agreement ¶ 13).

29.    In exchange for Gravier's grant of an exclusive license to Amazon Content to release the Untitled 2018 Allen Film domestically, Amazon Content agreed, among other commitments, to: (1) pay Gravier a minimum guarantee of $9,000,000 (*see* MAA ¶ 4(a)(ii)); (2) pay Gravier certain additional amounts based on the success of the film (*see, e.g.*, 2018 Allen Film Agreement ¶¶ 7(B) & 9(i)); and (3) theatrically release the Untitled 2018 Allen Film for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release" (*see* MAA ¶¶ 3(a) & 4(c); 2018 Allen Film Agreement ¶ 13).

30.    By executing the MAA, Gravier also "license[d] [to Amazon Content] the exclusive rights set forth in the [SPAs] to two Pictures" to be delivered to Amazon Content in 2019 and 2020 (the "Untitled 2019 Allen Film" and "Untitled 2020 Allen Film," respectively) for worldwide release on the terms set forth in the SPAs, as modified by the MAA. The MAA further provided that Amazon Content thereby "agree[d] to license and finance [the Untitled 2019 Allen Film] and [the Untitled 2020 Allen Film] in accordance with [the MAA]." MAA ¶ 5(a).

31.     On the effective date of the MAA, August 29, 2017, the Untitled 2019 Allen Film

and the Untitled 2020 Allen Film each were "deemed to be licensed pursuant to a new agreement

. . . on the same form as the [parties' prior] Wonder Wheel Agreement, but with the changes set

forth [in the MAA]."  MAA ¶ 1.  As with the Rainy Day Agreement and the 2018 Allen Film

Agreement, the 2019 Worldwide Allen Film Agreement and 2020 Worldwide Allen Film

Agreement each constitutes "an independent, standalone agreement, and all of the terms with

respect to [the 2019 Worldwide Allen Film Agreement and 2020 Worldwide Allen Film

Agreement are] as set forth in [their SPAs] as modified" by the MAA.  *Id.*

32.     In exchange for Gravier's grant of an exclusive license to Amazon Content to

release the Untitled 2019 Allen Film worldwide, Amazon Content agreed, among other

commitments, to: (1) pay Gravier a minimum guarantee "equal to the gross budget" for the Untitled

2019 Allen Film between "$25,000,000 and $27,500,000, with annual adjustments for inflation"

(*see* MAA ¶ 5(b)); (2) pay Gravier certain additional amounts based on the success of the film

(*see, e.g.*, 2019 Worldwide Allen Film Agreement ¶¶ 7(B) & 9(i)); and (3) theatrically release the

Untitled 2019 Allen Film for a period of at least 90 days, "in 20 of the top 25" markets in the

United States, and "on a minimum of 500 screens at its widest point of release," in addition to a

worldwide theatrical release (*see* MAA ¶¶ 3(a) & 4(c); 2019 Worldwide Allen Film Agreement ¶

13).

33.     In exchange for Gravier's grant of an exclusive license to Amazon Content to

release the Untitled 2020 Allen Film worldwide, Amazon Content agreed, among other

commitments, to: (1) pay Gravier a minimum guarantee "equal to the gross budget" for the Untitled

2020 Allen Film between "$25,000,000 and $27,500,000, with annual adjustments for inflation"

(*see* MAA ¶ 5(b)); (2) pay Gravier certain additional amounts based on the success of the film

(*see, e.g.*, 2020 Worldwide Allen Film Agreement ¶¶ 7(B) & 9(i)); and (3) theatrically release the Untitled 2020 Allen Film for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release," in addition to a worldwide theatrical release (*see* MAA ¶¶ 3(a) & 4(c); 2020 Worldwide Allen Film Agreement ¶ 13).

34.     The parties agreed that for each of the SPAs—the Rainy Day Agreement, the 2018 Allen Film Agreement, the 2019 Worldwide Allen Film Agreement, and the 2020 Worldwide Allen Film Agreement—"any claim for damages with respect to [that] Picture may be brought only under and with respect to the applicable [SPA] . . . as if the [SPA] were a standalone agreement." *Id*.  As alleged below, aside from an advance payment of $10,000,000 required under Paragraph 6 of the MAA and the payment of 10% of the $9,000,000 minimum guarantee for *A Rainy Day in New York*, Amazon Content has materially breached virtually *every obligation it has* under the Allen Film Agreements.

## AMAZON CONTENT'S ANTICIPATORY BREACH AND REPUDIATION OF THE ALLEN FILM AGREEMENTS

35.     Mr. Allen wrote and directed *A Rainy Day in New York*, and Mr. Allen and Gravier produced the film, in reliance on Amazon Content's commitments in the MAA and the Rainy Day Agreement, and in reliance on Defendants' representations that Amazon Studios would distribute the film widely.  Mr. Allen, Gravier, the film's investors, and the cast and crew spent a tremendous amount of time and effort and approximately $20 million to produce *A Rainy Day in New York*, which has a star-studded cast, including Jude Law, Selena Gomez, Elle Fanning, Diego Luna, Liev Schreiber, and Timothée Chalamet.  The film has been completed and Gravier has tendered delivery to Amazon Content.

36.     In December 2017, Amazon Studios' executives Jason Ropell and Matt Newman met with representatives of Mr. Allen and Gravier and discussed the negative publicity and reputational harm Amazon Studios had received because of allegations made against its former President, Mr. Price, and its association with Harvey Weinstein and The Weinstein Company.  The Amazon executives proposed a meeting in Seattle with Amazon.com Executive Vice-President Jeffrey Blackburn to discuss marketing for the film.  Although that meeting did not take place, Mr. Ropell, Mr. Newman, and Amazon Studios' Associate General Counsel, Ajay Patel, confirmed to Mr. Allen and Gravier's representatives in January 2018 that Amazon Studios would release *A Rainy Day in New York* consistent with Amazon Content's contractual obligation to do so (*see* MAA ¶ 4(a)(iv)), but requested that Mr. Allen and Gravier agree to "push back" the scheduled date for the release of the film to 2019.  At that time, the film had not yet been completed.

37.     Based on Defendants' representations, Mr. Allen and Gravier agreed to push back the release date of *A Rainy Day in New* York, completed the film, and continued to take steps to prepare for its release.  During this time, Mr. Allen and Gravier repeatedly informed Defendants that they were completing the film and taking steps to prepare for its release, and that Mr. Allen and Gravier were doing so in reliance on Defendants' representations that Amazon Studios' would distribute the film widely.  Mr. Allen and Gravier also informed Defendants that they were prepared to continue to meet all their obligations under the Allen Film Agreements.

38.     In further reliance on Defendants' representations, Mr. Allen began writing and developing the 2018 Allen Film, the 2019 Worldwide Allen Film, and the 2020 Worldwide Allen Film.  Gravier hired and began paying people for early pre-production work on the 2018 Allen Film, and Plaintiffs obtained commitments from, among others, a highly regarded cinematographer and a highly regarded production designer to work on the 2018 Allen Film.

13

39.     However, on June 19, 2018, after post-production work on *A Rainy Day in New York* had been completed, and contrary to Defendants' prior representations to Mr. Allen and Gravier, Mr. Patel sent an email to their representatives purporting to terminate the MAA and the SPAs. *See* Ex. B (the "Termination Notice").  In the Termination Notice, Defendants provided "notice that Amazon is terminating the Agreement with respect to each of the Pictures" and informed Gravier that "Amazon does not intend to distribute or otherwise exploit the Pictures in any domestic or international territories." *See id*.  Defendants did not provide any legal or factual basis for the Termination Notice. *See id.*

40.     After receiving the Termination Notice, Mr. Allen and Gravier's counsel repeatedly requested that Defendants identify the basis for the purported termination, along with any term of the MAA that could give Amazon Content the right to terminate.  Despite these repeated requests, Defendants have *never* identified any basis in fact or any term of the MAA giving Amazon Content the right to terminate the Allen Film Agreements.  Instead, Defendants' counsel merely made the vague statement that Amazon Content's performance of the MAA became "impracticable" because of "supervening events, including renewed allegations against Mr. Allen, his own controversial comments, and the increasing refusal of top talent to work with or be associated with him in any way, all of which have frustrated the purpose of the Agreement."  *See* Ex. C. Defendants' counsel still was unable to cite any term of the MAA or any legal basis to support the Termination Notice.  Although Mr. Allen and Gravier's counsel requested that Defendants (i) explain what they meant by "renewed allegations" and Mr. Allen's "controversial comments," (ii) identify the "top talent" to whom they referred, and (iii) state what term of the MAA purportedly gave Amazon Content the right to terminate, Defendants did not respond.

41.     As a result of Defendants' termination and refusal to distribute *A Rainy Day in New York* and the remaining Allen Films, Mr. Allen and Gravier have suffered—and will continue to suffer—substantial damages, including the loss of minimum guarantee payments due, the loss of additional payments based on the success of the films, the loss of financing for the productions, and the loss of promotion and distribution for the films.  Defendants' termination also has required Plaintiffs to forego the services of highly-regarded individuals who had agreed to work on the Allen Films, and has caused international distributors to renegotiate or delay performance of contracts to distribute the Allen Films, significantly increasing the damage to Mr. Allen and Gravier.  Further, Defendants' termination has interfered with Mr. Allen and Gravier's ability to meet certain obligations to outside investors and foreign distributors, which Mr. Allen and Gravier undertook in express reliance on Defendants' financial, promotional, and distribution commitments.

42.     Defendants have never denied that Amazon Content intentionally and knowingly breached the Allen Film Agreements in their entirety, or that Mr. Allen and Gravier will suffer substantial damages as a direct result of Defendants' actions.  Instead, Defendants essentially have conceded both Amazon Content's breach and Plaintiffs' damages, but brazenly demanded that Mr. Allen and Gravier mitigate the damages caused by the purported termination (*i.e.*, mitigate Defendants' liability), all while refusing to help Plaintiffs mitigate.

43.     On July 11, 2018, Plaintiffs provided Amazon Content with formal notice of breach and Plaintiffs' intent to seek full legal recourse if Amazon Content did not cure its breach within 15 business days.  *See* Ex. D.  On July 20, 2018, Amazon Content responded to Plaintiffs' notice by refusing to cure its breach and reiterating its repudiation of its obligations under the Allen Film

Agreements, stating that it "has no further rights or obligations with respect to [*A Rainy Day in New York*] or the other Pictures."  Ex. E.

### FIRST CLAIM FOR RELIEF
### <u>Breach of the Rainy Day Agreement</u>
### Against Amazon Content

44.     Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 43.

45.     Gravier and Amazon Content are parties to the MAA and the Rainy Day Agreement.

46.     The MAA and Rainy Day Agreement are intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing his film, *A Rainy Day in New York*, and for fees to be paid to Mr. Allen for writing and directing the film.  Therefore, Mr. Allen is a third-party beneficiary of the MAA and the Rainy Day Agreement (neither of which contains any provision prohibiting a third-party beneficiary from enforcing its terms).

47.     Paragraph 4(a) of the Rainy Day Agreement expressly requires Amazon Content to make a $9,000,000 minimum guarantee payment to Gravier for *A Rainy Day in New York*.

48.     The Rainy Day Agreement expressly requires Amazon Content to pay to Gravier additional amounts based on the success of the film.  Specifically, paragraph 9(i) requires Amazon Content to pay to Gravier an additional "10% of the Defined Proceeds" following the film's "Cash Breakeven" point, and "50% of the Defined Proceeds" following "Actual Breakeven."  Paragraph 7(B) requires Amazon Content to pay Gravier certain additional amounts, ranging from $25,000 to $100,000 for each nomination and/or win of certain Golden Globe Awards or Academy Awards.

49.     Paragraphs 3(a) and 13 of the Rainy Day Agreement expressly require Amazon Content to release *A Rainy Day in New York* theatrically for a period of at least 90 days, "in 20 of

the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release."

50.     Amazon Content's Termination Notice constitutes Amazon Content's material, anticipatory breach and repudiation of the Rainy Day Agreement.

51.     At all times relevant hereto, Plaintiffs have fully performed—or have been ready, willing, and able to perform—all duties and obligations required by the Rainy Day Agreement, except as may have been excused or prevented by the acts or omissions of Amazon Content, including Amazon Content's anticipatory breach and repudiation of the Rainy Day Agreement.

52.     Amazon Content's breach of the Rainy Day Agreement was intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Amazon Content has no right or authority to repudiate any of the terms of the Rainy Day Agreement and that it would cause substantial damage to Gravier, Mr. Allen, and to the film's investors and the cast and crew who spent the time, effort, and money to create the film.

53.     Plaintiffs are entitled to all payments due under the Rainy Day Agreement, including the remainder of the $9,000,000 minimum guarantee.

54.     Plaintiffs are further entitled to damages for Amazon Content's breach of contract, including Plaintiffs' general damages and lost profits, Mr. Allen's writing and directing fees, and Plaintiffs' costs and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**Breach of the 2018 Allen Film Agreement**
**Against Amazon Content**

55.     Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 54.

56.     Gravier and Amazon Content are parties to the MAA and the 2018 Allen Film Agreement.

57.     The MAA and 2018 Allen Film Agreement are intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing his film, the Untitled 2018 Allen Film, and for fees to be paid to Mr. Allen for writing and directing the film.  Therefore, Mr. Allen is a third-party beneficiary of the MAA and the 2018 Allen Film Agreement (neither of which contains any provision prohibiting a third-party beneficiary from enforcing its terms).

58.     Paragraph 4(b) of the 2018 Allen Film Agreement expressly requires Amazon Content to make a $9,000,000 minimum guarantee payment to Gravier for the Untitled 2018 Allen Film.

59.     The 2018 Allen Film Agreement expressly requires Amazon Content to pay to Gravier additional amounts based on the success of the film.  Specifically, paragraph 9(i) requires Amazon Content to pay to Gravier an additional "10% of the Defined Proceeds" following the film's "Cash Breakeven" point, and "50% of the Defined Proceeds" following "Actual Breakeven."  Paragraph 7(B) requires Amazon Content to pay Gravier certain additional amounts, ranging from $25,000 to $100,000 for each nomination and/or win of certain Golden Globe Awards and Academy Awards.

60.     Paragraphs 3(a) and 13 of the 2018 Allen Film Agreement expressly require Amazon Content to release the Untitled 2018 Allen Film theatrically for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release."

61.     Amazon Content's Termination Notice constitutes Amazon Content's material, anticipatory breach and repudiation of the 2018 Allen Film Agreement.

62.     At all times relevant hereto, Plaintiffs have fully performed—or have been ready, willing, and able to perform—all duties and obligations required by the 2018 Allen Film

Agreement, except as may have been excused or prevented by the acts or omissions of Amazon Content, including Amazon Content's anticipatory breach and repudiation of the 2018 Allen Film Agreement.

63.   Amazon Content's breach of the 2018 Allen Film Agreement was intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Amazon Content has no right or authority to repudiate any of the terms of the 2018 Allen Film Agreement and that it would cause substantial damage to Gravier, Mr. Allen, and to the film's investors and the cast and crew who committed to make the film.

64.   Plaintiffs are entitled to all payments due under the terms of the 2018 Allen Film Agreement, including the full $9,000,000 minimum guarantee.

65.   Plaintiffs are further entitled to damages for Amazon Content's breach of contract, including Plaintiffs' general damages and lost profits, Mr. Allen's writing and directing fees, and Plaintiffs' costs and attorneys' fees.

### THIRD CLAIM FOR RELIEF
### Breach of 2019 Worldwide Allen Film Agreement
### Against Amazon Content

66.   Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 65.

67.   Gravier and Amazon Content are parties to the MAA and the 2019 Worldwide Allen Film Agreement.

68.   The MAA and 2019 Worldwide Allen Film Agreement are intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing his film, the Untitled 2019 Allen Film, and for fees to be paid to Mr. Allen for writing and directing the film. Therefore, Mr. Allen is a third-party beneficiary of the MAA and the 2019 Worldwide Allen Film

Agreement (neither of which contains any provision prohibiting a third-party beneficiary from enforcing its terms).

69.     Paragraph 5(b) of the 2019 Worldwide Allen Film Agreement expressly requires Amazon Content to make a minimum guarantee payment "equal to the gross budget" for the Untitled 2019 Allen Film of "between $25,000,000 and $27,500,000, with annual adjustments for inflation."

70.     The 2019 Worldwide Allen Film Agreement expressly requires Amazon Content to pay to Gravier additional amounts based on the success of the film.  Specifically, paragraph 9(i) requires Amazon Content to pay to Gravier an additional "10% of the Defined Proceeds" following the film's "Cash Breakeven" point, and "50% of the Defined Proceeds" following "Actual Breakeven."  Paragraph 7(B) requires Amazon Content to pay Gravier certain additional amounts, ranging from $25,000 to $100,000 for each nomination and/or win of certain Golden Globe Awards and Academy Awards.

71.     Paragraphs 4(c) and 13 of the 2019 Worldwide Allen Film Agreement expressly require Amazon Content to release the Untitled 2019 Allen Film theatrically for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release."

72.     Amazon Content's Termination Notice constitutes Amazon Content's material, anticipatory breach and repudiation of the 2019 Worldwide Allen Film Agreement.

73.     At all times relevant hereto, Plaintiffs have fully performed—or have been ready, willing, and able to perform—all duties and obligations required by the 2019 Worldwide Allen Film Agreement, except as may have been excused or prevented by the acts or omissions of

Amazon Content, including Amazon Content's anticipatory breach and repudiation of the 2019 Worldwide Allen Film Agreement.

74.     Amazon Content's breach of the 2019 Worldwide Agreement was intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Amazon Content has no right or authority to repudiate any of the terms of the 2019 Worldwide Agreement and that it would cause substantial damage to Gravier and Mr. Allen.

75.     Plaintiffs are entitled to all payments due under the terms of the 2019 Worldwide Allen Film Agreement, including the full minimum guarantee of between $25,000,000 and $27,500,000, adjusted for inflation.

76.     Plaintiffs are further entitled to damages for Amazon Content's breach of contract, including Plaintiffs' general damages and lost profits, Mr. Allen's writing and directing fees, and Plaintiffs' costs and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**Breach of 2020 Worldwide Allen Film Agreement**
**Against Amazon Content**

77.     Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 76.

78.     Gravier and Amazon Content are parties to the MAA and the 2020 Worldwide Allen Film Agreement.

79.     The MAA and 2020 Worldwide Allen Film Agreement are intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing his film, the Untitled 2020 Allen Film, and for fees to be paid to Mr. Allen for writing and directing the film. Therefore, Mr. Allen is a third-party beneficiary of the MAA and the 2020 Worldwide Allen Film Agreement (neither of which contains any provision prohibiting a third-party beneficiary from enforcing its terms).

80.     Paragraph 5(b) of the 2020 Worldwide Allen Film Agreement expressly requires Amazon Content to make a minimum guarantee payment "equal to the gross budget" for the Untitled 2020 Allen Film of between $25,000,000 and $30,000,000, based on the "final gross budget for [the Untitled 2020 Allen Film] and [Untitled 2019 Allen Film] averag[ing] between $25,000,000 and $27,500,000, with annual adjustments for inflation."

81.     The 2020 Worldwide Allen Film Agreement expressly requires Amazon Content to pay to Gravier additional amounts based on the success of the film.  Specifically, paragraph 9(i) requires Amazon Content to pay to Gravier an additional "10% of the Defined Proceeds" following the film's "Cash Breakeven" point, and "50% of the Defined Proceeds" following "Actual Breakeven."  Paragraph 7(B) requires Amazon Content to pay Gravier certain additional amounts, ranging from $25,000 to $100,000 for each nomination and/or win of certain Golden Globe Awards and Academy Awards.

82.     Paragraphs 4(c) and 13 of the 2020 Worldwide Allen Film Agreement expressly require Amazon Content to release the 2020 Worldwide Allen Film Agreement theatrically for a period of at least 90 days, "in 20 of the top 25" markets in the United States, and "on a minimum of 500 screens at its widest point of release."

83.     Amazon Content's Termination Notice constitutes Amazon Content's material, anticipatory breach and repudiation of the 2020 Worldwide Allen Film Agreement.

84.     At all times relevant hereto, Plaintiffs have fully performed—or have been ready, willing, and able to perform—all duties and obligations required by the 2020 Worldwide Allen Film Agreement, except as may have been excused or prevented by the acts or omissions of Amazon Content, including Amazon Content's anticipatory breach and repudiation of the 2020 Worldwide Allen Film Agreement.

85.     Amazon Content's breach of the 2020 Worldwide Allen Film Agreement was intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Amazon Content has no right or authority to repudiate any of the terms of the 2020 Worldwide Allen Film Agreement and that it would cause substantial damage to Gravier and Mr. Allen.

86.     Plaintiffs are entitled to all payments due under the terms of the 2020 Worldwide Allen Film Agreement, including the full minimum guarantee of between $25,000,000 and $27,500,000, adjusted for inflation.

87.     Plaintiffs are further entitled to damages for Amazon Content's breach of contract, including Plaintiffs' general damages and lost profits, Mr. Allen's writing and directing fees, and Plaintiffs' costs and attorneys' fees.

### FIFTH CLAIM FOR RELIEF
### Breach of the Multipicture Acquisition Agreement
### Against Amazon Content

88.     Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 87.

89.     Gravier and Amazon Content are parties to the MAA.

90.     The MAA is intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing the Allen Films and for fees to be paid to Mr. Allen for writing and directing the Allen Films.  Therefore, Mr. Allen is a third-party beneficiary of the MAA (which does not contain any provision prohibiting a third-party beneficiary from enforcing its terms).

91.     The MAA expressly requires Amazon Content to: (i) provide financing for each of the Allen Films, including the financing for fees to be paid to Mr. Allen for writing and directing the Allen Films; (ii) pay Gravier minimum guarantee payments totaling in excess of $68,000,000; (iii) pay Gravier additional amounts based on the success of each of the Allen Films; and (iv) distribute each of the Allen Films widely.

23

92.     Amazon Content's Termination Notice constitutes Amazon Content's material, anticipatory breach and repudiation of the MAA.

93.     At all times relevant hereto, Plaintiffs have fully performed—or have been ready, willing, and able to perform—all duties and obligations required by the MAA, except as may have been excused or prevented by the acts or omissions of Amazon Content, including Amazon Content's anticipatory breach and repudiation of the MAA.

94.     Amazon Content's breach of the MAA was intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Amazon Content has no right or authority to repudiate any of the terms of the MAA and that it would cause substantial damage to Gravier and Mr. Allen.

95.     Plaintiffs are entitled to all payments under the terms of the MAA.

96.     Plaintiffs are further entitled to damages for Amazon Content's breach of contract, including Plaintiffs' general damages and lost profits, Mr. Allen's writing and directing fees, and Plaintiffs' costs and attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**Under the Rainy Day Agreement**
**Against Amazon Content**

97.     Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 96.

98.     Gravier and Amazon Content are parties to the MAA and the Rainy Day Agreement.

99.     The MAA and Rainy Day Agreement are intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing his film, *A Rainy Day in New York*, and for fees to be paid to Mr. Allen for writing and directing the film.  Therefore, Mr. Allen

is a third-party beneficiary of the MAA and the Rainy Day Agreement (neither of which contains any provision prohibiting a third-party beneficiary from enforcing its terms).

100.   Amazon Content has breached the implied covenant of good faith and fair dealing in the Rainy Day Agreement by, among other things, repudiating the agreement without cause; intentionally and willfully refusing to make any good faith effort to distribute *A Rainy Day in New York* and subsequently refusing to distribute the film at all; and continuing to allow Plaintiffs to spend time and money making *A Rainy Day in New York* while aware that Amazon Content would not pay the minimum guarantee or move forward with distribution of the film.  These actions destroyed the intended economic benefits of the agreement.

101.   Plaintiffs are entitled to damages for Amazon Content's breach of the implied covenant of good faith and fair dealing, including Plaintiffs' general damages and lost profits, and Plaintiffs' costs and attorneys' fees.

### SEVENTH CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing Under the MAA
### Against Amazon Content

102.   Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 101.

103.   Gravier and Amazon Content are parties to the MAA.

104.   The MAA is intended to benefit Mr. Allen in an immediate, direct way, including to provide financing for producing the Allen Films and for fees to be paid to Mr. Allen for writing and directing the Allen Films.  Therefore, Mr. Allen is a third-party beneficiary of the MAA (which does not contain any provision prohibiting a third-party beneficiary from enforcing its terms).

105.   Amazon Content has breached the implied covenant of good faith and fair dealing in the MAA by, among other things, repudiating the agreement without cause; intentionally and willfully refusing to make any good faith effort to distribute the Allen Films and subsequently

refusing to distribute any of the Allen Films at all; and continuing to allow Plaintiffs to spend time and money making *A Rainy Day in New York*, and to spend time and money preparing to produce the remaining Allen Films, while aware that Amazon Content would not pay the minimum guarantees for any of the Allen Films or move forward with distribution of any of the Allen Films. These actions destroyed the intended economic benefits of the MAA.

106.    Plaintiffs are entitled to damages for Amazon Content's breach of the implied covenant of good faith and fair dealing, including Plaintiffs' general damages and lost profits, and Plaintiffs' costs and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**<u>Unjust Enrichment</u>**
**Against All Defendants**

107.    Plaintiffs repeat and re-allege in full the allegations in paragraphs 1 through 106.

108.    Amazon Studios and Amazon Content have received and continue to receive benefits conferred on them as a result of the wrongful conduct alleged above, including through the substantial increase in value to Amazon Studios' and Amazon Content's film business because of Plaintiffs' commitment under the Allen Film Agreements to produce between four and six films for distribution by Defendants, and through Amazon Studios' and Amazon Content's extensive publicity of their relationship with Mr. Allen and Gravier to promote and enhance the Amazon Studios' and Amazon Content's film production and distribution business.

109.    Amazon Studios and Amazon Content received those benefits under circumstances such that it would be against equity and good conscience to permit Defendants to retain them, including that they repudiated their relationship with Mr. Allen and Gravier in bad faith after they had received the benefits.

110.    Mr. Allen and Gravier incurred substantial costs in providing benefits to Amazon Studios and Amazon Content under the Allen Film Agreements, including by producing *A Rainy Day in New York*, preparing to produce the remaining Allen Films, and foregoing other opportunities to finance and distribute the Allen Films.

111.    Plaintiffs are entitled to damages equal to the amount of Amazon Studios' and Amazon Content's unjust enrichment, and Plaintiffs' costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a.      For all payments due under the Allen Film Agreements, including in excess of $68,000,000 in minimum guarantee payments due under the Rainy Day Agreement, 2018 Allen Film Agreement, 2019 Worldwide Allen Film Agreement, and 2020 Worldwide Allen Film Agreement;

b.      For general damages in an amount to be proven at trial;

c.      For special damages in an amount to be proven at trial;

d.      For attorneys' fees and costs incurred by Plaintiffs in this action; and

e.      For such other and further relief as the Court deems just and proper.

Dated: February 7, 2019          Respectfully submitted,
      New York, New York

                                   QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

                                   /s/ Julia M. Beskin
                                  —————————————————

                                   Julia M. Beskin
                                   juliabeskin@quinnemanuel.com
                                   Donald J. Reinhard, II
                                   donaldreinhard@quinnemanuel.com
                                   51 Madison Avenue, 22nd Floor
                                   New York, New York 10010
                                   (212) 849-7000 (tel.)
                                   (212) 849-7100 (fax)

                                   John B. Quinn
                                   johnquinn@quinnemanuel.com
                                   Gary E. Gans (*pro hac vice* pending)
                                   garygans@quinnemanuel.com
                                   865 South Figueroa Street, 10th Floor
                                   Los Angeles, California 90017
                                   (213) 443-3000 (tel.)
                                   (213) 443-3100 (fax)

                                   *Attorneys for Plaintiffs Gravier Productions, Inc.*
                                   *and Woody Allen*