# EXHIBIT A

# EXHIBIT A-1

CONFIDENTIAL

MULTIPICTURE ACQUISITION AGREEMENT
WOODY ALLEN

This Agreement ("**Agreement**"), effective as of August 29, 2017 ("**Effective Date**"), is made between Amazon Content Services LLC ("**Distributor**") and Gravier Productions, Inc. ("**Licensor**" and together with Distributor, the "**Parties**" and each a "**Party**").  This Agreement sets forth the terms under which Licensor will grant certain exclusive rights in the United States and Canada to two theatrical features filmed by Woody Allen ("**Allen**") and certain exclusive, worldwide rights to the next two films filmed by Allen along with options for Distributor to acquire two further films filmed by Allen on a worldwide basis, for six films total, all as more particularly set forth below.  Licensor also grants to Distributor certain first look rights, and Distributor agrees to pay an advance as more particularly set forth below.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Structure:  Attached hereto as Exhibit A is the Long Form Acquisition Agreement, effective as of July 22, 2016, between Distributor and Licensor (the "**Wonder Wheel Agreement**") under which Distributor licensed the picture now known as *Wonder Wheel* from Licensor.  Capitalized terms not defined herein have the respective meanings set forth in the Wonder Wheel Agreement. Each picture licensed hereunder (each a "**Picture**" and together the "**Pictures**") will be deemed to be licensed pursuant to a new agreement, which is on the same form as the Wonder Wheel Agreement, but with the changes set forth below.  Each such new agreement (a "**Picture Agreement**") will be an independent, standalone agreement, and all of the terms with respect to a Picture will be as set forth in that Picture Agreement as modified hereby.  Similarly, once a Picture is deemed licensed hereunder, any claim or damages with respect to a Picture may be brought only under and with respect to the applicable Picture Agreement under which the Picture is licensed as if the Picture Agreement were a standalone agreement.

2.      Specifications:  All of the Pictures licensed hereunder will have the following specifications. ("**Specifications**"):

   a.   Title: To be determined by Allen, provided that Allen will inform Licensor of the title promptly following his determination thereof but in any event no later than Delivery. Licensor will be solely responsible for clearance and translation of the title in the Territory and should the title designated by Licensor not be cleared in the Territory, Licensor will designate an alternate cleared title.

   b.   Screenplay:  Woody Allen

   c.   Director:  Woody Allen

   d.   Technical Specifications: The Picture will be photographed in color, and will be of first class technical quality. The Picture will be a substantially new and original feature-length motion picture telling a continuous story with all necessary dialogue (which dialogue is originally recorded predominantly in the English language), music, lyrics

CONFIDENTIAL

lyrics and sound effects, fully edited, titled, and assembled with the soundtrack fully synchronized with the photographic action thereof.   The Picture will be shot in 4K and will be delivered in 4k and as per the Delivery Schedule attached to the Picture Agreement.  Since the technology requirements for exploitation of the Pictures may change over the term of this Agreement, the Parties agree to discuss in good faith changes to the Delivery Schedule that Distributor may request.

    e.    <u>Rating</u>: The Picture will be capable of receiving an MPAA rating no more restrictive than R.

    f.    <u>Language</u>:  The Picture will be in the English language.

    g.    <u>Running Time</u>: The Picture will have a running time (exclusive of credits) of no less than 85 minutes and no more than 120 minutes.

    h.    <u>Other specifications</u>:  The cast, producers, and cinematographers will be as selected by Allen in his sole discretion, but upon Distributor's request, Allen will promptly notify Distributor thereof once selected.

3.    <u>Domestic Release</u>:

    a.    <u>Release Commitment</u>:  For each Picture licensed hereunder, the release commitment in the **"Domestic Territory"** (which means the Territory as defined in the Wonder Wheel Agreement) will be as set forth in Section 13(a) of the Wonder Wheel Agreement. However, if Distributor determines in good faith that the P&A requirements associated with a release of a Picture on 500 screens in the Domestic Territory will likely result in P&A expenditures that exceed the proceeds to be generated as a result of that expenditure, Allen will consider in good faith Distributor's request to reduce the scale of the theatrical release for that Picture in accordance with a release plan to be provided by Distributor summarizing Distributor's proposed theatrical release and marketing campaign. Distributor may also request to release any Picture on a shorter window than as set forth in Section 13(a) of the Wonder Wheel Agreement.  Allen will respond to any such request within 10 days of Distributor's request with approval or disapproval, but any such decision will be in his sole, reasonable discretion.  Allen will consider whether other Majors or Mini-Majors  have released feature films with budgets similar to the Picture from Academy-award winning directors on a shorter window.   For instance, it would be presumptively reasonable if two of the Majors or Mini-Majors (as defined below) release feature films with budgets similar to the Picture from Academy-award winning directors in any manner other than theatrical release prior to 90 days following theatrical release (i.e., a shorter window), though, for clarity, Allen may elect to approve or disapprove in his sole discretion.  **"Majors or Mini-Majors"** means the six majors or Lionsgate, Roadside, Weinstein, STX, Open Road, Amblin, or MGM or specialty divisions of the foregoing (e.g., Sony Pictures Classics).

    b.    <u>Subdistributors</u>:  For each Picture licensed hereunder, Licensor and Distributor will mutually agree with respect to the theatrical distributor of the Picture in the Domestic Territory; provided, however, Licensor's approval will be deemed given if no disapproval is received within 10 days of Licensor's receipt of Distributor's written request for approval and Distributor, as well as Lionsgate and Sony Pictures Classics are hereby deemed mutually approved.  Approval of all other subdistributors of the Picture will be subject to the terms of the Picture Agreement, including, without limitation, the Creative Rights

CONFIDENTIAL

Rider.

4.      Domestic Pictures:  Licensor hereby licenses two Picture (respectively, the "**WASP 2017**" and the "**WASP 2018**" and together, the "**Domestic Pictures**") on the terms set forth in the Wonder Wheel Agreement as modified below.

      a.   In addition to the Specifications, the WASP 2017 will have the following specifications:

            i.   Budget: Gross budget of at least $18,900,000.  Licensor represents and warrants that this budget does not include financing costs, interest or overhead.

            ii.  MG: An MG of $9,000,000 will be due and payable to Licensor by Distributor and paid to the collection account manager designated by Licensor as follows (a) 10% within fifteen days following delivery to Distributor of a fully-executed copy of this Agreement to Distributor, (b) 80% within 30 days following the later to occur of Distributor's approval of the complete chain of title for the Picture and completion of "**Essential Delivery**" of the Picture to Distributor (i.e., delivery to Distributor and Distributor's technical acceptance of all materials identified as essential on Schedule A attached hereto, which has been updated to reflect the essential items) but not prior to August 15, 2018, and (c) 10% ("**Holdback**") following complete Delivery of the Picture. Notwithstanding the foregoing, Distributor will pay the full MG less the Holdback, as applicable, no later than Distributor's first commercial release of the Picture in the Territory in any medium; provided, however, that if upon such date of release complete Delivery has not been accepted by Distributor in accordance with the terms herein, Distributor will be entitled to withhold the Holdback until such time as complete Delivery has been accepted hereunder.

           iii. The Outside Delivery Date means August 15, 2018.

           iv.  Outside Release Date means 4 months after the Outside Delivery Date.

      b.   In addition to the Specifications, the WASP 2018 will have the following specifications:

            i.   Budget: Gross budget of at least $19,200,000.  Licensor represents and warrants that this budget will not include financing costs, interest or overhead.

            ii.  MG:  An MG of $9,000,000 will be due and payable to Licensor by Distributor and paid to the collection account manager designated by Licensor as follows (a) 10% within 45 days prior the scheduled start of principal photography, (b) 80% within 30 days following the later to occur of Distributor's approval of the complete chain of title for the Picture and completion of Essential Delivery, and (c) 10% Holdback following complete Delivery of the Picture.  Notwithstanding the foregoing, Distributor will pay the full MG less the Holdback, as applicable, no later than Distributor's first commercial release of the Picture in the Territory in any medium; provided,

CONFIDENTIAL

however, that if upon such date of release complete Delivery has not been accepted by Distributor in accordance with the terms herein, Distributor will be entitled to withhold the Holdback until such time as complete Delivery has been accepted hereunder.

    iii.    Outside Delivery Date will be in 2019.  At least 60 days before commencement of production on WASP 2018, Licensor will provide to Distributor the Outside Delivery Date, and the principal dates of preproduction, principal photography and post-production.

    iv.    Outside Release Date means 4 months after the Outside Delivery Date.

  c.    For the WASP 2017 and WASP 2018, Licensor will use good faith efforts to secure a first negotiation right for Distributor to acquire the Amazon On Demand rights in the international territories (i.e., all territories other than the Domestic Territory).

5.    Worldwide Films:

  a.    Pictures:  Licensor hereby (a) licenses the exclusive rights set forth in the Wonder Wheel Agreement to two Pictures, one with an Outside Delivery Date in 2019 (the "**WASP 2019**") and the other with an Outside Delivery Date in 2020 (the "**WASP 2020**"), and (b) grants to Distributor the exclusive option to license the rights set forth in the Wonder Wheel Agreement to two further films, one with an Outside Delivery Date in 2021 (the "**WASP 2021**") and the other with an Outside Delivery Date in 2022 (the "**WASP 2022**" and together with the WASP 2019, the WASP 2020, the WASP 2021, and the WASP 2022, the "**Worldwide Films**"), provided that, in each case, the Territory for the Worldwide Films is worldwide.  For clarity, Distributor hereby agrees to license and finance WASP 2019 and WASP 2020 in accordance with this Agreement.  If Distributor does not exercise its option to acquire the WASP 2021, then Distributor will not have the option to license the WASP 2022, and if Distributor does exercise the option to WASP 2021, it will also be deemed to have exercised its option to WASP 2022 (i.e., it's a two picture option).  At least 6 months before commencement of production on any Worldwide Film, Licensor will provide to Distributor a top sheet for the gross budget (and the net budget, if different) in the form set forth on Exhibit B, the actual outside delivery date, the proposed dates of preproduction, principal photography and post-production, and, to the extent known, the anticipated cast for that Worldwide Film.  Distributor will have 30 days within which to exercise its option by written notice to Licensor.  If Distributor does not exercise its option within that 30-day period, then Licensor will have no obligation to Distributor with respect to that Picture hereunder.

  b.    MG:

    i.    Amount:  For each Worldwide Film licensed hereunder, Distributor will pay an MG equal to the gross budget (less soft monies or incentives received) for the applicable Worldwide Film, provided that the final gross budget for that Worldwide Film and any preceding Worldwide Film averages between $25,000,000 and $27,500,000, with annual adjustments for inflation at the prime rate as reported by the Wall Street Journal (or, if the Wall Street Journal no longer exists, a similarly reputable publication) and provided,

CONFIDENTIAL

further, that the budgets will not include, and Distributor will not be obligated to pay for, financing costs, interest, or overhead.  For example, the WASP 2019 must have a gross budget of between $25,000,000 and $27,500,000, and the WASP 2019 and WASP 2020 must have an average gross budget of between $25,000,000 and $27,500,000 (assuming no inflation).

ii.  <u>Incentives</u>:  Distributor will be entitled to receive or receive the benefit of any tax credit, soft monies or incentives received with respect to each Worldwide Film licensed hereunder ("<u>Incentives</u>") according to the terms set forth hereinbelow.  If an Incentive for a Picture is received by Licensor (or its affiliate, e.g., in the event that Licensor sets up an affiliated production entity) such that it can be applied against production costs for a Picture (e.g., in the case of an upfront rebate), Licensor will apply, or cause to be applied, the received portion of the Incentive against the production costs for that Picture thereby reducing the amount that the Distributor needs to recoup (or pay, depending on timing) as an MG.  If an Incentive cannot be applied against the production costs for a Picture (e.g., because it is a credit received after the production costs are paid and submitted to the applicable tax authority), then within 45 days of receipt of the applicable Incentive: (a) if the Incentive is transferrable, Licensor will transfer, or will cause to be transferred, the Incentive to Distributor or (b) if the Incentive is not transferrable, Licensor and Distributor will work together in good faith (using Distributor's tax advisors at Distributor's expense) to either (1) obtain a notice of irrevocable assignment to pay Distributor an amount equal to the value of the Incentive (if such a notice is permissible under the applicable tax credit regime) or (2) if no such notice is permissible, pay directly to Distributor cash equivalent to the actual value of the Incentive theretofore received as a tax benefit to Licensor or its affiliate, as applicable.

iii.  <u>Timing</u>:  The MG for each Worldwide Film licensed hereunder will be due and payable to Licensor by Distributor following Distributor's receipt of an endorsement of Distributor as loss payee under the essential elements insurance policy up to the amount paid by Distributor to Licensor at the time of abandonment due to death or incapacity of Allen but otherwise in accordance with the cash flow schedule provided by Licensor to Distributor, which cash-flow schedule will be reasonably determined by Licensor as necessary to cash-flow the Picture, but in any event no sooner than the applicable percentage of MG is payable under the Wonder Wheel Agreement.

iv.  <u>Marketing Materials</u>:  For the Worldwide Films, Section 14 (Marketing Materials) (which relates to sharing of marketing materials) is hereby deleted.

v.  <u>Participation</u>:

CONFIDENTIAL

      i.      The Gross Receipts from the Domestic Territory and the international territories may be cross collateralized within each Worldwide Film but not across Worldwide Films.

      ii.     In any Territory where Distributor licenses Rights to a Picture to a third-party subdistributor, the Gross Receipts for exploitation of any Picture on Amazon on Demand or TVOD will equal the amounts actually received or irrevocably credited by Distributor from the applicable subdistributor with respect to such exploitation, provided that if the minimum guarantee payable by the subdistributor does not include payment for the Amazon on Demand or TVOD rights and the subdistributor licenses them back to Distributor without payment or, in lieu of that license, Distributor retains the Amazon on Demand and TVOD rights and Distributor does not pay the subdistributor for such rights (i.e., the result is the same as a license without payment, but structurally Distributor is just retaining the rights without licensing them back), then Distributor will include in Gross Receipts its rate card for such rights. For clarity, for purposes of calculating the imputed fee in Section 9(d)(i) of the Picture Agreement, the Territory means the Domestic Territory.

      iii.    For purposes of calculating Defined Proceeds (as defined in the Picture Agreement), the collection account manager's expenses will not exceed $1,000 per year.

c.     <u>Release</u>. For the Worldwide Films, Section 6 (Holdbacks) is hereby deleted, and for purpose of the release commitment in Section 13(a), the Territory means the Domestic Territory.

d.     <u>Subdistributors</u>. For each Worldwide Film licensed hereunder, Licensor and Distributor will mutually agree with respect to the theatrical distributor of the Picture in the Territory; provided, however, Licensor's approval will be deemed given if no disapproval is received within 10 days of Licensor's receipt of Distributor's written request for approval. For the Domestic Territory, the Majors and their specialty divisions, as well as Distributor, Lionsgate, and Sony Pictures Classics are hereby deemed mutually approved. Approval of all other sub-distributors acquiring all distribution rights for sale in the Picture in any territory in the rest of the world (i.e., worldwide excluding the Domestic Territory) (the "**ROW Territory**" and such distributors, the "**ROW Subdistributors**") will be subject to the terms set out below: the Picture Agreement, including, without limitation, the Creative Rights Rider.

      i.      In the event that Distributor engages a sales agent for the sale of the Worldwide Films in the ROW Territory, Distributor shall submit the identity of the agent and the terms of such agreement for approval by Licensor, with FilmNation hereby approved

      ii.     Distributor shall submit the identity of each ROW Subdistributor within the ROW Territory to Licensor for approval; provided, however, (a)

CONFIDENTIAL

Licensor's approval will be deemed given if no disapproval is received within 10 days of Licensor's receipt of Distributor's written request for approval and (b) the distributors on <u>Exhibit C</u> attached hereto are preapproved. Licensor shall approve the identity of each ROW Subdistributor with which Licensor entered into an agreement for the distribution in the relevant territory of either WASP 2017 or WASP 2018 unless Licensor has reasonable grounds to object to that ROW Subdistributor. Distributor will consult with Licensor on the applicable terms proposed with ROW Subdistributors, including with respect to the minimum guarantee, term, payment terms, and back-end splits for theatrical, home video, SVOD/TV, and EST/VOD.

iii. Distributor shall enter into agreements with such ROW Subdistributors that will require them to comply with Exhibit WA, which will be attached thereto. Distributor shall not enter into any sub-distribution agreements for the Worldwide Films in the ROW Territory that exceed the Term.

iv. If Distributor engages a delivery agent for any Worldwide Film in the ROW Territory, Distributor shall engage Schedule 2 as the delivery agent (provided that Distributor and Schedule 2 can agree on mutually acceptable terms) and Schedule 2 shall oversee delivery of the Worldwide Film employing the usual protocols in place for the WASP films. Any other delivery agent will be subject to Licensor's approval.

v. Distributor shall direct sub-distributors to contact Licensor directly with regard to all approvals requests required under Exhibit WA, including, without limitation, all artwork, title, release dates, screenings.

vi. In the event that Distributor engages a sales agent for the sale of the Worldwide Films in the ROW Territory, Distributor shall instruct the sales agent to provide Licensor with copies of all royalty statements provided by sub-distributors upon receipt.

6. <u>Advance</u>:  Within 15 days of the later of the two signatures dates set forth below, Distributor will pay to Licensor $10,000,000 (the "**Advance**"), which is recoupable from Licensor's Share on each of the Worldwide Films, on an un-cross-collateralized basis, with a maximum of $2,500,000 recoupable per Worldwide Film. For clarity, if WASP 2017, WASP 2018, WASP 2019, and WASP 2020 are delivered and Distributor does not exercise its option for WASP 2021 and WASP 2022, then Distributor will not be entitled to any refund of the Advance.  Without limiting Distributor's remedies hereunder or under any Picture Agreement, if Licensor fails to Deliver any Picture licensed hereunder other than due to death or disability and fails to cure such failure as set forth in Section 8.a, then Licensor will reimburse to Distributor the Advance less one-sixth thereof for each Picture Delivered in accordance with the applicable Picture Agreement.

CONFIDENTIAL

7.   First Look. Licensor will provide, or cause Allen to provide, an exclusive first look ("**First Look**") at all literary and visual materials that Licensor or Allen intend to exploit, and Distributor will have 30 days to review the materials, and, if Distributor elects to pursue exploitation of the materials, the Parties will negotiate the terms of such exploitation in good faith within that 30 day period or such longer period as the Parties may agree. For clarity, the First Look will not include materials that Allen or Distributor already exploited or licensed for exploitation prior to the Effective Date (e.g., an old movie that reverts to Allen), but would include, for instance, an unexploited script that Allen may have developed in the past and intends to make after the Effective Date.

8.   Delivery:

   a.   Without limiting Distributor's remedies under the applicable Picture Agreement: If Licensor fails to Deliver any Picture licensed hereunder by the Outside Delivery Date, Distributor will have no obligation to license that Picture or any subsequent Picture, and in no event will Distributor be obligated to license and pay for more than one film per year from 2017 through 2022, subject in each case to the last sentence of Section 25(iii) of the Picture Agreement (i.e., the cure provision). If Allen is unavailable to complete and deliver any Picture as required by the applicable Picture Agreement, Licensor will pay, or cause to be paid, the amount of the MG actually paid by Distributor to Licensor for that Picture within 90 days of Distributor's notice unless Licensor cures such failure within 15 business days of Distributor's notice and notifies Distributor of the same. If Distributor expends its own funds to cure or remedy any failure to Deliver any Picture, Distributor may deduct such amounts payable to Licensor in respect of that Picture.

   b.   For all Picture Agreements, Sections 12(ii) of the Wonder Wheel Agreement (which were intended to address the situation where Licensor was unable to obtain foreign financing) is not incorporated into the Picture Agreements, and Section 12(iii) is hereby revised to read as follows: "In the event of termination of this Agreement pursuant to Section 12(i), without limiting Distributor's other rights and remedies hereunder, Distributor will have no obligations to Licensor in connection with the Picture and vice versa (subject to Licensor's refund as set forth herein) and Licensor will refund to Distributor any monies paid by Distributor to Licensor hereunder plus interest thereon at LIBOR + 1% within two weeks of Licensor's receipt of such termination notice."

9.   Miscellaneous:

   a.   Audit: Licensor will have the audit rights set forth in the applicable Picture Agreement. Following completion of post-production, within 15 days of Distributor's request, Licensor will deliver to Distributor a preliminary final cost report for each Picture in the form set forth on Exhibit B, and within 6 months thereafter, a final cost report certified as true and correct by a certified account and an officer of Licensor.

   b.   Tax: Except as otherwise specified in this Section, each Party will be responsible for its own taxes as levied by the applicable taxing authorities. All payments payable by Distributor under this Agreement are inclusive of all applicable national, state or local sales or use taxes or value added taxes ("**Transaction Taxes**"). If and to the extent any payments hereunder are subject to any applicable Transaction Taxes, on or before the date payment is due, the payee will supply Distributor with an original, valid tax invoice separately stating these Transaction Taxes, to enable Distributor to claim credit for these

CONFIDENTIAL

taxes as applicable.  If taxes (other than Transaction Taxes) are required to be deducted or withheld on any payments to be made by Distributor, then Distributor will (a) deduct such taxes from the amount owed to the payee and pay them to the appropriate taxing authority and (b) secure and deliver to the payee a receipt or other required documentation for any taxes withheld as required under applicable laws.  Payment to any payee as reduced by such deductions or withholdings will constitute full payment and settlement to such payee of amounts payable under this Agreement.  Licensor will provide Distributor with any forms, documents, or other certifications as may be reasonably required by Distributor to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement.  Notwithstanding any other provision herein, each Party will indemnify the other Party against any interest or penalties that arise with respect to the non-indemnifying Party's reliance on forms, documents or other certifications provided by the indemnifying Party pursuant to this subsection b.

c.   Publicity and Press Releases:  Licensor will not make any announcement in connection with this Agreement, including, without limitation, press releases and social media mentions, without the prior written consent of Distributor.  Subject to the terms of this Agreement, including, but not limited to, the Creative Rights Rider attached to the Wonder Wheel Agreement, Distributor will control publicity (including, without limitation, social media mentions), and will have the exclusive right to issue all press releases in connection with this Agreement, subject to Allen's approval (to be exercised in accordance with the process set forth in Paragraph 2(c) of the Creative Rights Rider).  In addition, Distributor will have the right to use Allen's name, approved bio, approved photo and/or approved likeness in connection with the marketing and publicity of this Agreement, but for no other purpose without the express written consent of Allen in his sole and absolute discretion.  Allen (and/or Allen's representatives) will provide Distributor with a minimum of 2 quotes related to this Agreement and the Pictures (or will approve quotes provided by Distributor) in connection with the initial press release and the launch day press release. Distributor acknowledges that Allen is not contractually obligated to perform publicity services in connection with this Agreement but, should Allen agree to do so at Distributor's request, Allen will be provided with exclusive ground transportation, a hotel suite and private jet travel (G4 or better).

d.   Confidentiality: The Parties agree to keep the terms of this Agreement and (until the distribution of the initial press release by Distributor) the existence of the Agreement and identity of Distributor, confidential (except with respect to legal, financial and other company executives and professional advisors).  Licensor will not release to any third party any confidential or proprietary information owned or controlled by Distributor (including, but not limited to, any agreements, research and development information, designs and specifications, screenplays and advertising plans and materials), without the prior, express, written authorization of Distributor.

CONFIDENTIAL

    e.    <u>Representations</u>:  Each of the Parties represents and warrants that it has all rights and sole authority necessary to enter into and perform the terms of this Agreement.  Licensor represents and warrants that there are no claims pending or threatened in writing concerning the rights granted hereunder, nor will the grant of such rights to Distributor or the exploitation of such rights by Distributor in accordance with this Agreement violate any agreement or order to which Licensor is a party or trigger any consent or approval rights in any third party.

    f.    <u>LIMITATION OF LIABILITY</u>:  EACH PARTY HEREBY WAIVES ALL CLAIMS AGAINST THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES AND LICENSOR HEREBY WAIVES ALL CLAIMS TO DAMAGES OF ANY KIND RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR TORT AND UNDER ANY THEORY OF LIABILITY, IN EXCESS OF $15,000,000 AND DISTRIBUTOR'S ENTIRE LIABILITY TO LICENSOR FOR SUCH DAMAGES WILL NOT EXCEED $15,000,000. NOTWITHSTANDING THE FOREGOING, THIS PROVISION WILL NOT BE DEEMED TO WAIVE OR LIMIT ANY OF EITHER PARTY'S RIGHTS AT LAW TO ENFORCE THIS AGREEMENT WITH RESPECT TO PAYMENTS DUE TO SUCH PARTY FROM THE OTHER PARTY. FOR CLARITY, THE FOREGOING LIMITATION APPLIES ONLY TO CLAIMS UNDER THIS AGREEMENT AND NOT A CLAIM UNDER THE APPLICABLE PICTURE AGREEMENT. EACH PARTY WAIVES ANY AND ALL CLAIMS TO DAMAGES OF ANY KIND UNDER THIS AGREEMENT WITH RESPECT TO ANY PICTURES LICENSED PURSUANT TO A PICTURE AGREEMENT AND WILL INSTEAD BRING ANY SUCH CLAIMS ONLY UNDER THE APPLICABLE PICTURE AGREEMENT AS IF THE APPLICABLE PICTURE AGREEMENT WERE A STANDALONE AGREEMENT.

    g.    <u>Relationship of the Parties</u>: Nothing contained herein will be deemed to create a relationship of agency, partnership, joint venture, legal representation or agency between the Parties, and neither Party will be authorized to act on behalf of the other.     Without limitation of the foregoing, the Parties agree that the relationship between Distributor and Licensor as set forth herein does not constitute a partnership for U.S. tax purposes, and covenant not to take any position inconsistent with such treatment.

    h.    <u>Assignment</u>: Distributor will have the right to assign or transfer this Agreement and/or any of Distributor's rights hereunder to any person, firm or corporation; provided that Distributor will remain secondarily liable to Licensor unless (i) such assignee or transferee is (a) a person or entity into which Distributor merges or is consolidated, (b) a person or entity which acquires all or substantially all of Distributor's business and assets, (c) a person or entity which is controlled by, under common control with, or controls Distributor, or (d) any major or "mini-major" motion picture company or United States television network, in which case Distributor shall be relieved of any and all obligations and liability hereunder and (ii) such assignee or transferee accepts in writing Distributor's

CONFIDENTIAL

obligations hereunder. Distributor shall give Licensor written notice of any such assignment and acceptance provided that inadvertent failure to do so will not be deemed a breach hereof.  Licensor will not have the right to assign or transfer this Agreement. However, Allen may assign the right to receive money hereunder to a third party by providing an executed payment direction form reasonably acceptable to Distributor and by providing the payment information requested by Distributor, provided that Distributor may prohibit such assignment only if payments to such assignee would create any additional tax liability for Distributor or create risk to Distributor of legal liability under applicable law as reasonably determined by Distributor.

i.  Section 365(n):  The Parties intend that all Rights and other rights granted herein to Distributor are, for purposes of Section 365(n) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and any similar provisions of applicable laws of other jurisdictions ("Other Bankruptcy Laws"), fundamentally in the nature of "intellectual property" as defined in Section 101 of the Bankruptcy Code and similar provisions of Other Bankruptcy Law.  If a court in any bankruptcy case in which Licensor is a debtor treats any grant or transfer by Licensor of any interest in such Rights or other rights granted herein as an executory contract under Section 365 of the Bankruptcy Code or similar provisions of other Bankruptcy Laws, then Distributor and any other transferee or holder of the interest shall be entitled to all the protections and rights of a licensee under Bankruptcy Code Section 365(n) and similar provisions of Other Bankruptcy Laws, including the right to make an election to retain its rights as a licensee under Section 365(n)(l)(B) of the United States Bankruptcy Code and similar provisions of Other Bankruptcy Laws.  Distributor is not in this agreement making an election under section 365(n).

j.  Section 409A: It is the intention of the Parties that all payments in whatever form made or payable under the Agreement (including all related attachments, agreements and schedules thereto) shall be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder ("Section 409A") by reason of being license fees not in the nature of "compensation" for purposes of Section 409A, and being payable to an independent third party providing substantial products and services to multiple unrelated parties; accordingly, this Agreement should be construed in a manner consistent with such intention. Notwithstanding the foregoing, in the event any such payments should be deemed subject to Section 409A and not otherwise compliant therewith, the Parties will negotiate reasonably and in good faith to take such actions as may be commercially reasonable in order that such payments comply with, or are exempt from, Section 409A within the time period contemplated by Section 409A and applicable authority related thereto, including IRS Notice 2010-6 or other comparable IRS authority. Each payment provided for under this Agreement (including all related attachments, agreements and schedules thereto) shall be treated as a separate payment for purposes of Section 409A, to the extent applicable.  All payments under the

CONFIDENTIAL

Agreement shall be paid promptly (within the short term deferral period under 409A, to the extent applicable) following the date or event establishing Licensor's entitlement to such payment. For the avoidance of doubt, Distributor does not guarantee the tax treatment of any payments provided under this Agreement (including all related attachments, agreements and schedules thereto), whether pursuant to Section 409A or otherwise.

k.   Governing Law:  This Agreement will be governed by the laws of the State of New York, without reference to rules governing choice of law.  The Parties hereby irrevocably consent to the exclusive jurisdiction and venue of the federal and state courts located in New York County, New York with respect to any claims, suits or proceedings arising out of or in connection with this Agreement, and waive any claim or defense that any such court is an inconvenient or improper forum.  The Parties further waive any right to jury trial in any such claim, suit or proceeding.  In the event of any dispute under this Agreement, Licensor's sole remedy will be to pursue an action at law for money damages, and Licensor will not seek to or be entitled to enjoin the distribution, advertising or exploitation of the Picture or terminate or rescind this Agreement.  Neither Party will be in breach of this Agreement until they have received written notice from the non-breaching party and been given a 15 business day opportunity to cure following receipt of such written notice.

l.   Notices: Any notice required or permitted to be given under this Agreement shall be in writing and shall be sent by Federal Express, DHL or other recognized international courier service or by facsimile or electronic transmission (unless otherwise indicated herein) and shall be effective the earliest of (a) actual receipt, or (b) on the third business day after dispatch by Federal Express, DHL or other recognized international courier service, or (c) the next business day after such notice shall have been given by facsimile transmission with electronic answerback confirmation or electronic transmission. A "business day" shall mean any weekday (i.e., Monday through Friday) during which banks are generally open in the United States. Unless otherwise specified by written notice, the address for any such notice to Licensor shall be c/o Perdido Productions, 135 West 26th Street, 11th Floor, New York, NY 10001, Attn: Helen Robin.  A copy of all notices to Licensor shall be sent to: (1) Erika Aronson and Adam Stern, 23611 Malibu Colony Road, Malibu, CA 90265; and (2) Loeb & Loeb, LP, 10100 Santa Monica Blvd., Suite 2100, Los Angeles, CA 90067, Attn: Craig Emanuel and Erik Hyman.  Unless otherwise specified by written notice, all notices hereunder to Distributor will be sent to: Amazon Studios, c/o Amazon.com, Inc., 410 Terry Ave. North, Seattle, WA 98109, Attn: General Counsel, Facsimile: 206-266-7010 with a copy to: Amazon Studios LLC, 1620 26th St., Suite 4000N, Santa Monica, CA 90404, Attn: Assistant General Counsel.

m.   Counterparts: This Agreement may be executed in counterparts (including by facsimile or pdf), each of which will be deemed an original and all of which will constitute one and the

CONFIDENTIAL

same instrument. This Agreement is not effective until signed and delivered by both Parties and once signed and delivered by both Parties, this Agreement will be effective as of the date first set forth above.

n.      Entire Agreement:  This Agreement sets forth the entire and binding agreement between the Parties with respect to the subject matter hereof, and, will supersede and replace all prior or contemporaneous written or oral agreements pertaining hereto and can only be modified by a writing signed by both Parties.

[Signatures on the following page.]

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized officer as of the dates set forth below.

GRAVIER PRODUCTIONS, INC.

By: X _Woody Allen_

Name: _Woody Allen_

Title: _President_

Date Signed: _Aug-31-2017_

AMAZON CONTENT SERVICES, LLC

By: _____

Name: _____

Title: Vice President _____

Date Signed: _____

Acknowledging and agreeing with respect to Section 7 (First Look):

WOODY ALLEN

By: X _Woody Allen_

Date Signed: _Aug 31-2017_

DocuSign Envelope ID: E8939C7F-D628-46B4-A262-5A0354968805

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized officer as of the dates set forth below.

GRAVIER PRODUCTIONS, INC.                    AMAZON CONTENT SERVICES, LLC

By:_____                 By: _____
                                                 *Jason Ropell*
Name:_____                 Name: _Jason Ropell_____

Title:_____                 Title: _Vice President_____

Date Signed:_____                 Date Signed: _8/29/2017_____


Acknowledging and agreeing with respect to Section 7 (First Look):

WOODY ALLEN

By:_____

Date Signed:_____

# EXHIBIT A-2

CONFIDENTIAL

## Exhibit A
### Longform Acquisition Agreement for Wonder Wheel

Attached

CONFIDENTIAL
NON-PRECEDENTIAL

### LONG FORM ACQUISITION AGREEMENT
### "UNTITLED WOODY ALLEN PICTURE"

This Agreement ("Agreement"), effective as of July 22, 2016 ("Effective Date"), is made between Amazon Content Services LLC ("Distributor") and Gravier Productions, Inc. ("Licensor"), in connection with the exclusive grant of certain rights in and to the Picture (as defined in Section 1 below) to Distributor by Licensor.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Picture Specifications: The **"Picture"** means the motion picture project currently known as the "Untitled Woody Allen Picture" to be filmed by Woody Allen ("Allen") in 2016 which will conform to the following specifications ("Specifications"):

    (i)      Title: To be determined by Allen. Licensor will be solely responsible for clearance of the title in the Territory and should the title designated by Licensor not be cleared in the Territory, Licensor will designate an alternate cleared title.

    (ii)     Screenplay:  Woody Allen

    (iii)    Director:  Woody Allen

    (iv)    Cast:   Kate Winslet, Jim Belushi, Justin Timberlake and Juno Temple, or such replacement as may be selected and determined by Allen in his sole discretion.

    (v)     Producer:  Letty Aronson, Erika Aronson, Edward Walson

    (vi)    Cinematographer: Vittorio Storaro

    (vii)   Technical Specifications: The Picture will be photographed in color, and will be of first class technical quality. The Picture will be a substantially new and original feature-length motion picture telling a continuous story with all necessary dialogue (which dialogue is originally recorded in the English language), music, lyrics and sound effects, fully edited, titled, and assembled with the soundtrack fully synchronized with the photographic action thereof. The Picture has been shot in 4K and will be delivered in 4k and as per the Delivery Schedule attached hereto as Schedule A.

    (viii)  Rating: The Picture will be capable of receiving an MPAA rating no more restrictive than R.

    (ix)    Language:  The Picture will be in the English language.

    (x)     Running Time: The Picture will have a running time (exclusive of credits) of no less than 85 minutes and no more than 120 minutes.

2.      Rights: Licensor hereby irrevocably grants to Distributor and its affiliates on an exclusive, transferable and sublicensable basis a one-picture license in all distribution rights in and to the Picture (under copyright and otherwise) and all characters and literary and artistic material contained therein, for any and all versions of the Picture, in any and all manner, media, technology or device now known or hereafter devised in which exploitation of the Picture or any portion thereof may occur, in the original version and original version subtitled and/or dubbed into Spanish, French, German, Italian, Chinese, Korean, Japanese and/or Portuguese as well as any other languages approved by Allen (such approval

1

not to be unreasonably withheld or delayed and Distributor will first request access to foreign tracks from Licensor prior to creation of same which creation, if any, will be subject to the "Creative Rights Rider" as defined in Paragraph 10 below) for airline rights (provided that airline rights may not be exercised until 6 months after the initial theatrical release of the Picture in the Territory) and for all other rights licensed herein, original version subtitled and/or dubbed into French and/or Spanish, throughout the Territory (as defined in Section 4) during the Term (as defined in Section 5), excluding only the Reserved Rights (as defined in Section 3), but including, without limitation, theatrical, non-theatrical, all forms of television (including, without limitation, free, pay, pay per view, terrestrial, satellite, cable and near video-on-demand), all forms of home video or other home viewing technology now known or hereafter devised (including without limitation, cassette, videodisc, DVD, HD DVD and Blu Ray, electronic sell-through and download-to-own, and all forms of subscription, rental and video-on-demand), online/internet, digital streaming, interactive, airlines, ships, hotel/motel, clips (for promotional use only), mobile (e.g., cell phones), and the right to advertise, publicize and promote any and all of the foregoing, and further including the right to take such steps as Distributor deems appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Picture, or any infringement of the copyright on the Picture or to prevent any impairment of, encumbrance on, or infringement upon the rights of Distributor under this Agreement (collectively, the "Rights").

3.    Reserved Rights.

(i)    Subject to this Section 3, Licensor hereby reserves any rights in and to the Picture not expressly granted to Distributor hereunder, including, without limitation, Subsequent Production, live stage, soundtrack, music publishing, merchandising (including, without limitation, interactive games and devices, electronically read, digitized, interactive and computer-based or computer-assisted systems, devices and services), novelization, comic book, theme park rights, commercial tie-ins, clips (except to advertise, publicize and promote the Picture which are included in the Rights granted hereunder) and screenplay publishing rights (collectively, the **"Reserved Rights"**). As used herein, **"Subsequent Production"** means any audiovisual derivative works of any kind and nature (e.g., any theatrical prequels, sequels, remakes, television series, mini-series or other television productions, direct-to-video productions, animated productions, or any other prequel, sequel or remake productions intended to be exploited in any audiovisual medium) based in whole or in part upon the Picture or any element thereof or any underlying material related thereto.

(ii)    The Subsequent Production rights may not be exercised, optioned, assigned, granted or otherwise encumbered or disposed of to any third party except as follows: During the Term, Distributor will have the exclusive first right to negotiate with Licensor, for a period of 30 business days, with respect to each of the Subsequent Production rights. In the event Licensor and Distributor do not agree on terms with respect to the exploitation of the applicable Subsequent Production rights within the 30 day period, then Licensor may contact third parties for the purpose of exercising, selling or otherwise disposing of the applicable Subsequent Production rights, and Licensor will be free to dispose of    the

applicable Subsequent Production rights to third parties without further obligation to Distributor; provided, however, that Licensor will not authorize the release of any Subsequent Production by a third party until the date that is 3 years following Distributor's initial release of the Picture hereunder.

4.      Territory: The "Territory" means the United States and Canada, the Bahamas, Bermuda and their respective territories and possessions (including, without limitation, Guam, Puerto Rico, the U.S. Virgin Islands, the Caroline Islands, American Samoa, Northern Marianas Islands and Wake Islands) and armed forces and military installations of the foregoing wherever located throughout the universe, and airlines, ships and oil rigs flying the respective flags of any of the foregoing. Notwithstanding the foregoing, Distributor's rights in the Bahamas and Bermuda shall be limited to non-exclusive English and non-exclusive Spanish language rights.

5.      Term: The "Term" begins on the Effective Date and continues for 20 years following the earlier of (a) Delivery of the Picture (as defined below) and (b) the date of the first commercial release of the Picture by Distributor; provided that if Distributor has not recouped the Distribution Costs and the MG (each as defined and recouped in accordance with the terms hereof) at the end of such period, then the Term will be automatically extended for 5 additional years. Upon conclusion of the Term, Distributor will have the exclusive first right to negotiate with Licensor, for a period of 30 days, with respect to any further renewal, extension or license of the Picture in the Territory. In the event Licensor and Distributor do not agree on terms with respect thereto within the 30 day period, then Licensor will be free thereafter to license the Picture to a third party without any further obligation to Distributor.

6.      Holdbacks: Licensor will not exploit (or authorize the exploitation of) the Picture anywhere in the universe in any media (including, without limitation, festival screenings, premieres or any other public screenings) until the earlier of the initial commercial release in the United States (to the general public and excluding any limited release for awards qualifications or private or festival theatrical screenings) and, subject to timely Delivery, the Outside Release Date (as defined in Section 13(a) below); provided, however, subject to good faith meaningful consultation with Distributor, Licensor can screen the Picture privately, for award qualification and festivals outside of the Territory.

7.      MG: A minimum guarantee of $14,000,000 ("MG") will be due and payable to Licensor by Distributor as follows (a) $2,750,000 within three business days following delivery to Amazon of a fully-executed copy of this Agreement to Distributor, (b) $5,125,000 (the "Second Installment") upon the later to occur of (i) 42 days prior the scheduled start of principal photography but not prior to August 1, 2016 and (ii) Distributor's receipt of an endorsement of Distributor as loss payee under the essential elements insurance policy up to the amount paid by Distributor to Licensor at the time of abandonment due to death or incapacity of Allen, (c) $5,875,000 upon commencement of principal photography but not prior to      September      12,      2016,      and      (d)      $250,000

3

("Holdback") following complete Delivery of the Picture but not prior to August 15, 2017. For purposes of meeting the payment deadlines set forth in this Section 6, payment will deemed to have been received by Licensor upon Distributor's initiation of the wire transfer in accordance with the wire transfer instructions provided by Licensor. Notwithstanding the foregoing, Distributor will pay the full MG less the Holdback, as applicable, no later than Distributor's first commercial release of the Picture in the Territory in any medium; provided, however, that if upon such date of release complete Delivery has not been accepted by Distributor in accordance with the terms herein, Distributor will be entitled to withhold the Holdback until such time as complete Delivery has been accepted hereunder. The MG will be recoupable from and applicable against 100% of Defined Proceeds (as defined in Section 9(ii)).

8.       Award Advances: Provided Licensor is not in material breach or default of this Agreement, if the Picture is nominated for or wins (as applicable) the following awards, Distributor will pay Licensor the additional advances set forth below (collectively, the "Award Advances"). The Award Advances, if any, will be payable within 30 days following the announcement of nominations or wins for the applicable awards, and will be applicable against, and recouped from, Licensor's Share, as defined in Section 9. Other than as expressly set forth in this Agreement, Licensor acknowledges and agrees that Distributor is not assuming any third party payments, bonuses and/or participations in connection with the Picture other than the Award Bonuses.

   a.   If the Picture is nominated for a Golden Globe for Best Picture, Best Director and/or Best Screenplay or if an actor or actress in the Picture ("Talent") is nominated for a Golden Globe for Best Actress and/or Best Actor, then Licensor will be entitled to receive $25,000 for each such nomination. If the Picture wins a Golden Globe for Best Picture, Best Director and/or Best Screenplay or if Talent wins a Golden Globe for Best Actress and/or Best Actor, then Licensor will be entitled to receive $75,000 for each such win, and the nomination bonus for each category will be applicable against the win bonus for such category.

   b.   If the Picture is nominated for an Academy Award for Best Picture, Best Director and/or Best Screenplay or if Talent is nominated for an Academy Award for Best Actress and/or Best Actor, then Licensor will be entitled to receive $50,000 for each such nomination. If the Picture wins an Academy Award for Best Picture, Best Director and/or Best Screenplay or if Talent wins an Academy Award for Best Actress and/or Best Actor, then Licensor will be entitled to receive $100,000 for each such win, and the nomination bonus for each category will be applicable against the win bonus for such category.

9.   Licensor's Participation:

   (i)    "Licensor's Share" means (a) 10% of Defined Proceeds following Cash Breakeven (as defined herein) and (b) 50% of Defined Proceeds following Actual Breakeven (as defined herein).

   (ii)   "Defined Proceeds" will be defined pursuant to Schedule B attached hereto to be negotiated in good faith by the parties within Distributor's customary practices with respect to deals of this type taking into account Licensor's stature in the U.S. motion picture industry as of the Effective Date. The parties hereby agree that with respect to such definition of Defined Proceeds, the following with apply:

4

a. Cash Breakeven: For the purposes of calculating Cash Breakeven, the following will be deducted from Gross Receipts: actual third party distribution fees (not to exceed 15%), actual marketing and distribution costs and expenses (without overhead or interest as set forth in Section 9(ii)(g) below), the MG (plus interest as set forth in Section 9(ii)(g)), and Residuals (as defined in Section 13(d) below). The point at which all of the foregoing have been recovered by Distributor will be "Cash Breakeven."

b. Actual Breakeven: For the purposes of calculating Actual Breakeven, the following will be deducted from Gross Receipts: the Distribution Fee (which will be inclusive of actual third party distribution fees), marketing and distribution costs and expenses (without overhead or interest as set forth in Section 9(ii)(g) below), the MG (plus interest as set forth in Section 9(ii)(g)) and Residuals. The point at which all of the foregoing have been recovered by Distributor will be "Actual Breakeven."

c. Gross Receipts: "Gross Receipts" will equal (i) receipts from distribution of the Picture in the Territory by third parties at source, which will be accounted for as received by Distributor, plus (ii) receipts from distribution of the Picture by Distributor and its affiliates as set forth in Section 9(d) below.

d. Distribution by Distributor via Amazon Retail Distribution Channels: For distribution of the Picture by affiliates of Distributor (including, without limitation, distribution by Distributor's affiliates on Amazon Instant Video, Prime Instant Video and Amazon.com but not including third party sellers on Amazon.com) (collectively, the "Amazon Platforms"), the following amounts will be included in Defined Proceeds:

   i. Amazon On Demand Imputed Fee: For subscription, ad-supported or free video-on-demand on Amazon Platforms ("Amazon On Demand"), an imputed fee for all Amazon On Demand use equal to the following percentage of Receipts (as defined below), which such imputed fee will have a floor    of $1,000,000 and a cap of $10,000,000: (x) for Receipts up to $5,000,000, an imputed fee of 25% of those Receipts, (y) for Receipts from $5,000,001 to $10,000,000, an imputed license fee of 20% of those Receipts, or (z) for Receipts of $10,000,001 or greater, an imputed license fee of 15% of those Receipts. As used herein, "Receipts" means the theatrical box office of the Picture in the Territory as reported by *Rentrak* (or a reliable alternate replacement source used by Distributor) prior to the initial Amazon On Demand release.

   ii. Amazon TVOD Sales: For transactional video-on-demand, including   EST  and VOD on Amazon Platforms ("TVOD"): (x) 70% of non-refundable net retail revenue actually received by or credited to Distributor or its affiliates from Amazon TVOD during the first 12 months following theatrical release of the Picture in the Territory, and (y) thereafter, 60% of non-refundable net retail

5

revenue actually received by or credited to Distributor or its affiliates from Amazon TVOD; and

    iii. <u>Home Video Sales on Amazon Platforms</u>: For sales of hard goods home video media, the amount included in Defined Proceeds related to sales of such media by Distributor affiliates to retail customers will be the wholesale price paid to Distributor by third party retailers for such media.

e. <u>Distribution Fee and Distribution Costs</u>: Distributor's Distribution Fee will be 20% of Gross Receipts received by or irrevocably credited to Distributor in connection with any and all distribution of the Picture in any media in the Territory. The Distribution Fee will be inclusive of subdistributor fees, provided that if subdistributor fees are greater than 20%, Distributor will be entitled to deduct the full amount of such subdistributor fees as a distribution expense (and for clarity, Distributor will not have a right to charge any additional distribution fee to be retained by Distributor in connection with the same). No Distribution Fee will be collected on the Imputed fee for Amazon On Demand use by affiliates of Distributor (as set forth in Section 9(ii)d.i.). Distribution Costs will be as defined in <u>Schedule B</u>.

f. <u>Cross-Collateralization</u>: All receipts and distribution expenses with respect to the Picture will be cross-collateralized among all media and all territories comprising the Territory. For the avoidance of doubt, there will be no cross-collateralization for any purpose between Gross Receipts and Distribution Costs relating to this Agreement and Gross Receipts and Distribution Costs relating to any other agreement which may be entered into between Amazon and Licensor (i.e., Distributor will have no right to retain amounts due Licensor from Gross Receipts derived anywhere in the Territory in recoupment of unrecouped amounts arising out of the distribution of the Picture in in one or more territories outside the Territory).

g. <u>Interest and Overhead</u>: Distributor will recoup interest on the MG at LIBOR plus 1% calculated from the date of payment of the applicable portion of the MG to completion of delivery. Except as set forth in the preceding sentence, no internal interest or overhead shall be charged against the Defined Proceeds.

(iii)    From and after Distributor has recouped the Award Advances (if any) from Licensor's Share, Distributor will pay to Licensor the Licensor's Share, which will be payable (if any amounts are owed) 45 days after the end of each quarter during the Term. Distributor will provide statements of Licensor's Share payable to Licensor: on a monthly basis during the initial theatrical release (but in any event not less than a period of 90 days from the initial theatrical release) and thereafter on a quarterly basis 45 days after the end of each quarter during the Term, provided that, from and after two years after the initial theatrical release of the Picture in the United States, Distributor may elect to provide statements on a semi-annual basis. Notwithstanding the foregoing, no Statement will be required for any period that Licensor is not entitled to any payment unless Licensor requests statements in writing for such periods.

10.     Approvals: The Creative Rights and Approval Rights rider attached as Exhibit A ("Creative Rights Rider") is by reference incorporated herein, provided that the parties agree to the following changes:

   a.   Distributor will provide Licensor prior written notice (which may be via email) of screenings of the Picture prior to the theatrical release of the Picture in the Territory, and upon Licensor's request, Distributor will consult with Licensor with respect to those screenings.

   b.   Licensor will have approval over the placement of commercial breaks in the Picture to the extent that the platform via which the Picture is being distributed by or on behalf of Distributor allows for the designation of commercial breaks by Distributor or the applicable subdistributor.

   c.   Distributor will consult with Licensor on the initial theatrical release pattern for the Picture.

   d.   Distributor will consult with Licensor on any theatrical re-release of the Picture and if the Picture is re-released by or on behalf of Distributor, Distributor will order new prints for the re-release if requested by Licensor.

   e.   Distributor will contractually prohibit each subdistributor from distributing any version of the Picture other than the version provided to the subdistributor.

   f.   Licensor will have approval over trailers or ads included in the hard-media home video version of the Picture (if any) released by or on behalf of Distributor.

   g.   In the event of any conflict between any term or provision set forth in this Agreement or any other schedule or exhibit hereto, on the one hand, and the Creative Rights Rider, the Creative Rights Rider shall control.

11.     Reports, Consultation and Approvals:

   (i)    Distributor will have a right of prior written approval over any Changed Element of the Picture. As used herein, "Changed Element" means only a material change to any of the Specifications set forth in Section 1 above.

   (ii)   Distributor will have a right of prior written approval over any producer credit accorded in connection with the Picture other than those listed on Schedule E (which are hereby pre-approved), including, without limitation, "Executive Producer," "Producer" and "Co-Producer" credits.

12.     Delivery: All costs of delivery will be borne by Licensor. "Delivery" will mean delivery to and acceptance by Distributor by the Outside Delivery Date in accordance with the Specifications of all materials for the Picture set forth in a delivery schedule to be attached hereto, which schedule will be negotiated by the parties and which will include, without limitation, the items set forth on Schedule A and access to the original negative, delivery of all film, sound and video elements, E&O insurance certificate and music licenses. Licensor will Deliver the Picture to Distributor no later than June 30, 2017 ("Outside Delivery Date"). Time is of the essence with respect to Delivery by the Outside Delivery Date.

   (i)    If Licensor does not or cannot complete Delivery by the Outside Delivery Date or Licensor abandons the Picture, Licensor will promptly notify Distributor and Distributor will have the right, but not the obligation, upon written notice to Licensor, to terminate this Agreement.

   (ii)   Without limiting subsection (i), if Licensor and Distributor do not enter into a fully-executed agreement with respect to the remainder of the financing for the Picture to be provided in

7

connection with extra-Territorial rights (the "Foreign Agreement") within 30 days of the later of the two signature dates below, then either party hereto may terminate this Agreement by written notice to the other party, provided that Licensor may not terminate this Agreement if it has received the Second Installment, it being understood that, prior to the execution of the Foreign Agreement, Licensor may request in writing that Distributor not pay the Second Installment in order to preserve Licensor's termination right under this subsection (ii).

(iii)     In the event of termination pursuant to either Section 12(i) or 12(ii), Distributor will have no obligations to Licensor in connection with the Picture and vice versa (subject to Licensor's refund as set forth herein) and Licensor will refund to Distributor any monies paid by Distributor to Licensor hereunder plus interest thereon at LIBOR + 1% within two weeks of Licensor's receipt of such termination notice, it being agreed that, in the event of Distributor's termination under Section 12(i), the refund will not limit Distributor's other rights and remedies hereunder, but in the event of Distributor's termination under Section 12(ii), the refund will be Distributor's sole remedy and neither party will have any further obligation to the other subject only to Distributor's receipt of that refund.

13.     Release Commitment:

a.     Provided Licensor is not in material breach or default hereof (including, without limitation, completion of Delivery of the Picture no later than the Outside Delivery Date), Distributor or its affiliates or subdistributors will initially release the Picture in the Territory (i) no later than December 31, 2017 ("Outside Release Date") (provided such date will be automatically extended for events of force majeure, in the event Distributor receives any third party claims relating to the Picture that are not finally resolved in writing executed by Distributor with the applicable third party by a date that leaves Distributor sufficient time to market, publicize, promote and release the Picture by the intended release date, in the event Distributor is prevented by law or court order from exercising its rights hereunder or in the event Distributor in its good faith business and legal judgment believes releasing the Picture by such date will result in civil or criminal liability) and (ii) in 20 of the top 25 ADIs (as then reported by Arbitron or its successor) including all of the top 5 ADIs and (iii) on a minimum of 500 screens at its widest point of release non-simultaneously within the first 6 weeks following the initial theatrical release.

b.     Licensor and Distributor will mutually agree with respect to the theatrical distributor of the Picture in the Territory; provided, however, Licensor's approval will be deemed given if no disapproval is received within 10 days of Licensor's receipt of Distributor's written request for approval and Lionsgate is hereby deemed mutually approved. All other subdistributors of the Picture will be at Distributor's discretion and subject to the terms hereunder.

c.     Except as expressly set forth in the Creative Rights Rider, all other aspects of the exploitation of the Picture in the Territory will be determined by Distributor in its sole discretion; provided, however, that Distributor agrees that the first release of the Picture in the Territory will be theatrically and it will not exploit (or authorize the

8

exploitation of) the Picture in the Territory in any manner other than theatrical release (including, without limitation, TVOD and SVOD) until the date that is 90 days following the initial theatrical release of the Picture in the Territory.

d. As between Licensor and Distributor, Distributor will be responsible for any applicable SAG, DGA and WGA residuals ("Residuals", all recoupable as Distribution Costs) due in connection with its distribution of the Picture, and will enter into all assignment and assumption agreements required in connection therewith, subject to receiving all information therefor no later than the date of Essential Delivery.

14.    Marketing Materials: Licensor will have access to Distributor's marketing materials created in connection with the theatrical release of the Picture in the Territory (the "Marketing Materials") subject to Licensor's payment of 25% of Distributor's actual creation costs of such materials capped at $50,000 (the "Access Fee"), such Access Fee to be applied towards recoupment without any Distribution Fee charged thereon. Licensor will secure any applicable and necessary licenses, releases and other rights prior to the use of the Marketing Materials outside the Territory and make all necessary payments thereto, and shall indemnify Distributor from any claims resulting from the use of such Marketing Materials by Licensor. Notwithstanding the foregoing, Distributor shall liaise with Licensor prior to Distributor's clearance of the music for the Marketing Materials and, if Licensor confirms in writing to Distributor that Licensor intends to pay the Access Fee for such Marketing Materials, Distributor will use best efforts to clear the music in the Marketing Materials for worldwide use at the same time that Distributor clears such music for use in the Territory or to negotiate an option for worldwide music clearance.

15.    Credit:

(i)    Subject only to Licensor's third party contractual restrictions delivered to Distributor, Licensor's credit, and/or any guild restrictions Licensor has informed Distributor in writing on or before Essential Delivery to Distributor are applicable to the Picture: Distributor may, in its sole discretion, determine and arrange the placing and size of credits including credits above the title and/or above the artwork title, provided, Distributor may not alter the size or placement (including placement above or before the title) of the credits delivered by Licensor without Allen's prior written consent.

(ii)    Distributor or its designee will receive sole "Presentation Credit" on and in connection with the Picture in the Territory, the form of the Presentation Credit to be determined by Distributor subject to meaningful consultation with Licensor. The Presentation Credit will appear in the main titles wherever "[movie title]" appears, above or below the title (which will be determined in Distributor's sole discretion), and in the billing block portion of all paid ads wherever the billing block appears, above or below the title (which will be determined in Distributor's sole discretion). Distributor will receive sole animated logo credit and may add a logo credit for the mutually approved theatrical distributor, and will have the right to add those animated logos on screen prior to the commencement of the Picture. Without limiting the foregoing, Distributor will have the right to place the animated, static and/or "bug" logo (as applicable) for itself and the mutually approved theatrical distributor on any and all advertising, marketing, promotional, publicity, packaging and other materials in

9

connection with the Picture in the Territory.

(iii)   Distributor will not remove any credit or copyright notice appearing on screen as the Picture is delivered to Distributor except as follows: (i) to comply with a court order or the order of an arbitrator or mediator, (ii) as required in settlement of a dispute subject to meaningful consultation with Licensor, (iii) as required by law and/or (iv) to make such credits, logos and copyright notice consistent with the terms of this Agreement. No casual or inadvertent failure by Distributor or any third party to comply with any credit, name or likeness obligation or restriction, or to comply with any approval or consultation right, will be deemed a breach of this Agreement, provided that Distributor (or such third party which, for avoidance of doubt, Distributor will contractually require to abide by such obligations and/or restrictions) takes commercially reasonable steps to cure such failure on a prospective basis commencing on Distributor's (or such third party's) receipt of written notice thereof.

16.   Publicity and Press Releases: Licensor will not make any announcement in connection with the Picture, including without limitation press releases and social media mentions, without the prior written consent of Distributor. Subject to the terms of this Agreement, including, but not limited to, the Creative Rights Rider, Distributor will control publicity (including, without limitation, social media mentions), and will have the exclusive right to issue all press releases in connection with the Picture, subject to Allen's approval (to be exercised in accordance with the process set forth in Paragraph 2(c) of the Creative Rights Rider). In addition, Distributor will have the right to use Allen's name, approved bio, approved photo and/or approved likeness in connection with the marketing and publicity of the Picture, but for no other purpose without the express written consent of Allen in his sole and absolute discretion. Allen (and/or Allen's representatives) will provide Distributor with a minimum of 2 Picture- related quotes (or will approve quotes provided by Distributor) in connection with the initial press release and the Picture launch day press release. Distributor acknowledges that Allen is not contractually obligated to perform publicity services in connection with the Picture but, should Allen agree to do so at Distributor's request, Allen will be provided with exclusive ground transportation, a hotel suite and private jet travel (G4 or better). Licensor will use commercially reasonable efforts to cause any such actors in the Picture as Distributor may reasonably request to participate in promotional activities (including without limitation interviews and photo calls) in connection with the release of the Picture by Distributor, provided that Distributor will be responsible for costs and expenses in connection with such participation, including travel costs (and such costs and expenses will be recoupable as Distribution Costs); provided that the failure of any actor(s) to so participate shall not be deemed a breach of this Agreement by Licensor.

17.   Confidentiality: The parties agree to keep the terms of this Agreement and (until the distribution of the initial press release by Distributor) the existence of the Agreement and identity of Distributor, confidential (except with respect to legal, financial and other company executives and professional advisors). Licensor will not release to any third party any confidential or proprietary information owned or controlled by Distributor (including, but not limited to, any agreements, research and development information, designs and specifications, screenplays and advertising plans and materials), without the prior, express, written authorization of Distributor.

18.   Representations: Licensor represents and warrants that (i) it has all rights and sole authority necessary to enter into and perform the terms of this Agreement; (ii) it is the sole owner of the rights

granted herein and in the Picture, including, without limitation, the Rights; (iii) the Picture and materials supplied by Licensor will not violate or infringe, nor will Distributor's exploitation of the Rights in accordance with this Agreement violate or infringe, the copyright or, to the best of Licensor's knowledge (including that which Licensor should know in the exercise of reasonable diligence and prudence), any other intellectual property or other proprietary or personal right of any person, firm or corporation (including, without limitation, any right or privacy or publicity) or otherwise constitute libel, slander or defamation of any person or entity; (iv) there are no encumbrances, liens or agreements that could interfere with Distributor's exercise of the Rights in accordance herewith; (v) the copyright in the Picture and all literary, dramatic, and music material upon which the Picture is based will be valid throughout the Term and Territory; (vi) the Picture was or will be produced in accordance with all applicable laws, rules, regulations and collective bargaining agreements; (vii) all costs of production and delivery of the Picture, including, without limitation, all compensation, license fees and royalties, will be fully paid or discharged prior to Delivery of the Picture and the Picture will be delivered fully cleared (including, without limitation, with respect to all music contained in the Picture) as necessary for Distributor to exercise and use the Rights throughout the Territory during the Term without any additional payments with respect thereto (other than any WGA, DGA and SAG residuals payable by Distributor in connection with its distribution of the Picture and provided that all licensed music will be cleared only for in-context use in connection with promotional materials); (viii) all of the individuals furnishing services or granting rights in the Picture have authorized the use of their name, likeness, and biographical data in the advertising and promotion of the Picture pursuant to binding written agreements with Licensor which are assignable to Distributor (subject only to customary third party approval or consent rights, e.g., actor approvals regarding use of likenesses, of which Licensor has notified Distributor in writing); and (ix) there are no claims pending or threatened in writing concerning the Picture or the Rights, nor will the grant of the Rights to Distributor or the exploitation of the Rights by Distributor in accordance with this Agreement violate any agreement or order to which Licensor is a party or trigger any consent or approval rights in any third party (except for any customary third party approval or consent rights (e.g., actor approvals regarding use of likenesses) of which Licensor has notified Distributor in writing).

19.   Indemnity: Licensor will indemnify and hold harmless Distributor, its parent, subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors, and the directors, officers, agents, attorneys, consultants and representatives of the foregoing (the "Distributor Indemnitees"), from and against any and all third party claims, costs, liabilities, obligations, judgments and/or damages (including attorneys' fees), relating to or arising out of or incurred for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, that may be brought against any of the Distributor Indemnitees by reason of the actual or proposed production of the Picture, the use or disposition of rights granted herein, or any violation of applicable law in connection therewith, or in connection with the breach or alleged breach of any of the warranties, representations or obligations made by Licensor, other than any claim for which Distributor must indemnify Licensor pursuant to this Section. Distributor will have the right but not the obligation to adjust, settle or defend such suit, claim, proceeding, demand or cause of action, without affecting Licensor's indemnity; provided, that if Licensor makes bonding arrangements reasonably satisfactory to Distributor assuring Distributor of reimbursement for all payments and expenses in connection with such suits, claims, proceedings, demands and causes of action (including, without limitation, attorney's fees, whether or not litigation is commenced), Distributor will not settle such suit, claim, proceeding, demand or cause of action without Licensor's consent, which will not be unreasonably withheld. The previous proviso will not apply, and Distributor's right to settle any suit, claim, proceeding, demand or cause of action and Licensor's

11

Indemnity obligation will remain unconstrained, when Distributor deems advisable a settlement of a suit, claim, proceeding, demand or cause of action threatening or seeking an injunction against the production, distribution and/or exploitation of the Picture. In any case, whether Licensor or Distributor adjusts, settles or defends such claim, demand or cause of action, within fifteen days after demand (which demand will include a reasonably detailed description of Distributor's payments and expenses) therefor by Distributor, Licensor will reimburse Distributor fully for all such payments and expenses, including attorney's fees, in connection therewith. If Licensor fails to so reimburse Distributor, without waiving its right otherwise to enforce such reimbursement, Distributor will have the right to deduct such amount, or any part thereof, from any sums accruing to or for the account of Licensor under this Agreement or any other agreement. Distributor will indemnify, defend (selecting its own counsel) and hold harmless Licensor, its parent, subsidiaries, affiliates, assignees, and the directors, officers, agents, consultants and representatives of the foregoing (the "Licensor Indemnitees"), from all third party claims, costs, liabilities, obligations, judgments or damages (including reasonable, outside attorneys' fees), arising out of or incurred for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, that may be brought against any of the Licensor Indemnitees in connection with the distribution, advertising or promotion of the Picture, except to the extent that (a) such suits, claims, proceedings, demands or settlements are caused by, arise from or are in connection with Licensor's bad faith, willful misconduct, negligence or a breach or alleged breach of any of Licensor's warranties, representations or obligations to Distributor under this Agreement; or (b) such claims arise from or relate to a claim for which Licensor is obligated to indemnify Distributor hereunder. Licensor will have the right to participate in the defense of any such claims at Licensor's sole cost and expense.

20.    Insurance: Licensor will provide (a) an original certificate of errors and omissions insurance (together with an additional insured endorsement naming Distributor, its affiliates and its and their sub-distributors, licensees and assigns, and the respective officers, directors, shareholders, employees and agents of the foregoing, as additional insureds and (b) an endorsement of Distributor as loss payee under the essential elements insurance policy up to the amount paid by Distributor to Licensor at the time of abandonment due to death or incapacity of Allen ("Essential Element Insurance"). Licensor will maintain the Essential Element Insurance as well as minimum coverage of $3,000,000 for a single occurrence and $5,000,000 for aggregate claims with a deductible of no more than $25,000 for a minimum term of three years after Delivery. Licensor will be responsible for all deductibles and retentions under the policies. The E&O policy will cover all aspects of the Picture and any and all materials relating thereto (including all underlying material therefor, all behind-the-scene footage, "making of" documentaries, bloopers, EPK's, and bonus materials, all trims and outtakes, the title of the Picture, the music included in the Picture, and the distribution/release of the Picture on any media, now existing or hereinafter devised) and Licensor will deliver to Distributor endorsements to this effect. Licensor will provide documentation evidencing that premiums have been paid in full for the entire three-year term and provide at least thirty days written notice of cancellation or other material change to the policies.  The policies will include a provision that the policy will be primary and not contributory to any other insurance provided for the benefit of or by any additional insured. The E&O policy will be on a per-occurrence basis and will be issued from a reputable company. The insurance carrier will name any other person and/or entity as an additional insured, at no additional cost to Distributor, and provide a Certificate of Insurance with respect thereto, as requested by Distributor throughout the policy term. If the Picture is based on (or inspired by) a true story and/or true event(s) and/or if the Picture is based on (or inspired by) a real person (whether living or deceased), or if the real person (whether living or deceased) is portrayed in the Picture, the true life components will be covered under the policy and

Licensor will deliver documentation to Distributor to this effect. Neither an occurrence endorsement policy nor coverage under a blanket policy satisfies the foregoing.

21.     Audit: Licensor will have the right, at its own cost and expense, to audit Distributor's books and records insofar as they directly relate to the amounts owed hereunder with respect to Licensor's Share of Defined Proceeds from the Picture at the place where Distributor maintains those records, provided that the audit (i) is conducted only by an independent third party certified public accountant who is reasonably acceptable to Distributor (any such independent third party accountant to be retained on a non-contingency fee basis) (Distributor hereby pre-approves Green Hasson Janks, Miller Kaplan Arase LLP, Gelfand Rennert & Feldman LLP and D. Crudeli & Associates) only for purposes of verifying the amounts payable hereunder; (ii) is not disruptive to Distributor's business and takes place at a mutually agreed time during Distributor's normal business hours; (iii) does not occur more than once during any consecutive 12-month period; (iv) only covers statements rendered since the statements covered by the last audit conducted by Licensor (if any) and during the 36 months prior to the date notice of the the audit is given to Distributor; (v) takes place on at least 30 days' prior written notice; (vi) is completed within 30 days from commencement subject to extension solely to the extent all reasonably requested permissible documents and/or access have not been timely provided; (vii) is conducted by Licensor alone and not in conjunction or cooperation with any third party; and (viii) is not conducted during October, November or December (provided that any applicable time periods are tolled during such months). Notwithstanding anything to the contrary herein, Licensor will not have any right to inspect or copy any final, draft or provisional tax return or workpaper attributable to tax returns of Distributor, or require Distributor to produce any such tax return or workpaper or any information contained therein. Any information learned or disclosed by the auditor in connection with any such audit is confidential information of Distributor and subject to the nondisclosure and nonuse obligations set forth herein. If such audit reveals an underpayment to Licensor of more than the greater of 7.5% and $15,000, then Distributor shall reimburse Licensor for its out-of-pocket third party costs in connection with such audit (excluding travel and hotel accommodations) not to exceed the amount of the underpayment and provide Licensor with the amount of such underpayment.

22.     Tax: Except as otherwise specified in this Section, each party will be responsible for its own taxes as levied by the applicable taxing authorities. All payments payable by Distributor under this Agreement are inclusive of all applicable national, state or local sales or use taxes or value added taxes ("Transaction Taxes") that apply to the Rights granted to Distributor under this Agreement. If and to the extent any payments hereunder are subject to any applicable Transaction Taxes, on or before the date payment is due, the payee will supply Distributor with an original, valid tax invoice separately stating these Transaction Taxes, to enable Distributor to claim credit for these taxes as applicable. If taxes (other than Transaction Taxes) are required to be deducted or withheld on any payments to be made by Distributor, then Distributor will (a) deduct such taxes from the amount owed to the payee and pay them to the appropriate taxing authority and (b) secure and deliver to the payee a receipt or other required documentation for any taxes withheld as required under applicable laws. Payment to any payee as reduced by such deductions or withholdings will constitute full payment and settlement to such payee of amounts payable under this Agreement. Throughout the Term, Licensor will provide Distributor with any forms, documents, or other certifications as may be reasonably required by Distributor to satisfy any information reporting or withholding tax obligations with respect to any payments under this Agreement. Notwithstanding any other provision herein, each party will indemnify the other party against any interest or penalties that arise with respect to the non-indemnifying party's

13

reliance on forms, documents or other certifications provided by the indemnifying party pursuant to this Section 22.

23.    Relationship of the Parties: Nothing contained herein will be deemed to create a relationship of agency, partnership, joint venture, legal representation or agency between the parties, and neither party will be authorized to act on behalf of the other.    Without limitation of the foregoing, the parties agree that the relationship between Distributor and Licensor as set forth herein does not constitute a partnership for U.S. tax purposes, and covenant not to take any position inconsistent with such treatment.

24.    Limitation of Liability: EXCEPT, ON A NO-QUOTE, NON-PRECEDENTIAL BASIS, WITH REPEST TO MATERIAL BREACHES OF THE CREATIVE RIGHTS RIDER DUE TO (A) GROSS NEGLIGENT OR RECKLESS ACTS OR (B) INTENTIONAL OR WILLFUL ACTS OF MISCONDUCT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, (1) EACH PARTY HEREBY WAIVES ALL CLAIMS AGAINST THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES AND (2) LICENSOR HEREBY WAIVES ALL CLAIMS TO DAMAGES OF ANY KIND RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR TORT AND UNDER ANY THEORY OF LIABILITY, IN EXCESS OF $15,000,000 AND DISTRIBUTOR'S ENTIRE LIABILITY TO LICENSOR FOR SUCH DAMAGES WILL NOT EXCEED $15,000,000. NOTWITHSTANDING THE FOREGOING, THIS PROVISION WILL NOT BE DEEMED TO WAIVE OR LIMIT (A) ANY OF EITHER PARTY'S RIGHTS AT LAW TO ENFORCE THIS AGREEMENT WITH RESPECT TO PAYMENTS DUE TO SUCH PARTY FROM THE OTHER PARTY OR (B) WITH RESPECT TO EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 19 OR 22.

25.    Miscellaneous:

(i)    Notwithstanding anything to the contrary, as conditions precedent to this Agreement, all of Distributor's obligations hereunder (including but not limited to the MG payments) will be subject to Distributor's receipt and approval of the complete COT to the Picture (provided Distributor will review and respond or approve COT within 30 days following receipt of complete COT) and Distributor's receipt of a fully executed copy of this Agreement, an executed and notarized Copyright Mortgage and Assignment attached hereto as Schedule C and executed and notarized Short Form License and Instrument of Transfer attached hereto as Schedule D.

(ii)    Distributor will have the right to assign or transfer this Agreement and/or any of Distributor's rights hereunder to any person, firm or corporation; provided that Distributor will remain secondarily liable to Licensor unless (1) such assignee or transferee is (a) a person or entity into which Distributor merges or is consolidated, (b) a person or entity which acquires all or substantially all of Distributor's business and assets, (c) a person or entity which is controlled by, under common control with, or controls Distributor, or (d) any major or "mini-major" motion picture company or United States television network, in which case Distributor shall be relieved of any and all obligations and liability hereunder and (ii) such assignee or transferee accepts in writing Distributor's obligations hereunder. Distributor shall give Licensor written notice of any such assignment and acceptance provided that inadvertent failure to do so will not be deemed a breach hereof. Licensor will not have the right to assign or transfer this Agreement. Notwithstanding the foregoing,    following

14

Delivery (which includes Distributor's technical acceptance thereof), Licensor may assign this Agreement and/or any of Licensor's rights hereunder to (i) a parent or affiliate and/or (ii) payment entitlements to any single third party on a prospective basis.

(iii)   The parties intend that all Rights and other rights granted herein to Distributor are, for purposes of Section 365(n) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and any similar provisions of applicable laws of other jurisdictions ("Other Bankruptcy Laws"), fundamentally in the nature of "intellectual property" as defined in Section 101 of the Bankruptcy Code and similar provisions of Other Bankruptcy Law. If a court in any bankruptcy case in which Licensor is a debtor treats any grant or transfer by Licensor of any interest in such Rights or other rights granted herein as an executory contract under Section 365 of the Bankruptcy Code or similar provisions of other Bankruptcy Laws, then Distributor and any other transferee or holder of the interest shall be entitled to all the protections and rights of a licensee under Bankruptcy Code Section 365(n) and similar provisions of Other Bankruptcy Laws, including the right to make an election to retain its rights as a licensee under Section 365(n)(1)(B) of the United States Bankruptcy Code and similar provisions of Other Bankruptcy Laws.   Distributor is not in this agreement making an election under section 365(n).

(iv) This Agreement will be governed by the laws of the State of New York, without reference to rules governing choice of law. The parties hereby irrevocably consent to the exclusive jurisdiction and venue of the federal and state courts located in New York County, New York with respect to any claims, suits or proceedings arising out of or in connection with this Agreement, and waive any claim or defense that any such court is an inconvenient or improper forum. The parties further waive any right to jury trial in any such claim, suit or proceeding. In the event of any dispute (except solely in connection with Distributor's violation of Licensor's Reserved Rights), subject to Paragraph 2(j) of the Creative Rights Rider, Licensor's sole remedy will be to pursue an action at law for money damages, and Licensor will not seek to or be entitled to enjoin the distribution, advertising or exploitation of the Picture or terminate or rescind this Agreement. Neither party will be in breach of this Agreement until they have received written notice from the non-breaching party and been given a 15 business day opportunity to cure following receipt of such written notice.

(v)  Leslee Dart will be engaged as the publicist for the Picture at a monthly fee of $17,500 per month for 6 months prior to the initial theatrical release of the Picture and on a monthly basis thereafter should Distributor determine continued publicity for the Picture is necessary, the cost of which shall be recouped by Distributor as a Distribution Cost.

(vi) All references herein to $'s are to United States dollars.

(vii) To the extent necessary for Distributor to exercise the Rights granted hereunder, Licensor hereby grants Distributor a first position security interest and lien in the Territory during the Term in the Rights, the Picture and all results and proceeds thereof, to secure all of Licensor's obligations and Distributor's rights under this Agreement (subject only to customary guild liens for which Distributor acknowledges the guilds will not enter into a non-disturbance agreement except to the extent such non-disturbance language is included within the guilds' customary distributor assumption agreements executed by Distributor).

15

Upon execution of this Agreement, Licensor will deliver to Distributor an executed copy of the Copyright Mortgage and Assignment attached hereto as Schedule C and the Short Form License and Instrument of Transfer attached hereto as Schedule D, each of which will be deemed incorporated herein. Licensor agrees to promptly execute, cause to be executed, acknowledge, provide, deliver, file and record any and all additional acts, deeds, contracts and documents and other instruments, and take or cause to be taken such further actions, as may be reasonably necessary or desirable for Distributor to effectuate or confirm the provisions of this Agreement. Licensor irrevocably grants Distributor the power coupled with an interest, with rights of substitution and delegation, to execute, acknowledge, provide, deliver, file and record any and all such acts, deeds, contracts and documents in Distributor's name if Licensor has not complied with Distributor's request within 7 days thereof (or such shorter period of time as Distributor may reasonably require).

(viii)   Notices: Any notice required or permitted to be given under this Agreement shall be in writing and shall be sent by Federal Express, DHL or other recognized international courier service or by facsimile or electronic transmission (unless otherwise indicated herein) and shall be effective the earliest of (a) actual receipt, or (b) on the third business day after dispatch by Federal Express, DHL or other recognized international courier service, or (c) the next business day after such notice shall have been given by facsimile transmission with electronic answerback confirmation or electronic transmission. A "business day" shall mean any weekday (i.e., Monday through Friday) during which banks are generally open in the United States. Unless otherwise specified by written notice, the address for any such notice to Licensor shall be c/o Perdido Productions, 135 West 26th Street, 11th Floor, New York, NY 10001, Attn: Helen Robin. A copy of all notices to Licensor shall be sent to: (1) Erika Aronson and Adam Stern, 23611 Malibu Colony Road, Malibu, CA 90265; and (2) Loeb & Loeb, LP, 10100 Santa Monica Blvd., Suite 2100, Los Angeles, CA 90067, Attn: Craig Emanuel and Erik Hyman. Unless otherwise specified by written notice, all notices hereunder to Distributor will be sent to: Amazon Studios, c/o Amazon.com, Inc., 410 Terry Ave. North, Seattle, WA 98109, Attn: General Counsel, Facsimile: 206-266-7010 with a copy to: Amazon Studios LLC, 1620 26th St., Suite 4000N, Santa Monica, CA 90404, Attn: Assistant General Counsel.

(ix)   This Agreement may be executed in counterparts (including by facsimile or pdf), each of which will be deemed an original and all of which will constitute one and the same instrument. This Agreement is not effective until signed and delivered by both parties and once signed and delivered by both parties, this Agreement will be effective as of the date first set forth above.

This Agreement sets forth the entire and binding agreement between the parties with respect to the subject matter hereof, and, will supersede and replace all prior or contemporaneous written or oral agreements pertaining hereto and can only be modified by a writing signed by both parties.

[Signatures on the following page.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officer as of the dates set forth below.

GRAVIER PRODUCTIONS, INC.

AMAZON CONTENT SERVICES, LLC

By: _____

Name: _Letty Aronson_

Title: _Vice - Pres._

Date Signed: _7.22.16_

By: _____

Name: _____

Title: Vice President

Date Signed: _____

_Elaine Alcantara_

ELAINE ALCANTARA
Notary Public - State of New York
No. 01AL6186553
Qualified in Bronx County
My Commission Expires November 14, 20__

17

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized officer as of the dates set forth below.

GRAVIER PRODUCTIONS, INC.

By: _____

Name: _____

Title: _____

Date Signed: _____

AMAZON CONTENT SERVICES, LLC

By: _____

Albert Cheng

Name: _____

Title: Vice President

July 22, 2016

Date Signed: _____

17

## EXHIBIT A

### Creative Rights Rider

### WOODY ALLEN CREATIVE RIGHTS AND APPROVAL RIGHTS

This Woody Allen Creative Rights and Approval Rights exhibit (the **"Creative Rights Rider"**), is an exhibit to a Long Form Acquisition Agreement, effective as of July 22, 2016 entered into between Amazon Content Services, LLC (**"Distributor"**) and Gravier Productions, Inc. (**"Licensor"**) in connection with the exclusive grant to Distributor by Licensor of certain rights in and to a motion picture (**"Picture"**) to be written and directed by Woody Allen (**"Allen"**) in accordance with the terms of the agreement to which this Creative Rights Rider is attached (the **"Agreement"**). In accordance with the terms of the Agreement as a material condition thereof, Distributor is required to contractually ensure that only the approved version of the Picture is distributed and exhibited in accordance with the Creative Rights Rider and Distributor shall be responsible to notify all of its sub-distributors, licensees and sub-licensees of the requirements contained in the Creative Rights Rider (each an **"Authorized Exploitation Party"**) and to attach a copy of Exhibit WA-AEP in the form attached hereto to each agreement with an Authorized Exploitation Party. As a material condition of the Agreement, Distributor hereby undertakes and agrees that its exploitation, licensing, sale, sub-distribution, advertising and publicity, and use of the Picture is subject to the terms hereof and agree that it will abide by all of such terms that are applicable to it in the territory which is the subject of the Long Form Acquisition Agreement (the **"Territory"**). In the event of any conflict between the terms of this Creative Rights Rider and the terms of the Agreement, the terms of this Creative Rights Rider shall prevail. The terms of this Creative Rights Rider are a material term of the Agreement.

1.      Approved Version of the Picture. The "approved version of the Picture" means the version of the Picture delivered by or on behalf of Licensor pursuant to the Agreement with only such cuts, edits, changes or alterations as have been approved by Allen or are otherwise expressly permitted under the Agreement. Distributor agrees that it shall distribute and exhibit only the approved version of the Picture and that it will contractually obligate its Authorized Exploitation Party(s) to distribute and exhibit only the approved version of the Picture and shall attach, or contractually cause to be attached, a copy of Exhibit WA-AEP to each of its agreements with its Authorized Exploitation Party(s). A copy of Exhibit WA-AEP is attached hereto.

2.      Allen's Creative Rights. Distributor acknowledges that its exploitation, licensing, sale, sub-distribution, advertising and publicity, and use of the Picture is subject to Allen's creative rights and restrictions as follows and as set forth in the Agreement:

(a)      Ratings. The Picture as delivered may not be cut or edited or changed in any way including, without limitation, both the video elements and the audio elements except as permitted in this Agreement if it meets the length and color requirements set forth in this Agreement and if it is capable of receiving an MPAA rating no more restrictive than R. Allen shall have the first right to make any changes required to achieve such rating, as well as to qualify in the USA for standards and practices requirements consistent with pay/premium cable

television (e.g., HBO), for government imposed censorship and to avoid bona fide legal claims by third parties. The resulting changed version of the Picture may be distributed only in that portion of the Territory or in that medium requiring the changes.

(b)     No Editing of the Picture without Prior Approval by Allen / Commercial Breaks and Trailers. In connection with television exploitation, the Picture can be interrupted for commercial advertisements provided that Allen will be consulted on the placement of commercial inserts, provided that permitted commercial breaks and other program interruptions (e.g. station breaks) are consistent with customary timing requirements for applicable exhibition in the Territory and such commercial insertion points are consistent with customary timing requirements of cable and syndicated television exhibitors in general in the Territory. No portion of the Picture may be deleted for the purpose of incorporating a commercial or otherwise. Allen shall have approval (exercisable in his sole and absolute discretion) over the inclusion of any biographical sketches or other information (including, without limitation, the inclusion of any commercials or any other material or information on the home video devices respecting the Picture) which Distributor desires to include in any hard good home video media distribution of the Picture. In connection with distribution on home video devices, Distributor shall have the right to include up to 2 trailers for other of its motion pictures and television programs with ratings no more restrictive than the rating of the Picture and advertisements for the soundtrack album of the Picture (if any) and no more than 1 advertisement for Distributor media products or services through which the Picture is made available (provided that, with respect to such advertisement for such Distributor media products or services through which the Picture is made available, any advertisement will be subject to the restrictions related to commercial tie-ins as set forth in Paragraphs 2(e) and 2(e)(i) below).

(c)     Marketing Assets. Distributor will control all marketing campaigns (including all social media channels and content), subject to Allen's approval rights as set forth below. Allen will have approval over the creative aspects of the Marketing Assets (including, but not limited to, title, stills, key art, one sheets, trailers, teasers, television spots and press kits, and the packaging of all home video devices) ("**Marketing Assets**") in the Territory. Distributor shall prepare the initial Marketing Assets, including the key art and one sheets, and the video packaging which shall be submitted to Allen for approval for use in the Territory. Allen will provide his approval or disapproval within 10 business days of receipt for the initial review of the Marketing Assets and video packaging for approval, and 7 business days of receipt for any resubmissions by Distributor for approval of the marketing assets and video packaging by Allen. Allen's failure to timely respond as set forth above shall be deemed to be approval. If Allen disapproves all or any portion of the Marketing Assets and/or video packaging in the Territory ("**Disapproved Elements**"), Allen shall provide along with his notice of disapproval suggested modifications so that the Disapproved Elements could be resubmitted for approval. After 5 rounds of submissions from Distributor for approvals by Allen under the procedure set forth above, if there are still Disapproved Elements, then Allen shall have the right to prepare alternative material to the Disapproved Elements and to engage such person[s] as Allen may in his sole discretion designate at their usual rates, subject to Distributor's reasonable approval, (which shall not be excessive compared to other performing similar services and of a similar stature) to create such material at Distributor's sole cost and expense, provided that such expenses are recoupable Distribution Expenses (as defined in the Agreement). Allen's approval rights shall include the placement of the title and all verbiage in the key art and other Marketing

Assets. Any Marketing Assets previously approved by Allen will not need re-approval so long as such Marketing Assets are not changed in any material manner. For purposes hereof, resizing print and static online ads to and from larger or smaller size (e.g., running a quarter page ad that was previously approved as a full page print ad without material creative changes), translating or dubbing approved Marketing Assets in to other languages or adding with a secondary purpose to an advertisement in accordance with paragraph 2 (e) below in association with Distributor's Prime Instant Video (as set forth in Appendix 1 attached hereto) to an approved Marketing Asset, and/or using the approved verbiage in Appendix 1 for online search and adwords, shall not constitute a material change. Distributor agrees that it, and that it will contractually obligate its Authorized Exploitation Party(s), will utilize only such Marketing Assets and video packaging as are approved by Allen. For the avoidance of doubt Marketing Assets may not include "Created By" "A Woody Allen Picture" or any other form of possessory credit.

(d)     Publicity. Allen's designated publicist will be meaningfully consulted by Distributor in connection with the publicity plan for the Picture. In addition, Distributor shall provide the outside publicist with round-trip business-class transportation, if available and actually used, and reasonable first-class hotel accommodations (room and tax only) in connection with any publicity services rendered by Allen at a location not within the city of the outside publicist's permanent residence, it being understood that all such costs shall be recoupable by Distributor as a Distribution Expense of the Picture.

(e)     Commercial Tie-Ins. No exploitation of merchandising or commercial tie-in rights (including but not limited to so called kiosk sales of home video devices) with other products or services, including but not limited to Distributor products and services (e.g., Kindle, Fire TV, Amazon.com) may occur without Allen's prior express written consent exercisable in his sole and absolute discretion.

(i)     Exception for Distributor's Prime Instant Video. Notwithstanding the foregoing or any other provision hereof, Distributor shall be permitted without Allen's prior express written consent exercisable in his sole and absolute discretion, to market, promote, associate and advertise the Picture, including Allen's name, with Distributor's Prime Instant Video but only in a manner where the primary purpose of such marketing, promotion, association and/or advertising is for the Picture and the reference to Distributor's Prime Video is secondary (as set forth in Appendix 1 attached hereto and as depicted in the examples attached thereto, with Allen retaining the right to approve the placement of the title and other verbiage in all Marketing Assets), provided that, in such case (A) Distributor utilizes only the Marketing Assets previously approved by Allen pursuant to subparagraph 2 (c) above and (B) Distributor may not use Allen's likeness if contained in the approved Marketing Assets without his prior express written consent exercisable in his sole and absolute discretion.

(f)     For the avoidance of doubt and notwithstanding anything to the contrary in the Agreement, including this Creative Rights Rider, the examples set forth in Appendix 1 are hereby approved by Licensor and Allen to be used in connection with any of the approved Marketing Assets.

(g)     For the avoidance of doubt, Distributor may only utilize the Marketing Assets approved by Allen pursuant to sub-paragraph 2 (c) above. Other than as expressly

permitted in sub-paragraph 2 (e) above with regard to Distributor's Prime Instant Video, Distributor may not use any clips from the Picture or Allen's name, voice or likeness for any purpose other than to advertise and promote the Picture without Allen's prior express written consent in his sole and absolute discretion.

      (h)    Previews and Screenings. Distributor will meaningfully consult with Allen on any preview or screenings, including without limitation all press screenings.

      (i)    Excerpts and Clips Subject to Allen Approval. Distributor will not license to any third party any excerpts or clip licenses without Licensor's and Allen's prior express written approval. Licensor does not grant to Distributor hereunder any such right to license excerpts or "clips" or out-takes from the Picture.

      (j)    In the event Distributor shall fail to comply with its obligations to distribute only the Allen approved version of the Picture and otherwise in accordance with this Creative Rights Rider, Licensor has the rights and remedies set forth in the Agreement. In the event any of Distributor's Authorized Exploitation Party(s) fail to comply with their obligations to distribute only the Allen approved version of the Picture and otherwise in accordance with Exhibit WA-AEP, Distributor may terminate the agreement authorizing the Authorized Exploitation Party to distribute the Picture or assert any applicable injunctive relief remedy under such agreement, subject to any applicable notice and cure provisions. Distributor acknowledges Allen (and Allen's Loan out services corporation, Dylan & Satchel Productions, Inc.) are third party beneficiaries of the provisions of this paragraph 2, and shall have the ability to exercise their rights respecting the foregoing, as contained in Exhibit WA-AEP

      (k)    Video and Television Processes. Except as otherwise specifically set forth in the Agreement or in this Creative Rights Rider, Distributor may not cause or authorize any adjustments to the Picture which would alter the visual and/or audio characteristics of the Picture for television and home video but it may cause the minor adjustment of a non-anamorphic picture at the top and/or bottom of the frame for television and home video exhibition (i.e. it may reformat from an aspect ratio of 1.85:1 to 1.33:1 with such adjustments to be approved and executed by Allen (or at his instructions). Letterbox format must be used on the laser disc and DVD versions of the Picture, provided, however, that the production and distribution of laser discs and DVD versions which enable the consumer to select either the letter box or videocassette format on the disc is permitted so long as they are the approved video version of the Picture. There shall be no difference between the approved version of the Picture as delivered by Licensor and broadcast by means of TVOD or SVOD and the approved video version of the Picture except for the adjustment permitted to the video version provided for in this subparagraph (j). Distributor shall not cause or authorize any other adjustments to the Picture which would alter the video and/or audio characteristics of the Picture.

      (l)    Copies of Exhibit WA-AEP to Third Parties. Distributor, in its agreements with all Authorized Exploitation Parties, shall require that they may only distribute and exhibit only the approved version of the Picture in accordance with Exhibit WA-AEP a copy of which shall be attached to Distributor's agreement with each such Authorized Exploitation Party(s), and Distributor shall endeavor to obtain an acknowledgment of the same from such Authorized Exploitation Party(s) designating Allen and Dylan & Satchel Productions, Inc. as third party

beneficiaries (with regard to all creative matters set forth in Exhibit WA-AEP) of each such agreement with an Authorized Exploitation Party(s) authorizing the exploitation of the Picture. In the event Distributor is unable to obtain such acknowledgment, Distributor will not provide the Picture to such Authorized Exploitation Party(s). Distributor agrees to make best efforts to license the Picture subject to this Creative Rights Rider and Exhibit WA-AEP.

(m)    Running Time and Linear Viewing. The Picture may not be sold, licensed, distributed, exhibited, or otherwise exploited in or by any medium which changes the running time of the Picture and/or permits the viewer to alter the sequence of the visual or audio portion of the Picture (for the avoidance of doubt, customary playback options including chaptering, rewinding, forwarding, etc. will not constitute manipulation or alteration of the sequence of the visual or audio for purposes of this Agreement (collectively, "**Alteration**") and must only permit viewing in a linear fashion, it being understood that Alteration of the Picture (such as the DVD version) by a third party using independent means (e.g. manipulation of the DVD version by computer or other digital devices) shall not constitute a breach of this subparagraph 2.(1) by Distributor, unless Distributor has embedded coding or software into the device that enables, or has expressly authorized, Alteration by such third party.

3.    Foreign Language Versions. Allen shall have the final approval of the dubbing and subtitling of all foreign language versions of the Picture to be shown in the Territory and shall have the right to designate the foreign dubbing editor provided that such editor is available on a schedule reasonably designated by Distributor and agrees to render his services upon usual and customary terms for Allen projects. The cost of dubbing and subtitling, including but not limited to the foreign dubbing editor' s fees and expenses, shall be paid by Distributor and/or each sub-distributor but may be recouped as a Distribution Expense. Jeff Davidson is approved as foreign language dubbing editor and use of any other foreign language dubbing and subtitling editor shall require Allen's prior written consent. In the event Distributor elects to use a foreign language dubbing editor other than Jeff Davidson, Distributor shall submit to Licensor for submission to Allen, no later than 90 days prior to the scheduled date of release in the Territory, the name and C.V. of 3 proposed alternative foreign language dubbing editors and contact information for the directors of the last six programs where each such person acted as the foreign language dubbing editor, in order for Allen to give consideration to such proposed person. Allen's decision shall be in his sole and unfettered judgment. The subtitled video version, if any, will be the same version including, without limitation, the subtitles, as the subtitled broadcast foreign language version for the Territory, if any.

4.    Trustee. All of Allen's rights under this Agreement, including but not limited to the creative rights and approval rights expressed in this Creative Rights Rider will, in the event of Allen's death, be administered by one or more trustees appointed by Allen.

5.    Timeline to Respond to Approval Requests from Distributor. Except as otherwise provided herein, Allen shall respond to any requests by Distributor for an approval within 7 business days of receipt. If Allen responds with a disapproval such disapproval will include suggested modifications so that if made could be re-submitted for approval. Allen's failure to timely respond shall be deemed to be approval.

5

6.      Allen's Approval Right Procedure. All written notification to Allen and requests for approval shall be made in writing to the following:

Woody Allen, c/o Perdido Productions, 135 West 26th Street, 11th Floor, New York, NY 10001, Attn: Helen Robin, Tel +1 (212) 582-9062, Fax +1 (212) 956 7697;Email: helenrobin@me.com

WITH COPIES TO: Erika Aronson and Adam Stern, 23611 Malibu Colony Road, Malibu, CA 90265 Email: erika@taborlake.com.

Attention: Loeb & Loeb, LP, 10100 Santa Monica Blvd., Suite 2100, Los Angeles, CA 90067, Attn: Craig Emanuel and Erik Hyman, Tel +1 (310) 282-2000, Fax +1 (310) 282-2200, Email: cemanuel@loeb.com, Email: ehyman@loeb.com.

7.      Headings. Captions, headings and organization are for convenience only and shall not be used to construe meaning.

## Appendix 1

*An Amazon Original Movie* by itself or in conjunction with [Title]

and/or

*Exclusively on Prime*
*Only on Prime*
*Stream the Picture [Exclusively or Only] on Prime Instant Video*
*Stream the Picture on Prime*
*Watch [the Picture] Exclusively [or Only] on Prime*
*An Amazon Original Movie only on Prime*
*Watch the Picture on Prime*
*Watch [Title] Written and Directed by Woody Allen on Prime*
*Watch [Title] Written and Directed by Woody Allen [Exclusively or Only] on Prime*
*Watch [Title] [Exclusively or Only] on Prime*
*Stream [Title] only on Prime*
*Get/Watch the Picture free on Prime*
*Start your free Prime trial today to watch [Title]*
*Start your free Prime trial today to watch [Title] Written and Directed by Woody Allen*
*Get access to [Title] Written and Directed by Woody Allen by subscribing to Prime*
*Start your 30-day Amazon Prime free trial today to watch [Title]*
*Watch [Title] Written and Directed by Woody Allen*
*Get access to [Title] Written and Directed by Woody Allen by becoming a member of Prime*

and/or (in conjunction with any of the secondary, additional call-to-actions):

Watch Now
Stream Now
Watch Free
Get Started
Start your 30 day free trial
Start your free month
Watch for $0.00 with Prime
Now on Prime

Note: For purposes hereof, the words *"Prime," "Amazon Prime," "Prime Instant Video"*, *"Amazon Instant Video"* and *"Amazon"* are approved variations and uses within any of the foregoing approved verbiage.

The ratio of the font size of the foregoing verbiage to the font size of the title of the Picture shall be the same ratio as set forth in the attached examples.

## EXHIBIT WA-AEP

### WOODY ALLEN CREATIVE RIGHTS AND APPROVAL RIGHTS

This Woody Allen Creative Rights and Approval Rights exhibit ("**Exhibit WA-AEP**"), is an exhibit to an agreement (the "**Subdistribution Agreement**") dated_____, entered into between Amazon Content Services LLC, ("**Distributor**") and_____("**Subdistributor**") regarding a motion picture ("**Picture**") to be written and directed by Woody Allen ("**Allen**") and distributed in certain territories by Distributor pursuant to that certain agreement dated [_____], 2016 between Distributor and [_____] ("**Licensor**") (the "**Agreement**"). As a material condition of the Subdistribution Agreement Subdistributor hereby undertakes and agrees that its exploitation, licensing, sale, sub-distribution, advertising and publicity, and use of the Picture as set forth in the Subdistribution Agreement is subject to the terms hereof and agrees that it will abide by all of such terms that are applicable to it in the territory which is the subject of the Subdistribution Agreement (the "**Territory**"). In the event of any conflict between the terms of this Exhibit WA-AEP and the terms of the Subdistribution Agreement, the terms of this Exhibit WA-AEP shall prevail. The terms of this Exhibit WA-AEP are a material term of the Subdistribution Agreement.

### 1.    Approved Version of the Picture.

The "approved version of the Picture" means the version of the Picture delivered by or on behalf of Licensor to Distributor pursuant to the Agreement with only such cuts, edits, changes or alterations as have been approved by Allen or are otherwise expressly permitted under the Agreement. Distributor shall provide Subdistributor with the approved version of the Picture. Subdistributor agrees that it shall distribute and exhibit only the approved version of the Picture and that it will contractually obligate its authorized sub-distributors and sub-licensees (each, an "**Authorized Exploitation Party**") to distribute and exhibit only the approved version of the Picture and shall attach, or contractually cause to be attached, a copy of Exhibit WA-AEP to each of its agreements with its Authorized Exploitation Party(s).

### 2.    Allen's Creative Rights.

Subdistributor acknowledges that its exploitation, licensing, sale, sub-distribution, advertising and publicity, and use of the Picture is subject to Allen's creative rights and restrictions as follows:

(a)    The Picture as delivered may not be cut or edited or changed in any way including, without limitation, both the video elements and the audio elements except as permitted herein. Allen shall have the first right to make any changes required to achieve an MPAA rating no more restrictive than [R], as well as to qualify in the USA for standards and practices requirements consistent with pay/premium cable television (e.g., HBO), for government imposed censorship and to avoid bona fide legal claims by third parties. The resulting changed version of the Picture may be distributed only in that portion of the Territory or in that medium requiring the changes.

(b)    In connection with television exploitation, the Picture can be interrupted for commercial advertisements provided that Allen will be consulted on the placement of

commercial inserts, provided that permitted commercial breaks and other program interruptions (e.g. station breaks) are consistent with customary timing requirements for applicable exhibition in the Territory and such commercial insertion points are consistent with customary timing requirements of cable and syndicated television exhibitors in general in the Territory. No portion of the Picture may be deleted for the purpose of incorporating a commercial or otherwise. Allen shall have approval (exercisable in his sole and absolute discretion) over the inclusion of any biographical sketches or other information (including, without limitation, the inclusion of any commercials or any other material or information on the home video devices respecting the Picture) which Subdistributor desires to include in any hard good home video media distribution of the Picture. In connection with distribution on home video devices, Subdistributor shall have the right to include up to 2 trailers for other of Distributor's motion pictures and television programs with ratings no more restrictive than the rating of the Picture and advertisements for the soundtrack album of the Picture (if any) and no more than 1 advertisement for Distributor media products or services through which the Picture is made available. (provided that, with respect to such advertisement for such Distributor media products or services through which the Picture is made available, any advertisement will be subject to the restrictions related to commercial tie-ins as set forth in Paragraphs 2(c) and 2(e)(i) below).

(c)     Allen will have approval over the creative aspects of all Marketing Assets (including, but not limited to, title, stills, key art, one sheets, trailers, teasers, television spots and press kits, and the packaging of all home video devices) in the Territory ("**Marketing Assets**"). Subdistributor shall prepare the initial Marketing Assets, including the key art and one sheets, and the video packaging which shall be submitted to Allen for approval for use in the Territory. Allen will provide his approval or disapproval within 10 business days of receipt for the initial review of the Marketing Assets and video packaging for approval, and 7 business days of receipt for any resubmissions by Subdistributor for approval of the Marketing Assets and video packaging by Allen. Allen's failure to timely respond as set forth above shall be deemed to be approval. If Allen disapproves all or any portion of the Marketing Assets and/or video packaging in the Territory ("**Disapproved Elements**"), Allen shall provide along with his notice of disapproval suggested modifications so that the Disapproved Elements could be resubmitted for approval. After five rounds of submissions from Subdistributor for approvals by Allen under the procedure set forth above, if there are still Disapproved Elements, then Allen shall have the right to prepare alternative material to the Disapproved Elements and to engage such person[s] as Allen may in his sole discretion designate at their usual rates, subject to Subdistributor's reasonable approval, (which shall not be excessive compared to other performing similar services and of a similar stature) to create such material at Subdistributor's sole cost and expense, provided that such expenses are recoupable Distribution Expenses (as that term is defined in the Subdistribution Agreement). Allen's approval rights shall include the placement of the Title and all verbiage in the key art and other Marketing Assets. Any Marketing Assets previously approved by Allen will not need re-approval so long as such Marketing Assets are not changed in any material manner. Subdistributor agrees that it will, and that it will contractually obligate its Authorized Exploitation Party(s) to, utilize only such Marketing Assets and video packaging as are approved by Allen. For purposes hereof, resizing print and static online ads to and from larger or smaller size (e.g., running a quarter page ad that was previously approved as a full page print ad without material creative changes), translating or dubbing approved Marketing Assets in to other languages or adding with a secondary purpose to an advertisement in accordance with paragraph 2 (e) below in association with Distributor's Prime Instant Video (as

set forth in Appendix 1 attached hereto) to an approved Marketing Asset, and/or using the approved verbiage in Appendix 1 for online search and adwords, shall not constitute a material change. For the avoidance of doubt, Marketing Assets may not include "Created By," "A Woody Allen Picture" or any other form of possessory credit.

(d)     Allen's designated publicist will be meaningfully consulted by Subdistributor in connection with the publicity plan for the Picture. In addition, Subdistributor shall provide the outside publicist with round-trip business-class transportation, if available and actually used, and reasonable first-class hotel accommodations (room and tax only) in connection with any publicity services rendered by Allen at a location not within the city of the outside publicist's permanent residence, it being understood that all such costs shall be recoupable by Subdistributor as a Distribution Expense of the Picture.

(e)     To the extent any such rights are granted in the Subdistribution Agreement, no exploitation of merchandising, games or commercial tie-in rights (including but not limited to so-called kiosk sales of home video devices) with other products or services including but not limited to Distributor's products and services (e.g., Kindle, Fire TV, Amazon.com) may occur without Allen's prior express written consent exercisable in his sole and absolute discretion.

(e) (i)  Exception for Distributor's Prime Instant Video. Notwithstanding the foregoing or any other provision hereof, Subdistributor shall be permitted without Allen's prior express written consent exercisable in his sole and absolute discretion, to market, promote, associate and advertise the Picture, including Allen's name, with Distributor's Prime Instant Video but only in a manner where the primary purpose of such marketing, promotion, association and/or advertising is for the Picture and the reference to Distributor's Prime Video is secondary (as set forth in Appendix 1 attached hereto and as depicted in the examples attached thereto, with Allen retaining the right to approve the placement of the Title and other verbiage in all Marketing Assets), provided that, in such case (A) Subdistributor utilizes only the Marketing Assets previously approved by Allen pursuant to subparagraph 2 (c) above and (B) Subdistributor may not use Allen's likeness if contained in the approved Marketing Assets without his prior express written consent exercisable in his sole and absolute discretion.

(f)     For the avoidance of doubt and notwithstanding anything to the contrary in the Subdistribution Agreement, including this Exhibit WA-AEP, the examples set forth in Appendix 1 are hereby approved by Licensor and Allen to be used in connection with any of the approved Marketing Assets.

(g)     For the avoidance of doubt, Subdistributor may only utilize the Marketing Assets approved by Allen pursuant to sub-paragraph 2 (c) above. Other than as expressly permitted in subparagraph 2 (e) above with regard to Distributor's Prime Instant Video, Subdistributor may not use any clips from the Picture or Allen's name, voice or likeness for any purpose other than to advertise and promote the Picture without Allen's prior express written consent in his sole and absolute discretion.

(h)     Subdistributor will meaningfully consult with Allen on any preview or screenings, including without limitation all press screenings.

(i)     Subdistributor will not license to any third party any excerpts or clip licenses without Licensor's and Allen's prior express written approval. Distributor does not grant to Subdistributor any such right to license excerpts or "clips" or out-takes from the Picture.

(j)     In the event Subdistributor shall fail to comply with its obligations to distribute only the Allen approved version of the Picture and otherwise in accordance with this Exhibit WA-AEP, Distributor may terminate the Subdistribution Agreement authorizing Subdistributor to distribute the Picture or assert any applicable injunctive relief remedy under such Subdistribution Agreement, subject to any applicable notice and cure provisions as set forth in the Subdistribution Agreement. Subdistributor acknowledges and undertakes for itself and its Authorized Exploitation Parties that as a material term of and an indispensable inducement to Distributor's execution of the Subdistribution Agreement, including but not limited to Subdistributor's exhibition, distribution, sub-distribution, exploitation and use of the Picture pursuant to the Subdistribution Agreement shall be expressly subject to this Exhibit WA-AEP which is deemed to be a part thereof and that, in the event of any conflict in the terms of the Subdistribution Agreement, this Exhibit WA-AEP and/or any written agreement between the parties, this Exhibit WA-AEP shall prevail and Subdistributor acknowledges this Exhibit WA-AEP is for the benefit of Allen who is a third party beneficiary of this Exhibit WA-AEP and that Allen, and/or Dylan & Satchel Productions, Inc. (the company that loaned Allen's services in connection with the production of the Picture) ("Lender"), shall have the right to directly enforce this Exhibit WA-AEP in the event of any breach by Subdistributor subject to any notice and cure provisions in the Subdistribution Agreement. A copy of this Exhibit WA-AEP which is attached hereto is incorporated herein and will be attached to each and every sub-distribution and/or license agreement entered into by Subdistributor.

(k)     Video and Television Processes. Except as otherwise specifically set forth in this Exhibit WA-AEP, Subdistributor may not cause or authorize any adjustments to the Picture which would alter the visual and/or audio characteristics of the Picture for television and home video but it may cause the minor adjustment of a non-anamorphic picture at the top and/or bottom of the frame for television and home video exhibition (i.e. it may reformat from an aspect ratio of 1.85:1 to 1.33:1 with such adjustments to be approved and executed by Allen (or at his instructions). Letterbox format must be used on the laser disc and DVD versions of the Picture, provided, however, that the production and distribution of laser discs and DVD versions which enable the consumer to select either the letter box or videocassette format on the disc is permitted so long as they are the approved video version of the Picture. There shall be no difference between the approved version of the Picture as delivered by Licensor to Distributor and distributed by Distributor and the version distributed by Subdistributor, or the approved home video version used by Distributor and the home video version of the Picture distributed by Subdistributor except for the adjustment permitted to the video version provided for in this subparagraph (k). Subdistributor shall not cause or authorize any other adjustments to the Picture which would alter the video and/or audio characteristics of the Picture.

(l)     Subdistributor, in its agreements with all Authorized Exploitation Parties, shall require that they may only distribute and exhibit only the approved version of the Picture in

11

accordance with this Exhibit WA-AEP a copy of which shall be attached to Subdistributor's agreement with each such Authorized Exploitation Party(s), and Subdistributor shall endeavor to obtain an acknowledgment of the same from such Authorized Exploitation Party(s) designating Allen and Lender as third party beneficiaries (with regard to all matters set forth in Exhibit WA-AEP) of each such agreement with an Authorized Exploitation Party(s) authorizing the exploitation or use of the Picture. In the event Subdistributor is unable to obtain such acknowledgment, Subdistributor will not provide the Picture to such Authorized Exploitation Party(s). Subdistributor agrees to make best efforts to license the Picture subject to this Exhibit WA-AEP.

(m)     The Picture may not be sold, licensed, distributed, exhibited, or otherwise exploited in or by any medium which changes the running time of the Picture and/or permits the viewer to alter the sequence of the visual or audio portion of the Picture (for the avoidance of doubt, customary playback options including chaptering, rewinding, forwarding, etc. will not constitute manipulation or alteration of the sequence of the visual or audio for purposes of this Subdistribution Agreement (collectively, "**Alteration**") and must only permit viewing in a linear fashion, it being understood that Alteration of the Picture (such as the DVD version) by a third party using independent means (e.g. manipulation of the DVD version by computer or other digital devices) shall not constitute a breach of this subparagraph 2.(i) by Subdistributor, unless Subdistributor has embedded coding or software into the device that enables, or has expressly authorized, Alteration by such third party.

(n)     Subdistributor may dub and/or subtitle in foreign languages (or authorize others to do so), provided that Allen will have approval over the entity/person engaged to prepare dubs in Spanish, French, German, and Italian. Jeff Davidson is pre-approved with respect to dubbing all four of these languages for the Picture.

(o)     Subdistributor may "bleep" or delete language, with such bleeping or deleting limited to the seven words prohibited by USA networks standards and practices, but without in any way altering any visual aspects. Such edited versions may only be used where the delivered version is prohibited from use by local censorship requirements.

(p)     In the event the Picture is edited and thereafter exploited in any manner other than as permitted hereunder or the Picture is exploited in a manner that is not in compliance with the Subdistribution Agreement, including but not limited to, this Exhibit WA-AEP, in addition to any other rights or remedies available at law, Licensor, Allen or Lender shall be entitled to seek injunctive relief with respect to the specific territory or exploitation which is in violation of the terms agreed upon herein (e.g., a violation of these terms with respect to exploitation in Spain, shall not give rise to a right to seek injunctive relief regarding the exploitation by Subdistributor in France, unless there is a separate violation there as well), subject to 10 business days prior written notice to Subdistributor with Subdistributor's right to cure within said 10 business days.

(q)     Wherever in this Agreement Licensor's or Allen's consent is required it shall be given in writing and signed only by Stephen Tenenbaum or Irwin Tenenbaum or such other person appointed in writing by Licensor and/or Allen.

(r)     Subdistributor shall have the right to use Allen's name, approved bio and approved photo and/or approved likeness in connection with the marketing and publicity of the Picture, but for no other purpose without the express written consent of Allen in his sole and absolute discretion.

(s)     Subdistributor does not have the right to develop or exploit any Picture games or Picture merchandise without Allen's express prior written approval which may be granted or withheld in his sole and unfettered discretion.

3.     Foreign Language Versions.

Allen shall have the final approval of the dubbing and subtitling of all non-English language versions to be shown in the Territory and shall have the right to designate the foreign dubbing editor provided that such editor is available on a schedule reasonably designated by Subdistributor and agrees to render his services upon usual and customary terms for Allen projects. The cost of dubbing and subtitling, including but not limited to the foreign dubbing editor's fees and expenses, shall be paid by Subdistributor but may be recouped as a Distribution Expense (as defined in the Subdistribution Agreement). Jeff Davidson is approved as foreign language dubbing editor and use of any other foreign language dubbing and subtitling editor shall require Allen's prior written consent. In the event Subdistributor elects to use a foreign language dubbing editor other than Jeff Davidson, Subdistributor shall submit to Licensor for submission to Allen, no later than 90 days prior to the scheduled date of release in the Territory, the name and C.V. of 3 proposed alternative foreign language dubbing editors and contact information for the directors of the last six programs where each such person acted as the foreign language dubbing editor, in order for Allen to give consideration to such proposed person. Allen's decision shall be in his sole and unfettered judgment. The subtitled video version, if any, will be the same version including, without limitation, the subtitles, as the subtitled broadcast foreign language version for the Territory, if any.

4.     All of Allen's rights under this Exhibit WA-AEP will, in the event of Allen's death, be administered by one or more trustees appointed by Allen.

5.     Except as otherwise provided herein, Allen shall respond to any requests by Subdistributor for an approval within 7 business days of receipt. If Allen responds with a disapproval such disapproval will include suggested modifications so that if made could be re-submitted for approval. Allen's failure to timely respond shall be deemed to be approval.

6.     Allen's Approval Right Procedure.

All written notification to Allen and requests for approval shall be made in writing to the following:

Woody Allen, c/o Perdido Productions, 135 West 26th Street, 11th Floor, New York, NY 100001, Attn: Helen Robin, Tel +1 (212) 582-9062, Fax +1 (212) 956 7697; email: helenrobin@me.com

WITH COPIES TO:

Erika Aronson and Adam Stern, 23611 Malibu Colony Road, Malibu, CA 90265 Email: erika@taborlake.com.

Attention: Loeb & Loeb, LP, 10100 Santa Monica Blvd., Suite 2100, Los Angeles, CA 90067, Attn: Craig Emanuel and Erik Hyman, Tel +1 (310) 282-2000, Fax +1 (310) 282-2200, Email: cemanuel@loeb.com. Email: ehyman@loeb.com.

Attention: Shani Hinton, c/o Bintry Mill, Mill Road, Bintree, Norfolk, England, Email: shanihinton@mc.com

7.     Headings. Captions, headings and organization are for convenience only and shall not be used to construe meaning.

## Appendix 1

*An Amazon Original Movie* by itself or in conjunction with [Title]

and/or

*Exclusively on Prime*
*Only on Prime*
*Stream the Picture [Exclusively or Only] on Prime Instant Video*
*Stream the Picture on Prime*
*Watch [the Picture] Exclusively [or Only] on Prime*
*An Amazon Original Movie only on Prime*
*Watch the Picture on Prime*
*Watch [Title] Written and Directed by Woody Allen on Prime*
*Watch [Title] Written and Directed by Woody Allen [Exclusively or Only] on Prime*
*Watch [Title] [Exclusively or Only] on Prime*
*Stream [Title] only on Prime*
*Get/Watch the Picture free on Prime*
*Start your free Prime trial today to watch [Title]*
*Start your free Prime trial today to watch [Title] Written and Directed by Woody Allen*
*Get access to [Title] Written and Directed by Woody Allen by subscribing to Prime*
*Start your 30-day Amazon Prime free trial today to watch [Title]*
*Watch [Title] Written and Directed by Woody Allen*
*Get access to [Title] Written and Directed by Woody Allen by becoming a member of Prime*

and/or (in conjunction with any of the secondary, additional call-to-actions):

Watch Now
Stream Now
Watch Free
Get Started
Start your 30 day free trial
Start your free month
Watch for $0.00 with Prime
Now on Prime

Note: For purposes hereof, the words "*Prime*," "*Amazon Prime*," "*Prime Instant Video*", "*Amazon Instant Video*" and "*Amazon*" are approved variations and uses within any of the foregoing approved verbiage.

The ratio of the font size of the foregoing verbiage to the font size of the title of the Picture shall be the same ratio as set forth in the attached examples.

## SCHEDULE A
## DELIVERY SCHEDULE

These Delivery Requirements will be deemed incorporated into that Agreement, effective as of [Insert Date], between Amazon Content Services, LLC ("[Distributor]") and Gravier Productions, Inc. ("Licensor"). Licensor's obligations in connection with the Picture will not be complete until Licensor has physically delivered, except as otherwise noted therein, each and every item and element listed below. When Delivery of the Digital and/or Video materials (as described below) is by access, such material will be available to Amazon, and Licensor will use the form laboratory access letter provided by Amazon and agreed to by Licensor. Licensor will make delivery to Amazon or its designees in Los Angeles or elsewhere as Amazon may designate. To the extent that title to any tangible property is transferred under this Agreement, title will transfer from Licensor to Distributor upon receipt by Distributor. For the transfer of any property by Distributor to Licensor, title will pass to Licensor upon delivery to common carrier. All publicity materials and documentation are to be provided along with English translations if the original versions are in a foreign language. All Digital and Video material will be of commercially acceptable quality. Licensor will be responsible for maintaining its own set of materials at its own lab or storage facility (i.e. original video masters should not be delivered to Amazon). Upon Licensor's delivery of all items below, Amazon will have 45 days in which to evaluate the elements and determine their technical acceptance. Delivery of the Picture in substantial accordance with this Delivery Schedule is of the essence. Failure by Licensor to correct any defects within 20 days will be considered a material breach of the Agreement. With respect to Woody Allen's approval rights hereunder, in the event of Allen's death, Allen's appointed trustee will exercise such approval rights.

### A. DIGITAL / VIDEO MATERIALS:

1. <u>Digital Cinema Package</u>: Physical Delivery of one multi-reel DCP with a single CPL. Two second head/tail pop should be included in every reel with trim head and tail leaders in the CPL. The DCP shoud be in a 24- or 48-frame progressive scan Digital Cinema format with a minimum projector resolution of 2048 by 1080 pixels, source image format conforming to INTEROP D-Cinema Distribution Master – Image Characteristics; image compression (if used) conforming to ISO/IEC 15444-1 (JPEG 2000), and image and sound file formats suitable for exhibition in commercial Digital Cinema sites. The audio in a typical Digital Cinema Package (DCP) is 5.1 channels of discrete audio, and that is the preferred audio configuration. The minimum for a non-mono configuration of the audio will be three channels as Left, Center, Right (a Left/Right configuration is not acceptable in a theatrical environment). The audio data will be formatted in conformance with INTEROP D-Cinema Distribution Master – Audio Characteristics and INTEROP D-Cinema Distribution Master – Audio Channel Mapping and Channel Labeling. A DKDM must also be provided. The textless materials formatted as DCDM must be delivered on the same hard drive in a separate folder. Please see Postops Guidelines for specific file naming structure. The textless DCDM should be on the master DCP CRU drive in a separate folder clearly labeled.

2. <u>Textless DCDM and ProRes Reel</u> – Lab access to one master textless digital content distribution master delivered on LTO 6 (LTFS) as well as a copy on the DCP drive in a separate folder (A1). Lab access to one ProRes Textless reel (ProRes 422 HQ codec, Rec709, 3840 x 2160 (or OAR), 23.98 fps, 5.1+ Lt/Rt Audio UHD file) Please see Post Ops Guidelines for specifics on naming conventions.

3. <u>AIV UHD SDR Master</u> – Physical delivery of one Final UHD Master File Video Asset (ProRes 422 HQ codec, Rec709, 3840 x 2160 (or OAR.), 23.98 fps, 5.1+ Lt/Rt Audio UHD file. Full technical specifications to be provided by Amazon Studios).

4. <u>AIV UHD HDR Master</u> – If available, Physical delivery of one Final 4K HDR Master File Video Asset (ProRes 422 HQ codec, PQ, 4096 x 2160 (or N.A.S.), 23.98 fps, 5.1+ Lt/Rt Audio 4K file. Full

technical specifications to be provided by Amazon Studios).

5. AIV HD Split Track QT – Physical Delivery of one (1) unsubtitled long play Pro Res 422 HQ Quicktime (OAR). High Definition masters shall be made directly from the digital files with Mono Dialogue on Ch.1, Mono Sound Effects on Ch.2 and LT/RT Stereo Music on channels 3&4. The master shall be delivered as 1080p at a rate of 23.98

6. AIV HD Clean Screener INTENTIONALLY DELETED

7. AIV HD Watermarked Screener-INTENTIONALLY DELETED

8. AIV HD Forensically Watermarked Screener – INTENTIONALLY DELETED.

9. 1.78 Pan and Scan HD Masters - (Pro Res 422 HQ): One (1) Pro Res 422 HQ QT master in the 23.98 format, in a 4:4:4 color space, as follows: one (1) QT in the 16X9 (1.78:1 full frame) format. The QT shall contain proper head slates (which include, without limitation, the title, running time, aspect ratio, audio configuration, name of the record vendor, the date of creation, etc.). Channels 1 & 2 shall contain the 2-track printmaster LT/RT limited to +12db. Channels 3 & 4 shall contain 100% fully filled stereo M&E limited to +20db. Channels 5 thru 10 shall contain the 5.1 printmaster limited to +20db. Channels 11 & 12 shall contain the 2-track printmaster LT/RT limited to +20db. All textless backgrounds shall be attached to the tail of each video master. The textless backgrounds shall be in the proper aspect ratio and shall be color timed.

10. Digital Files: Irrevocable access (subject to Woody Allen approval in each instance) to the 2K or 4K un-color-corrected digital preservation master and color corrected CTM DPX files on LTO5 or hard drive.

    (a) Trim Passes of Primary CTM (Rec709, P3, HDR or any other approved versions) should be archived to LTO5.

11. Closed Captioning Files: Physical delivery of one electronic copy of the closed captioning files. (Note: must be an SCC file).

12. Video Description Files: INTENTIONALLY DELETED.

13. Subtitling Files: If applicable and available, physical delivery of one electronic copy of the subtitling files (STL file).

14. Main and End Titles: Physical delivery of TIFF of PSD files of main & end graphics, and one electronic copy (WORD document) of the main and end titles as they appear in the final cut of the Picture.

15. HD Blu-Ray: INTENTIONALLY DELETED.

## B. ARCHIVAL

1. LTO Back-Ups: At the conclusion of the production cycle, all original elements used in the picture must be archived to LTO5 and access to the Distributor will only be provided upon written request to Woody Allen (and written approval by Woody Allen in conjunction with a specific, separate Lab Access letter and in accordance with the Creative Rights Rider to the Agreement. This includes, but is not limited to, the following items:

    • Edit elements (Avid Projects, Photoshop Files)

- Graphics files (Main Titles artwork, textless)
- Final Pro Res UHD & HD Split Track Masters
- Hard drives & Digital Media Map/Screenshots (if delivering with consolidated elements)
- Final music, sound effects, and any other audio files (undipped)
- And all other media that may not be mentioned above. The Post Production Department is responsible for supervising the archival process, including all packing and shipping. S/he must ensure that all the required paperwork is included and that it matches all delivered media. Any elements that do not meet the following requirements will be sent back to Licensor for re-packing at the Licensor's expense.

## C. SOUND MATERIALS:

1. 6 Track Printmasters: Physical delivery of the six-track printmaster (5.1) recorded as 24 bit Protools files at a sample rate of 48k at BOTH 23.98 (longplay) & 24 frames per second (in reels) with non-drop frame timecode on hard drive.

2. 2 Track Printmasters: Physical delivery of the two-track printmaster recorded as 24 bit Protools files at a sample rate of 48k at BOTH 23.98 & 24 frames per second with non-drop frame timecode on hard drive.

3. 6 Track DME: Physical delivery of the six track master of the picture as WAV or AIFF files on hard drive with the following configuration: channels 1&2: Dialogue Left, Right, channels 3&4: Music Left, Right and channels 5&6: Effects Left, Right.

4. 6+2 Track M&Es: Physical delivery of the fully filled 6+2 track 5.1 M&E on tracks 1 to 6, Optional Material on channel 7 and Dialogue Guide on Channel 8 recorded as 24 bit Protools files at a sample rate of 48k at BOTH 23.98 & 24 frames per second with non-drop frame timecode on hard drive.

5. 2 Track M&E: Physical delivery of the fully filled 2 track printmaster on hard drive recorded as 24 bit Protools files at a sample rate of 48k at BOTH 23.98 & 24 frames per second with as channel 1: M&E left total, channel 2: M&E right total.

6. Multiple Track Stems: Physical delivery of the 6 track stereo dialogue, 6 track stereo music and 6 track stereo stems recorded as 24 bit Protools files at a sample rate of 48k at 24 frames per second on hard drive.

7. Music Tracks: Electronic delivery of original score for trailer and ancillary material, along with recorded tapes, each original music cue and music source cue recorded in its entirety on one CD, if possible; otherwise, individual CDs of each original music cue and music source cue recorded in its entirety and any licensed music which Amazon can utilize in connection with creating trailers for the Picture (if any), and if soundtrack album rights are granted to Amazon, from which Amazon can produce a soundtrack album. (Undipped)

## D. ADVERTISING/PUBLICITY MATERIALS:

1. Color Images: Physical Delivery of fully approved color stills that include an initial amount of one-hundred fifty (150) images to be delivered by Licensor in a digital format (at least 300 dpi at 8x10 in TIFF format). Images should match the final look of the Picture. Each of said stills/slides shall be accompanied by an English language title which is descriptive of the scene and the performers

3

depicted, and should be clearly numbered. If stills are insufficient to mount a creative campaign and Distributor feels screen grabs are necessary, Distributor will request approval from Allen in advance of choosing screen grabs. Licensor must pay to have such grabs pulled from the feature digital files.

2. <u>Unit Photography</u>. If available, and if Allen approves in writing (e-mail will suffice), physical Delivery of all available unit photography in digital format of 300 dpi at 8x10 in TIFF format: (i) depicting different scenes and/or poses taken from the Picture; and (ii) taken during the production of the Picture; which shall be suitable for use by Distributor in the preparation of advertising, exhibition, and publicity material for the Picture. All unit photography not provided pursuant to Section D1 above will require further approval by Allen and any third party depicted that has photo approval prior to use by Distributor. Licensor will procure such necessary approvals. In the event digital images are delivered as raw files, any conversion to TIFF format of selects by Distributor shall be treated as a distribution expense in accordance with the Agreement.

3. <u>Billing Block</u>: Physical delivery of the approved and final billing block that is contractually correct, to appear in paid advertising and key art of the Picture in electronic format as a WORD document, and all required logos in vector format (AI, PSD or EPS files) which shall represent exact placement, wording and size of each paid advertising credit. Licensor shall provide a word version and PDF version of final billing block with a written statement at the bottom of the billing block stating "Licensor approves the above billing block as of [DATE]. Licensor represent(s) and warrant that the billing block contains all the credits the Licensor contractually agreed upon to appear in the billing block portion of paid ads in connection with the Picture.

4. <u>Title Art/Fonts</u>: If available, physical delivery of the original artwork, illustrations, hand lettering and printed title art cards, of the main and end titles and other captions and titles that appear in the Picture as a J-peg, EPS or TIFF. Licensor may also deliver title art in layered files in electronic format and should also provide font name information.

5. <u>Press Kits</u>: Physical delivery, if available, of a one-page synopsis, production notes and biographies of principal cast and crew members. Notes on the production of the Picture shall include history of the production; illuminating comments by the cast and key filmmakers about the Picture, its significance and its special claims on the interest of the moviegoers. All Production Notes shall be read and approved by Producer and if available, the Director and anyone else so designated by Producer before they are delivered to Distributor. Production Notes to be delivered as a Microsoft Word document.

6. <u>Promotional/Added Value Materials</u>: If available, physical delivery of one hard drive containing all promotional and/or added value material including any copies of all advertisements, paper accessories and other advertising and publicity materials, if any, prepared by Licensor or by any other party in connection with the exploitation and release of the Picture, including deleted scenes, featurette, interviews with the principal cast, the director and producer and B-roll (to the extent created) and behind-the-scenes footage of the actors and filmmakers working. To the extent any material provided by Licensor required third party approval (cast, crew, writer, director, etc.) all material provided shall be deemed approved for use in connection with the Picture. All music and usage rights used in the creation of these Materials shall be cleared for worldwide use.

7. <u>Trailer Elements (if available)</u>:
   (a) <u>Digital Trailer Video Master</u>: Physical delivery of one Pro Res 422 HQ Trailer Video Master, including texted and full textless versions. Composite audio, music and effects on channels 1&2, and music and effects on channels 3&4.
   (b) <u>Trailer DCP</u>: Physical delivery of one trailer DCP on hard drive.

4

E. DOCUMENTATION: To be delivered as digital copies (or originals where applicable):

1. <u>QC Reports</u>: Physical delivery of quality control reports from an approved lab in connection with the DCP Master and each UHD Master delivered to Distributor.

2. <u>Final Shooting Script</u>: Upon request by Distributor for award consideration, physical delivery of the Final Shooting Script in electronic format, and As Broadcast Script (if available).

3. <u>Final Cast and Crew List</u>: Physical delivery of the final cast and crew list in electronic format, which includes contact information. Final cast and crew list must also include all post-production crew hired in association with the Picture and any characters deleted from the Picture. The cast and crew lists delivered by Licensor to Distributor will not be confidential and Distributor will be authorized to share with regards to the exploitation of the Picture.

4. <u>Character Deletion Report</u>: INTENTIONALLY DELETED.

5. <u>Dialogue Continuity and Spotting List</u>:
Physical delivery of the English language final combined dialogue and action continuity list, delivered electronically in WORD format, of each version of the Picture and Trailer containing all spotted dialogue, narration, sound vocals, and all text including all opening titles and complete end credits appearing in the Picture, subs and supers, as well as cut-by-cut description of the action of the Picture in its final form, with time code in and time code out (matching the video masters), and the total duration of each line of dialogue. If the Picture is in a foreign language, one copy in the foreign language of a detailed, final combined dialogue and action continuity list on CD-Rom, if available.

6. <u>Main Title Statement of Obligations</u>: Physical delivery of a statement, summarizing all contractual main title screen credit obligations with respect to the Picture along with copies of the contractual language, for all cast, crew and entities who have been accorded main title credit on-screen. (Should agreements for any cast members or personnel who are accorded screen credit not exist, then signed releases from those individuals), The statement will include each credit in one column and a summary of the credit obligation in the adjacent column, including form, placement, size and exclusions. If there is no obligation to accord a certain credit which has been accorded, the "obligation" should be stated as "producer's discretion". Template to be provided by Amazon Studios.

7. <u>Paid Advertising Statement of Obligations</u>: A complete, accurate and typewritten statement ("Paid Ad Statement") in the English language of any and all third-party paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights with excerpts from each applicable third party agreement setting forth the precise extent and nature of such obligations, restrictions, consultation rights and/or approval rights (including any tie-in obligations) attached thereto. The format of the statement should include all individuals and entities that are accorded credit in the billing block and shall be listed in the order of how those individuals appear in the billing block. The statement will include each credit in one column and a summary of the credit obligation in the adjacent column, including form, placement, size and exclusions. If there are no paid advertising and credit obligations and/or name and likeness restrictions, a signed written statement upon which Licensee may rely must be provided by Licensor. Template to be provided by Amazon Studios.

8. <u>Dubbing/Subtitling Restrictions</u>: Physical delivery of a statement of all dubbing and subtitling restrictions relating to the replacement of any player's voice, including the dubbing of dialogue in a

5

language other than that in which the Picture was originally recorded. A contact list of all technical talent entitled contractually or by union affiliation to be provided with notice of any and/or all post production work (timing of the picture, video transfers, television editing, etc.). Template to be provided by Amazon Studios.

9. Editing Restrictions: To the extent not covered in the Creative Rights Rider to the Agreement, all contractual rights of or obligations to any party regarding supervising or participating in cutting/editing for airlines or television, or other post-production or cutting/editing processes. A contact list of all technical talent entitled contractually or by union affiliation to be provided with notice of any and/or all post production work (timing of the picture, video transfers, television editing, etc.).

10. Premiere and Film Festival Obligation Statement: One (1) summary outlining the Premiere and Film Festival obligations (including, without limitation, all obligations pertaining to the number of invitations to be issued, travel accommodations, hotel accommodations, per diem, etc.) for all individuals affiliated with the Picture. If there are no Premiere and/or Film Festival Obligations, a written statement on which Distributor can rely on indicating such shall be provided. Template to be provided by Amazon Studios.

11. Cast/Talent/Personnel Agreements: Physical delivery of copies of fully-executed long form agreements (including nudity riders) or Distributor-approved certificates of engagement for the writer, director, producer, executive producers, co-producers, co-executive producers, composer, music supervisors, department heads, and principal cast members, as well as all other cast members, talent and personnel who are afforded credit on-screen in the main titles or the billing block, along with a key cast and crew contact list.

12. Affidavit: Physical delivery of an affidavit sworn to by an officer of the production company stating that all costs of production have been paid for and there are no liens, encumbrances or claims as of the date of the Affidavit.

13. Releases: Physical delivery of all signed releases from all persons identified by name, voice or likeness in the Picture who do not have signed contracts.

14. Stock Footage /Third Party Content Licenses: Physical delivery of all signed licenses for all stock footage, images, photographs, product placements, film clips, artwork, books, copyrighted and/or trademarked materials, or other third party materials used in the Picture, along with a completed Stock Footage Cue Sheet (template provided by Amazon Studios). Copies of all fully-executed licenses (and proof of payment of the licensing fees) shall be delivered.

15. Other Agreements: Access to all other agreements and documents relating to the Picture (e.g., clearances, releases, minor permits/parental consent forms, nudity riders, any other documentation related to minors and, if any payments are due in connection with such agreements, evidence of any such payments in full, etc.) as may be required.

16. Music Cue Sheet: Electronic delivery of the Music Cue Sheet for the feature film and trailer provided by Licensor (if any) in a form accepted by International Performing Rights Societies, in the English language showing the particulars of all music contained in the Picture and any completed Trailers delivered hereunder, including the title of each composition, and with respect to each composition: (i) the names of composers; (ii) the names of publishers (including percentage of ownership if more than one publisher); (iii) the usages (whether background instrumental, background vocal, etc.); (vi) the place for each composition showing the film footage and running time for each cue; and the (v) performing rights society involved. All the information above should be included within one document. If applicable, one (1) copy of any narration agreement(s) used in connection with the Picture or any trailers delivered by

6

Licensor to Distributor pursuant to this Agreement. If any composition is within the public domain, Licensor shall identify such composition(s) in writing. The Music Cue Sheet must be in an industry standard format, a sample which Amazon Studios will provide.

17. Music Licenses: Electronic delivery of all synchronization and performing rights licenses (fully executed) and all master use licenses (fully executed) for all non-original music embodied in the Production. Licensor shall provide proof of payment for all synchronization and master use licenses. All licenses must be on an all media full buy-out basis, in perpetuity and remain in full force and effect and must permit the reproduction and distribution of such non-original music in all media, now known or hereinafter devised, throughout the Term and in the Territory at no additional cost to Distributor including, but not limited to, all future media (including the internet) as defined in the Agreement. In addition, the information in the licenses must agree with the information provided in the Music Cue Sheet and end credits.

18. Composer Agreement: If there is any composed music in the Picture, one (1) copy of the fully executed Composer Agreement and all other agreements for all other music personnel (including, without limitation, the Music Supervisor, any and all releases for vocalists, musicians, etc., and any co-publishing or administration agreements, and to the extent applicable, any Soundtrack Album Agreement, manuscripts/lyrics (clean and explitive versions, if any) for the musical composition).

19. Producer's Errors and Omissions Insurance: Physical delivery of the E&O certificate in accordance with the terms of the Agreement. A copy of the E&O insurance application, E&O policy and endorsement in accordance with the terms of the Agreement must also be included.

20. Chain of Title: Physical delivery of the complete chain of title materials, which will include:

(a) Underlying Rights Documents: Complete chain of title materials evidencing Licensor's ownership of the Picture and all underlying property and Licensor's right, title and authority to grant the Rights being granted hereunder (including, without limitation, a summary page detailing all documents delivered evidencing the chain). Licensor shall register all chain of title agreements with the U.S. copyright office and provide Distributor proof of filing.

(b) Copyright Registration Certificate: One filed U.S. Copyright Registration Certificate/Form PA (stamped by the Library of Congress) for the screenplay and one filed U.S. Copyright Registration Certificate/Form PA (stamped by the Library of Congress) for the Picture. If the certificate (Form PA) has not yet been returned from the Library of Congress, Licensor will deliver a copy of the certificate (Form PA) along with a copy of the cover letter and check that accompanied the certificate (Form PA) to the Copyright Office. Licensor agrees to deliver one copy of each of the Copyright Registration Certificates to Amazon when received.

(c) Certificate of Authorship: One original Certificate of Authorship (required if the writer's agreement is not available) in the form required by Amazon.

(d) Certificate of Origin: Ten (10) original notarized Certificates of Origin of the Picture in the form required by Amazon.

(e) Short Form License/Instrument of Transfer (notarized): Three (3) original notarized assignments of the rights granted Amazon in and to the Picture under the Agreement. Amazon will prepare the document for Licensor's review and execution. Licensor to file Short Form License/Instrument of Transfer with U.S. copyright office and provide Amazon proof of filing.

7

(f) Title Report: One current (no more than 60 days old) title report and accompanying legal opinion showing that the title of the Picture is available for use within the Territory without infringing any other person or entity's rights. If the title of the Picture has insurance coverage, a copy of the Title Report submitted to Licensor's insurance carrier will suffice. Title Report and opinion shall be provided by an approved vendor, with Thomson CompuMark pre approved.

(g) Copyright Report: One current (no more than 60 days old) copyright report provided by an approved vendor, showing that Licensor has good clear title to the picture and all underlying rights.

(h) Copyright Mortgage and Assignment: Three original assignments, fully executed and notarized by Licensor, granting Amazon a security interest in and to the rights granted Amazon in and to the Picture under the Agreement. Amazon will prepare the document for Licensor's review and execution. Licensor to file Copyright Mortgage and Assignment with U.S. copyright office and provide Amazon proof of filing.

(i) UCC-1 Financing Statement: If requested by Amazon. Licensor to file UCC-1 Financing Statement with applicable secretary of state office(s) per Amazon.

(j) UCC Search: One (1) current UCC Search of Licensor and all other respective entities (from a reputable service) from the following states: (i) California; (ii) the state of Licensor's principal place of business; and, (iii) the state of producer's principal place of business. Each search report must show that the Picture is free and clear of any and all liens. Each report must include copies of the referenced filings, to the extent applicable, and shall identify the collateral. In order for delivery to be deemed complete, Licensor shall address all issues, if any, outlined in the UCC Search Report, including providing proof that all existing liens (including financiers and the bond company, as applicable) have been extinguished.

21. MPAA Rating Certificate: Physical delivery of a paid rating certificate from the Motion Picture Code and Rating Administration of America Inc. with a restriction not greater than "R".

22. Dolby/Sound License: Physical delivery of an executed copy of the license agreement for use of Dolby sound, or any sound license in connection with the Picture, for the duration of the license term and for unlimited distribution. If a Sound License was not necessary for completion of the Picture, a statement noting the release of such obligations must be provided.

23. Laboratory Access Letter: One (1) original copy of the Laboratory Access Letter (or Storage Access Letter) granting Distributor access during the term to all materials, as applicable, signed by Licensor and the laboratory. Distributor shall provide Licensor with a copy of its standard Laboratory Access Letter. Upon Distributor's request, Licensor shall execute additional Laboratory Access Letter agreements with Distributor's sub-license partners if required by Distributor with regards to the exploitation of the Rights. Amazon will provide Licensor with access letter template to be forwarded to lab for execution.

24. Subordinations: Physical delivery of subordinations executed by all parties providing financing and completion bonds for the production and delivery of the Picture or having any lien, charge or security interest in the Picture or its revenues.

25. Residual Worksheet: Physical delivery of one Residual Worksheet along with the production payroll records (showing the respective social security numbers, addresses, compensation and evidence of payment in full, and the number of days worked), all talent and crew agreement for those cast and crew

members who are entitled to payment of residuals, and all other information and documentation required under the Residual Worksheet. Amazon will provide Licensor with the Residual Worksheet to be completed by Licensor.

26. American Humane Association Disclaimer: If the Picture contains the American Humane Association (AHA) disclaimer that "no animals were harmed in the making of this "film," a copy of the disclaimer approval letter issued by the AHA shall be provided.

27. 2257 and 2257A Regulations: With respect to the Picture that includes any depiction of simulated sexually explicit conduct: a copy of the certification to the U.S. Attorney General under 18 U.S.C §2257A(h) in the form required by 28 C.F.R. §75.9 (a "Certification") applicable to the Picture from the certifying producer of the Picture; and with respect to each performer (including minor performers) in the Picture, identifiable information for each such performer (including the performer's name, addresses and date of birth).

28. Guild Approvals (if applicable):

   (a) Directors Guild Credit Approval: If the Picture was produced under the jurisdiction of the Directors Guild of America ("DGA"), a letter from the DGA approving the list of screen credits for the Picture submitted to the DGA pursuant to Article 8-201 of the DGA Basic Agreement. The following documents/information must also be provided: DGA Agreement signed by Production Co. (Basic, Low Budget, Modified, etc), Directors & DGA Crew DGA Deal Memos, Names & SS#'s of Director and DGA Crew, Loanout Corporation Names & Federal ID#'s, shooting location(s), principal photography date.

   (b) Writers Guild Credit Verification: If the Picture was produced under the jurisdiction of the Writers Guild of America ("WGA"), a copy of the Notice of Tentative Writing Credits submitted to the WGA and, if the writing credits were submitted to a WGA credit arbitration, a copy of a letter from the WGA setting forth the final writing credits as determined by the WGA Credits Committee. Notice of Final Writing Credits from WGA, WGA Agreement signed by Production Co. (Basic, Low Budget, Modified, etc), Names & SS#'s of WGA members, Loanout Corporation Names & Federal ID#'s, shooting location(s), principal photography date.

   (c) Screen Actors Guild ("SAG"): The following documents/information must also be provided if the Picture was produced under the jurisdiction of SAG: SAG Final Cast List (From payroll processor indicating amounts paid and days/hours worked), final credits, shooting location(s), principal photography date, SAG Player Time Sheets, SAG Player Contracts, SAG Agreement signed by Production Co. (Basic, Low Budget, Modified, etc).

   (d) Production Designer Credit Waiver: If the Picture was produced under the jurisdiction of the Society of Motion Picture and Television Art Directors Local 876 ("Art Directors Guild") and producer desires to accord credit to the art director in the form "Production Designer", a copy of a written waiver from the Art Directors Guild approving the use of such "Production Designer" credit.

   (e) IATSE: If the Picture was produced under the jurisdiction of IATSE, a copy of the Proration Application (if applicable).

   (f) Additional Waivers: Letters with regard to any additional waivers.

   (g) American Federation of Musicians ("AFM"): Any contracts with musicians that state residuals to

9

be paid to AFM.

29. Metadata Spreadsheet: Electronic delivery of the AIV Metadata worksheet, as supplied by Amazon.

30. Fact Sheet: Electronic delivery of the General Fact Sheet, as supplied by Amazon.

10

SCHEDULE B
DEFINED PROCEEDS

This Schedule B (this "**Schedule**") is attached to and made part of the Long Form Acquisition Agreement dated July 22, 2016 entered into between Gravier Productions, Inc. ("**Participant**") and Amazon Content Services, LLC ("**Amazon**") with regard to the Picture (the "**Agreement**"). Defined terms used in this Schedule which are not defined herein will have the meaning given to them in the Agreement, as applicable.

To the extent of any conflict between the provisions of this Schedule B and the provisions of the Agreement, the terms set forth in the Agreement will govern and prevail.

1.    Calculation of Defined Proceeds. "**Defined Proceeds**" is calculated by deducting (and recouping) from Gross Receipts all Distribution Fees, all Distribution Expenses, all Participations, all Cost of Production and all Deferments, each in that order. These terms are defined as follows:

a.    "**Gross Receipts**"

i.    Gross Receipts means, subject to Paragraph 1.a.ii below, the aggregate of:

(A)    All Theatrical Distribution Receipts;

(B)    All Television Distribution Receipts;

(C)    All Consumer Video Distribution Receipts, as calculated pursuant to Schedule A-1, attached hereto;

(D)    All Music Publishing Distribution Receipts, as calculated pursuant to Schedule A-2, attached hereto;

(E)    All Sound Recording Distribution Receipts, as calculated pursuant to Schedule A-3, attached hereto;

(F)    All Games Distribution Receipts, as calculated pursuant to Schedule A-4, attached hereto;

(G)    All Merchandising Distribution Receipts, as calculated pursuant to Schedule A-5, attached hereto;

(H)    All Tax Credits received by Amazon and any Affiliate of Amazon;

(I)    All Infringement Recoveries;

(J)    In lieu of actual receipts derived worldwide and in perpetuity from any Amazon On Demand Distribution, Amazon is deemed to have received, upon exploitation by Amazon via Amazon On Demand, Gross Receipts in an amount equal to the Imputed Amount for the Picture and receipts from Amazon On Demand Distribution will not be included in Theatrical Distribution Receipts, Television Distribution Receipts, Consumer Video Distribution Receipts, Music Publishing Distribution Receipts, Sound Recording Distribution Receipts, Games Distribution Receipts, Merchandising Distribution Receipts, and Other Distribution Receipts; and

1

(K) All other receipts ("**Other Distribution Receipts**") actually received and earned by or irrevocably credited to Amazon from any other distribution or exhibition of the Picture, if applicable ("**Other Distribution**").

ii. Gross Receipts does not include:

(A) Receipts received by Amazon and any Affiliate of Amazon and thereafter refunded;

(B) Deposits, advances, and other amounts received by Amazon and any Affiliate of Amazon until the same are earned and non-returnable;

(C) Receipts received by Amazon or any Affiliate of Amazon from exhibition of the Picture contributed to charitable organizations or related to premieres of the Picture;

(D) Receipts received by Amazon and any Affiliate of Amazon through the development, production or distribution in any media, now known or hereafter invented, of any spinoff, remake, prequel, sequel, radio or spoken word production, theatrical production, pilot or other audience testing or community development materials, or other derivative programs or productions of any kind of the Picture (collectively, "**Picture Derivatives**") or transfer of any part of Amazon's right to produce and/or exploit the same;

(E) Receipts received by a distributor unless and until such distributor accounts to Amazon with respect to the same and actually pays Amazon the portion thereof that is payable to Amazon, in which case only such portion may be considered Gross Receipts subject to the terms of this Agreement;

(F) Receipts received by (1) exhibitors or others who may actually exhibit the Picture to the public including but not limited to box office receipts and concession receipts; (2) radio and television broadcasters; (3) cable operators; (4) manufacturers, wholesalers and retailers of consumer video; (5) book, magazine, video game, and music publishers; (6) phonograph record producers and distributors; (7) manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, video games, goods, services or theme park or other attractions; and (8) any other person, firm, or corporation exploiting the Picture or subsidiary rights therein; whether or not any of the foregoing are Affiliates of Amazon;

(G) Receipts received by Amazon and any Affiliate of Amazon for consumer subscription or access fees, such as cable service fees, subscription video on demand service fees, and programming service or carriage fees from any third-party cable or satellite or comparable distributor;

(H) Receipts received by Amazon and any Affiliate of Amazon in connection with any advertising, sponsorship, promotion, product integration, or similar arrangement of any kind or in connection with Amazon's inclusion of any advertising or promotional materials for products or services prior to, during or after the Picture;

(I) Receipts received by Amazon and any Affiliate of Amazon in connection with any Theatrical Distribution, Television Distribution, Consumer Video Distribution, Music Publishing Distribution, Sound Recording Distribution, Games Distribution, Merchandising Distribution, and Other Distribution in the event Participant or any person or entity affiliated with

2

Participant is entitled to a royalty or other participation in receipts in any way derived from the exploitation of the aforesaid rights, whether pursuant to the Agreement, any collective bargaining agreement, or otherwise (for clarity, if Participant is entitled to a royalty or other participation in receipts derived from Merchandising Distribution that also includes receipts from Games Distribution, in such instance, Gross Receipts hereunder will not include receipts in connection with both Games Distribution and Merchandising Distribution);

(J) Any sums paid or payable to Amazon and any Affiliate of Amazon (or advances given to Amazon or any Affiliate of Amazon) in connection with financing transactions of any nature, including, but not limited to, transactions to finance development, production or distribution costs or expenses for the Picture, or as reimbursement of such costs or expenses in connection with the Picture;

(K) Any amounts received by Amazon and any Affiliate of Amazon in connection with any advertisement, product or promotional material that is not intended for sale by or on behalf of Amazon or any Affiliate of Amazon to customers on a standalone, transactional basis including, without limitation, posters made available to exhibitors, preloading of the Picture on video devices, one-sheets, jackets for, covers of, and inserts in, book publications or videodiscs, hats, t-shirts, souvenir programs, soundtrack recordings, or other promotional merchandise that is distributed to the public free of charge;

(L) Any amounts collected in connection with the distribution of the Picture as taxes or for payment of taxes (e.g., admission, sales, use or value added taxes, etc.);

(M) Any amounts derived from any so-called "sneak preview" of the Picture that are allocated to the motion picture that is otherwise playing at the applicable theater at the time of the sneak preview;

(N) Receipts received by Amazon and any Affiliate of Amazon in connection with the disposition of print stocks, exploitation or use of stock footage, props, set, wardrobes, equipment or other items relating to or taken from the Picture or otherwise purchased, designed, created or construed in connection with the production and or distribution of the Picture, film, tape, sound and other materials retained in connection with library purposes, featurettes, and still photographs which relate to or are derived from the Picture;

(O) Any amounts paid or payable to Amazon or any Affiliate of Amazon for, in connection with or as the result of their furnishing, supplying, rendering, procuring, arranging for or making available any materials, equipment, facilities or services in connection with the production of the Picture; and

(P) Non-monetary consideration received by Amazon and any Affiliate of Amazon from the exploitation of the Picture unless and until such consideration is actually converted into monetary currency and then only when, to the extent of, and in the amount actually received by Amazon and any Affiliate of Amazon, as applicable.

b. "**Distribution Fees**" are, with respect to each type of distribution, the greater of (i) 30% of Gross Receipts or (ii) the percentage of Gross Receipts charged to Amazon as a distribution fee by a distributor, if any, used by Amazon. Notwithstanding the foregoing, no Distribution Fee will be charged by Amazon on the Imputed Amount.

c. "**Distribution Expenses**" means all expenses paid or payable by or for the account of Amazon in connection with the distribution, licensing, exhibition or other disposition of the Picture, or the exercise of any merchandising, publishing, music or other rights, and will include, without

3

limitation (i) performance fees, reuse fees, royalties and Residuals (including, without limitation, (1) the cost of calculating those performance fees, reuse fees, royalties and Residuals and (2) all performance fees, reuse fees, royalties and Residuals attributable to Consumer Video Distribution) other than fees or royalties included in the Cost of Production; (ii) union or association fees or charges including allocable portion of dues, assessments, including legal fees and costs, and contributions, e.g., to IFTA, MPAA, AMPTP, MPEA, the Academy of Motion Picture Arts and Sciences and similarly constituted or substitute organizations throughout the world (including legal fees to counsel respecting anti-trust and piracy matters and matters formerly handled by AMPTP prior to any subdistributor's withdrawal therefrom); (iii) the costs of taking delivery of the Picture for distribution and all duped and dubbed negatives, soundtracks, prints, release prints, masters, encodings, transfers, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connection therewith and inspecting and checking exhibitors; projection and sound equipment and facilities and all other additional material and editorial and laboratory work; (iv) outside legal and accounting fees attributable to distribution; (v) federal, state, local or other taxes (regardless of the manner that such taxes are treated on Amazon's tax returns), domestic or foreign, however denominated and assessed or accrued in a financial statement reserve against the Picture, or arising from the Gross Receipts derived therefrom, or the distribution, exhibition or other disposition of the Picture or other material connected therewith (excluding from such taxes corporate income and franchise taxes on Amazon); (vi) allowances made to exhibitors, licensees or others for advertising, exploitation, or publicity including all refunds, rebates, credits, discounts, allowances and adjustments granted to exhibitors, vendors or other licensees, whether occasioned by condemnation by boards of censorship, settlement of disputes, volume thresholds, incentives or otherwise; (vii) fees, commissions or other compensation (other than Distribution Fees) paid or incurred to any broker, sales agent, or other intermediary or party in connection with the Picture or in connection with the exercise of any rights in the Picture or other material connected therewith; (viii) contingent compensation or other Participations paid or incurred to any agency;

(ix) collection costs and/or the costs of auditing the sums payable by licensees or exhibitors including costs of checking theatre attendance and reports, and investigating unauthorized usage of the Picture, whether payable or incurred by Amazon employees or other persons; (x) Advertising Costs; (xi) costs of all transportation, duplication, packaging, physical media, physical and electronic storage and insurance coverage for any risk of loss with respect to the Picture; (xii) shipping, returns, tariffs, customs and duties; (xiii) bank conversion and transfer fees, including costs to transmit to the United States any funds accruing to Amazon from the Picture in foreign countries, such as cable expenses and any expenses incurred in contesting the imposition of restrictions which result in restricted funds, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars; (xiv) costs to obtain and maintain trademark and copyright registration for the Picture; (xv) costs of procuring the approval of the various censorship authorities and rating boards, such as MPAA, including the recutting, re-editing or shortening or lengthening the Picture for release in any part of the Territory or for exhibition on television or other media, or in order to confirm to the requirements of censorship authorities, or in order to conform to the peculiar national or political prejudices likely to be encountered in any part of the Territory, or for any purpose or reason; (xvi) costs of any cutting or other alteration of the Picture for various distribution uses, and any materials connected therewith including the cost of preparing any foreign versions including the costs in connection with changing the title of the Picture; (xvii) costs and expenses incident to any claims or proceedings (including damages, settlements, and legal fees) relating to the exhibition or distribution of the Picture or the exercise of any rights in the Picture, including, but not limited to, all costs incurred in securing any amounts included in, or enforcing collection of, revenues from the exploitation of the Picture or to prevent the unauthorized exhibition or distribution of the Picture or any impairment of, encumbrance on or infringement of the Picture; (xviii) costs and expenses to collect and monetize Tax Credits; (xix) participations or royalties payable with respect to the exercise of merchandising, publishing, or music rights and any costs of manufacturing or materials in connection therewith; (xx) all licenses, duties, fees or any other amounts required to permit use of the Picture; (xxi) to the extent, in its sole discretion, Amazon treats the receipts of any subdistributor as Gross Receipts hereunder, then all items deducted by

4

such subdistributor as distribution expenses, and which Amazon accepts for the purpose of its accountings with such subdistributor, shall be treated as Distribution Expenses under the corresponding subparagraph of this Paragraph; and (xxii) all other costs customarily incurred by distribution in connection with the sale, distribution, marketing and exploitation of motion pictures or customarily treated as a cost of sale, distribution or marketing, and which are not included in the Cost of Production of the Picture. Notwithstanding the foregoing, no (A) discounts, rebates or credits received by Amazon as a result of or based on the volume or quantity of advertising placed or prints, or other materials ordered, or the manner or time of payment of any Distribution Expenses, or otherwise, or (B) advertising agency commission rebates received by Amazon shall be taken into account in computing Distribution Expenses. To the extent that, in its sole discretion, Amazon treats the receipts of any subdistributor as Gross Receipts hereunder, then all items deducted by such subdistributor as distribution expenses, and which Amazon accepts for the purpose of its accountings with such subdistributor, will be treated as Distribution Expenses hereunder.

        d.    "**Participations**" means any amount (excluding those specified in Paragraph 1.f below and which are not included in the computation of the Cost of Production) payable to any person or entity (other than Amazon and Affiliates of Amazon) whether characterized as a contingent deferment, gross participation, net participation, profit participation, contingent compensation, performance bonus, award or credit bonus, or otherwise which is based, dependent, computed or payable, in whole or in part, on performance of the Picture or the net or gross receipts, earnings or proceeds derived from exploitation of the Picture or any percentage of the foregoing or is payable at such time as any such performance, receipts, earnings or proceeds equal a specified level or amount whether such receipts, earnings or proceeds are computed in the same manner as under this Agreement or otherwise or any similar type of payment or the economic equivalent thereof. No sums payable as a share of Defined Proceeds shall be deductible under this Paragraph.

        e.    "**Cost of Production**" means all costs of developing, producing and delivery of the Picture calculated according to the customary method of accounting now or hereafter employed by Amazon, including without limitation (1) costs of the Picture-related literary material including any royalties or bonuses and expenses incurred by Amazon or its Affiliates; (2) completion bond fee, whether paid to a third party, or as an imputed fee to Amazon equivalent to the customary charges of third party completion guarantors; (3) financing costs and charges; (4) legal and accounting fees; (5) compensation for services rendered, rights granted, or materials or facilities furnished in connection with the Picture, including without limitation any residual, royalty or similar compensation that is prepaid or guaranteed; (6) costs of advertising and publicity; (7) costs of production offices; (8) costs of equipment and facilities (including telephone and copying) used for or in connection with the Picture; (9) costs of cast, errors and omissions, and other insurance obtained in connection with production of the Picture; (10) costs of music and sound effects; (11) costs of laboratory work in connection with release prints, tapes, or titles; (12) costs and expenses incident to claims or proceedings (including without limitation damages, settlements and legal fees) relating to the production of the Picture; (13) amounts allocated to the Picture by Amazon out of the unearned guaranteed compensation paid to persons rendering services in connection with the Picture under an overall term or development agreement with Amazon ("unearned guaranteed compensation" being the portion of the guaranteed compensation that has not been credited against earnings under such overall term or development agreement) and all other related costs (including without limitation, for any and all production year(s) of the Picture during which one or more persons are performing services in connection with the Picture, the full annual compensation computed and paid to such personnel, provided there will be no "double charging" of fees payable to such personnel under this Paragraph); (14) package commission(s) payable "up front" (i.e., not out of profits or receipts) charged by any talent agency or consultant that collects a commission in connection with the Picture; (15) all "fringe payments" payable in connection with the foregoing, and (16) the cost of filing, preparing and perfecting security interests and assignments in the Picture-related literary material and obtaining reports and certificates in connection therewith. For avoidance of doubt, Cost of Production includes any payments required to be made at a later date following production of the Picture, determined in the customary manner Amazon accounts for production costs at the time the Picture is

5

produced. Amazon or subdistributor studio facilities may be used to the extent they reasonably meet production requirements; and all charges in connection therewith will be included in the Cost of Production in accordance with Amazon or subdistributor facilities and fringe payments in effect at the time of production. Insurance recoveries related to items in this Paragraph 1.e will be credited to the Cost of Production. There will be no double deductions, i.e., any item in the Cost of Production cannot again be charged as a Distribution Expense and vice versa. Notwithstanding anything to the contrary in this Paragraph 1.e, should Amazon advance or guarantee any portion of Participant's or any third party's share of contingent compensation, such amount advanced or guaranteed will be included as a Participation and not as a Cost of Production. For clarity, Cost of Production is the gross cost and is not net of Tax Credits.

    f. "**Deferments**" means all amounts payable pursuant to an agreement approved in writing by Amazon to any person entitled to same out of first net proceeds or Defined Proceeds, or prior to there being such net proceeds or Defined Proceeds, unless there is a different order of payment specified under the Agreement.

    g. As used herein:

     i. "**Advertising Costs**" means costs of all advertising, publicity, marketing, promotion, sales and licensing in connection with the Picture including cost of ad space, time, physical material used for production of or broadcasting ads and commercials, shipping, integrating and monitoring of ads and commercials, preparation and distribution of ad and promotional material, the properly allocated cost of attending sales markets and meetings, customary costs of sales agents, salaries, fees, and travel and business expenses of Amazon advertising and marketing executives and sales agents in connection with the Picture, customary costs of talent connected to the Picture, and publicists, press representatives and field exploitation persons appropriately allocated to the Picture, and regardless if incurred by or paid to Amazon employees or other persons, customary costs of previews, screenings, premieres, entertainment of press and personalities, research and tests of ad concepts and efficacy, press books and kits, trailers, stills and other accessories and publicity releases, so-called cooperative and/or theater advertising, and/or other advertising engaged in by, with, or for exhibitors, to the extent Amazon pays, shares in, or is charged with all or a portion of such costs, and all other exploitation costs relating to such theater exhibition, and the administrative expenses and borrowing costs chargeable by banks and financiers in connection with financing advertising costs. Any costs and charges referred to in this subparagraph expended or incurred prior to delivery of the Picture and not included in the Cost of Production of the Picture shall be included in costs under this subparagraph. Notwithstanding the foregoing, Advertising Costs will not include internal costs or fees of Amazon or its Affiliates with respect to advertising by Amazon or its Affiliates on Amazon Platforms (e.g., pre-roll advertisements for the Picture on Amazon Video or advertising on the Amazon.com homepage), it being agreed that third-party costs related thereto (e.g., the cost to create or test the advertisement or provide data analytics with respect thereto) will be included as Advertising Costs.

     ii. "**Affiliate**" means any entity directly or indirectly owned by or under direct or indirect common ownership with the applicable entity.

     iii. "**Amazon**" means Amazon.com, Inc.

     iv. "**Amazon On Demand**" means subscription, ad-supported or free video-on-demand on Amazon Platforms.

     v. "**Amazon On Demand Distribution**" means distribution of Amazon On Demand.

     vi. "**Amazon Platform**" means any platform, application, service or channel, wherever located or offered, that is owned, operated or controlled by Amazon or any Affiliate of Amazon,

6

or branded "Amazon" or with any brand owned by Amazon or any Affiliate of Amazon, including, but not limited to, the Amazon Prime Video subscription video on demand service.

vii.     "Amazon Television Distribution" means Television Distribution on an Amazon Platform.

viii.     "Amazon TVOD" means transactional video-on-demand, including EST and VOD on Amazon Platforms;

ix.     "Amazon TVOD Distribution" means distribution of Amazon TVOD.

x.     "Imputed Amount" means, for distribution of the Picture by Amazon On Demand Distribution, an amount equal to 20% of USDBO up to $5,000,000 in USDBO, 15% of USDBO from $5,000,001 to $10,000,000 in USDBO, and 10% of USDBO from $10,000,001 to $15,000,000 in USDBO, with a cap of $5,000,000. "USDBO" means United States domestic box office as reported by *Rentrak* (or a reliable alternate replacement source used by Amazon) prior to the initial exploitation via Amazon On Demand Distribution.

xi.     "Infringement Recoveries" means any damages or monetary settlements actually received by Amazon from any suit, action or proceeding for copyright infringement of Amazon's rights in the Picture (other than to the extent arising from any infringement of such rights in the Picture by or on behalf of Participant).

xii.     "Non-Theatrical Distribution" means the exhibition or distribution of the Picture to non-paying audiences in educational and institutional facilities, airlines in flight, oil rigs, public transportation, corporate locations, ships-at-sea, nursing homes, hospitals, hotels, motels, prisons, and other similar locations or forms of transportation: (A) by traditional projection means (regardless of whether standard or non-standard gauge film is used), closed-circuit, on-site originated television, and videocassette or video disc in public, common areas of such locations and forms of transportation; or (B) by closed-circuit, on-site originated television in the non-public non-common areas of such locations.

xiii.     "Residuals" means all amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason or, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, in supplemental markets, or otherwise, together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture. To the extent such payments are made to or on behalf of Participant, such payments shall be deemed a credit against any percentage compensation payable to Participant hereunder to the extent not prohibited by the applicable collective bargaining agreement. Any payments made to Participant hereunder prior to payment of such Residuals are deemed a credit against such Residuals to the extent not prohibited by the applicable collective bargaining agreement. In neither event may credit, when applicable and applied, be deducted a second time against Participant.

xiv.     "Tax Credits" means all tax credits, incentives, and rebates actually received by Amazon that are directly attributable to the production of the Picture.

xv.     "Television Distribution" means all forms of distribution or exhibition of the Picture to televisions, mobile devices, personal computers and other devices, throughout the universe, whether now existing or hereafter devised, via broadcast, cable, satellite, wireless network, IP and all other forms of distribution technologies, whether now existing or hereafter devised, under so-called "free to   the

7

consumer" ad supported business models, so-called "linear pay TV" and video on demand ("VOD"), near video on demand ("NVOD"), and "subscription video on demand" business models and all other business models, whether now existing or hereafter devised. Television Distribution includes distribution or exhibition of the Picture by Non-Theatrical Distribution and excludes Consumer Video Distribution.

xvi. **"Television Distribution Receipts"** means all receipts actually received and earned by or irrevocably credited to Amazon derived from the distribution or exhibition of the Picture via Television Distribution (other than in connection with Amazon Television Distribution).

xvii. **"Theatrical Distribution"** means the exhibition of a Picture by any process now known or hereafter devised in walk-in or drive-in theaters open to the general public on a regularly scheduled basis where a fee is charged for admission. For the purposes of clarity, exhibition of a Picture over an interconnected network of computers for personal viewing is not Theatrical Distribution.

xviii. **"Theatrical Distribution Receipts"** means all receipts actually received and earned by or irrevocably credited to Amazon from the distribution or exhibition of the Picture via Theatrical Distribution, i.e., all monies pursuant to licenses from Amazon directly to exhibitors and receipts from theatre box office for four-wall road show exhibitions, to the extent receipts from such engagements taken as a whole exceed costs incurred for such engagements.

2. Receipts from Licensees. In the event Amazon or its Affiliates license, sell or assign the right to exploit the Picture to a third party and that third party licenses the rights back to Amazon or its Affiliates (e.g., Amazon licenses the Theatrical Distribution and Consumer Video Distribution Rights to a third-party distributor and that third-party distributor licenses the electronic sell-through rights back to Amazon), Gross Receipts will include the amounts actually earned and received in respect of the licensing, sales, or assignment and not any amounts received in respect of any subsequent sale or license by Amazon or its Affiliates.

3. No Double Deductions. Amazon will in no event double deduct any Distribution Expense, Cost of Production, or Participations (i.e., any item included in any of Cost of Production, Distribution Expenses or Participations will not be included in any other of the foregoing).

4. Records and Payment, Audit Right, and Taxes.

a. Amazon will keep accurate books of account and records with respect to distribution of the Picture for a period of 3 years. Following Participant's receipt of each Statement referred to below and to the extent such Statement has not become incontestable, upon prior written request by Participant, Amazon will permit an independent, first class, reputable audit firm with experience in the motion picture or television industry engaged by Participant at Participant's expense on a non-contingency fee basis, that has signed Amazon's Non-Disclosure Agreement and that Amazon has approved in writing in advance, to audit, at Amazon's place of business where Amazon generally keeps accounting records, no more often than once per calendar year and upon no less than 60 days' prior written notice, the relevant records of Amazon to verify the correctness of the amounts shown as owing to Participant in a Statement; provided, that: (i) no such audit may be conducted during the last quarter of the calendar year (i.e., during the months of Oct., Nov. and Dec.); (ii) any such audit may only be conducted during normal business hours and in a manner designed to not interfere with Amazon's ordinary business operations and may not continue beyond a period of 30 consecutive days after commencement thereof; (iii) each such audit may only cover the period commencing after the period covered by the last audit conducted and pertain to Statements provided by Amazon within the preceding 12 month period, and pertain to amounts not covered by the last audit conducted; and (iv) unless otherwise agreed to by Amazon, no such audit may be combined with the audit of any other participant. Any information learned by the auditor is Amazon confidential information. A copy of the report of such audit shall be delivered to Amazon at the same time it is made available to Participant and, in any event, no later

8

than 60 days after completion of the field work. If it is determined, as a result of any such audit, that Participant is owed an incremental Defined Proceeds payment, Amazon will pay the same within 45 days. If such audit reveals an overpayment to Participant, then Participant will pay to Amazon the amount that should not have been paid within 45 days of receiving the audit report. The records supporting any Statement may not be audited more than once. The manner in which Amazon or any Affiliate treats any amount referred to in this Schedule for Amazon's or the Affiliate's tax or financial purposes will have no bearing on the computation of Defined Proceeds. Participant will have no right to inspect any tax return of Amazon, any distributor, or any Related Party, or require the production of the same or any information contained therein. Amazon will (the "**Reporting Period**") furnish Participant statements (the "**Statements**") showing the Gross Receipts, Distribution Fees, Distribution Expenses, Participations, Cost of Production, and Deferments as hereinabove provided quarterly for the first two (2) years, semi-annually for the next two (2) years and annually thereafter. Amazon will pay to Participant, concurrently with the furnishing of such Statements, the sums, if any, shown to be due Participant by such Statements. The first of such Statements and accompanying payment, if any, will be furnished 90 days following the calendar quarter in which the Picture was first commercially released in the Territory. Notwithstanding the foregoing, no Statement will be required for any period that Participant is not entitled to any payment. Each Statement will become final and binding unless Participant gives Amazon written notice of challenge thereto within 12 months after the mailing date of such Statement and specifies in such written notice the item or items of dispute and Participant's basis for challenge. In the event of such challenge such Statement will be final and binding as to all items or matters not specifically challenged. In the event of such notice of challenge, Participant must commence an action in a court of competent jurisdiction within 12 months of the date of such challenge or any claim or cause of action in connection therewith will be deemed waived. The 12-month period during which Participant may give Amazon written notice of challenge to a Statement will apply to any item in a Statement only once. For example, if the first Statement sets forth the Cost of Production of the Picture, then the 12-month period will apply to such first Statement and the appearance of such Cost of Production figures in any subsequent Statement will not affect the final and binding nature of the first report of the Cost of Production.

      b.    If Amazon makes any overpayment to Participant, Amazon shall have the right to deduct and retain for its own account an amount equal to any overpayment from any and all sums that would thereafter otherwise be due or payable by Amazon to Participant or for Participant's account, or may demand repayment from Participant in which event Participant shall repay such overpayment within 45 days from when such demand is made.

      5.    Foreign Receipts. Amazon's obligations under this Schedule will apply only to Gross Receipts actually received and earned by Amazon. Foreign receipts will be deemed received only when such receipts are actually received by Amazon in the United States in United States dollars, and until such time no foreign receipts will be included in Gross Receipts. When such foreign receipts are converted they will be accounted for in United States dollars at the rate of exchange at which such receipts are actually converted and remitted. Any discounts, taxes, duties or charges imposed in connection with the receipt or remittance of foreign funds will be deducted from Gross Receipts as Distribution Expenses.

      6.    Transfer of Amazon's Rights. Amazon or any assignee, licensee or other transferee will have the right at any time or from time to time to make a total or partial outright sale or grant of any or all of Amazon's right, title and interest in any rights, the proceeds from the exploitation of which are includible in Gross Receipts (such sale or grant may, at Amazon's election, be for a specific territory or for a specific right, e.g., television rights in Canada), to any person, firm or corporation, free and clear of Participant's participation in Defined Proceeds or, at Amazon's sole election, subject thereto. In the event such a sale or grant is free and clear of Participant's participation in Defined Proceeds, that portion of the gross proceeds of such sale or grant that is attributable (in Amazon or such transferee's good faith business judgment) to the aforesaid rights in which Participant has a right of participation will be deemed "Gross Receipts" hereunder, it being expressly understood and agreed that the participation, if any, by Participant in the proceeds of such sale or grant will thereafter exclude Participant from any further right of

participation in Defined Proceeds or any other proceeds derived from the exploitation of the applicable rights sold or granted. In the event such a sale or grant is subject to Participant's participation in Defined Proceeds, Amazon will secure from the buyer an agreement for the benefit of Participant that such buyer will: (a) comply with all the terms and conditions hereof for Participant's benefit; (b) assume all of Amazon's obligations to Participant hereunder; and (c) secure from any subsequent buyer an agreement for the benefit of Participant to be bound to the same extent as Amazon or the original buyer is bound. In the event Amazon sells or grants subject to Participant's interest and complies with (a), (b) and (c) above, then the proceeds of such sale or grant will be excluded from the Gross Receipts hereunder and Amazon will thereafter have no further obligation to Participant hereunder with respect to the Picture.

7.      Transfer of Participant's Rights. Participant will have the right to sell, transfer, assign and mortgage or otherwise hypothecate Participant's right to receive any Defined Proceeds hereunder to any third party to the extent legally permissible; provided, however, that (a) Amazon will have a right of first refusal to acquire such participation, which right Amazon may exercise at any time within the 10 days after receipt by Amazon of written notice from Participant containing all of the terms and conditions of a bona fide offer for such interest, which offer Participant intends to accept, including the name of such prospective purchaser, and (b) in the event of any such sale, transfer, assignment, mortgage or hypothecation, (i) only a single party, acting as disbursing agent, will be entitled to receive payment from Amazon and to exercise the rights of Participant hereunder, and (ii) only Participant, and not such transferee or assignee, will have the right to audit Amazon's books, or to contest or challenge Amazon's statements or to bring any action or proceeding in connection therewith, as set forth in Paragraph 4 hereof. Except as provided in this Paragraph 7(b)(ii), in the event of a sale, transfer, assignment, mortgage or other hypothecation of Participant's right to receive any Defined Proceeds hereunder, all references to "Participant" shall mean the applicable recipient of Participant's rights.

8.      Other Terms.

        a.      This Schedule provides a structure for potential bonus payments to Participant, in accordance with the terms of the Agreement, in the event certain receipts, as specifically defined in this Schedule, related to Amazon's distribution and exploitation of the Picture, exceed certain costs and fees and charges, as specifically defined in this Schedule, related to development, production, distribution and other exploitation of the Picture. Participant acknowledges that the way those receipts, costs, fees and charges are defined and calculated in this Schedule is a "construct" which is not intended to bear any relation to any methods of determining receipts, costs, fees, charges, or "profitability" used by Amazon and its Affiliates in other contexts, including for purposes of their own transfer pricing, financial reporting or tax reporting purposes, or used by others in the television or motion picture industry for their own internal purposes, contingent compensation calculation purposes, or otherwise.

        b.      Participant expressly waives and agrees to hold harmless Amazon from any and all claims by Participant or those claiming under Participant that any course of marketing has been determined without exercise of proper business judgment. Amazon has no obligation to produce or distribute the Picture or, if produced and distributed, to distribute it in any particular way, or to maximize Gross Receipts in any way. Amazon will control all business decisions with respect to distribution agreements and other aspects of any distribution of the Picture in its sole and absolute discretion including determining the extent, if any, to which it will audit or verify payments or costs charged to Amazon or assert claims with respect thereto. Amazon has not made any representations with respect to the likelihood or amount of Defined Proceeds, if any, which will or may be derived from distribution or exploitation of the Picture or payable to Participant hereunder.

        c.      Participant acknowledges that Amazon is part of a large, diversified, multi-faceted and multi-jurisdictional group of affiliated companies engaged in a variety of business activities. Amazon has advised Participant and Participant acknowledges that Amazon has entered into and intends to

10

frequently enters into business transactions with Affiliates of Amazon and other related parties (collectively, "Related Parties") and Participant acknowledges and agrees that Amazon is entitled, but not obligated, to, and may, in its sole discretion enter into agreements or other arrangements with Related Parties in connection with any or all rights relating to the Picture, including all exploitation rights and all subsidiary, ancillary and other rights relating thereto (the "Exploitation Rights"). Participant specifically acknowledges and agrees that the Imputed Amount serves as a negotiated substitute for any "arms-length" or "fair market" value of receipts from transactions under which the Picture or the exercise of any rights related thereto are licensed to Affiliates of Amazon for exploitation. Participant hereby acknowledges and agrees that Amazon is under no obligation, express or implied, to offer the Exploitation Rights or any part thereof to unaffiliated or unrelated third parties, whether in lieu of or in addition to offering such rights to Related Parties, or to otherwise seek or secure any business arrangements with any unaffiliated or unrelated third parties with respect thereto. If the Picture is produced and/or acquired, the ability of Amazon to exploit the Picture and related rights through Related Parties is a material inducement to Amazon to undertake the economic risk of financing and producing and/or acquiring the Picture and is a material factor in Amazon's decision to do so, and Amazon is expressly proceeding in reliance thereon. Without limiting the generality of any other provision of the Agreement or this Schedule, Participant hereby waives any right to make any claim or seek any relief, whether at law or in equity (specifically including injunctive relief), asserting the existence or breach or any such express or implied obligation.

d.      Participant acknowledges and agrees that any agreement or other arrangement by Amazon with a Related Party regarding the Exploitation Rights will be conclusively presumed to be fair, reasonable and unobjectionable unless Participant can establish that such agreement or other arrangement is on financial terms which, taken as a whole are materially less favorable economically to Amazon than the terms of Similar Transactions generally entered into by Amazon with unaffiliated or unrelated third parties (such materially less favorable agreement or arrangement being hereinafter referred to as a "Less Favorable Arrangement"). For purposes hereof, the term "Similar Transactions" will mean agreements or other arrangements relating to motion pictures similar to the Picture, which involve rights, which are comparable to the Exploitation Rights or any relevant part thereof. If Amazon enters into a Less Favorable Arrangement, Participant expressly agrees that Participant's sole right and remedy against Amazon for entering into such Less Favorable Transaction will be a binding arbitration conducted in accordance with the JAMS/Endispute Comprehensive Arbitration Rules and Procedures ("JAMS"). In the context of any such proceeding, special care shall be taken to minimize the disclosure, if any, to Participant (as distinguished from the arbitrator) of the terms of Amazon's other deals, it being acknowledged and agreed that such deals are proprietary in nature and constitute confidential trade secrets of Amazon. In any such proceeding, Participant's sole remedy will be (i) the establishment of monetary terms which are in the same range as those monetary terms to which the Related Party has agreed to during the same chronological period in similar transactions (e.g., in the same ancillary market with the same life cycle) with unrelated third parties for programs which are similar to the Picture (e.g., another first class theatrical motion picture with comparable budget, comparable ratings, a comparable cast and no unusual exigencies) and (ii) the right to receive an adjustment on the next accounting statement when due, for any additional payments that may be required, to the extent required to render such Less Favorable Arrangement not a Less Favorable Arrangement. Participant hereby expressly waives any right to seek or obtain any other relief in connection with any such claimed Less Favorable Arrangement, including, without limitation, punitive damages or preliminary or permanent equitable relief. It is further acknowledged and agreed that Participant's audit rights with respect to a transaction with a Related Party will be limited to an examination of Amazon's books and records of account relating only to the monies actually received and earned by or irrevocably credited to Amazon pursuant to such transaction.

e.      In the event any amount is paid to Participant (under the Agreement or otherwise) as an advance against a share of Defined Proceeds or otherwise indicated as recoupable from Defined

Proceeds, Amazon will be entitled to apply the amount against and recoup the amount from any Defined Proceeds otherwise payable to Participant under this Schedule.

        f.      There is a creditor-debtor relationship between Amazon and Participant with respect to payment of amounts due Participant hereunder and nothing contained herein shall be construed to create an agency, trust or fiduciary obligation with respect to such amounts or to prevent Amazon from commingling any such amounts with any other funds or give Participant a lien on the Picture and Participant waives any right to claim to the contrary. Amazon's obligation to pay Participant hereunder shall not bear interest nor entitle Participant to gains which may accrue to such funds prior to payment to Participant.

        g.      Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this paragraph and neither party shall become liable by any representation, act or omission of the other contrary to the provisions hereof. The use of terms such as "Gross Receipts", "Defined Proceeds" or "Participant" are used solely as a convenience to describe the results of the computations set forth in this Schedule and are not intended to create an inference of any relationship other than creditor/debtor with respect to payments, if any, pursuant to such computations or definitions.

        h.      Nothing in this Agreement will give Participant the right to a lien on the Picture or Gross Receipts. Participant will not be entitled to interest or any other award or penalty with respect to Amazon's obligation to pay Participant's Defined Proceeds (or part thereof) even in the event of a dispute between Participant and Amazon concerning the interpretation of this Schedule or payments to Participant hereunder. Without limiting any other provision of this Agreement, Participant waives any right at law or equity to revoke the Agreement or terminate any rights granted to Amazon hereunder by reason of a claimed non-payment of monies allegedly due and payable hereunder, it being agreed that Participant's sole remedy for any such alleged non-payment will be limited to a claim for any money that is due and payable hereunder.

        i.      Nothing herein contained shall be deemed to create a third party beneficiary agreement.

        j.      Amazon will have the right from time to time and in its business judgment to establish and adjust reserves for any Distribution Expenses, Cost of Production, Participations, uncollected accounts or other items which Amazon believes in its business judgment will be excluded from, deductible from or credited against Gross Receipts hereunder. Amazon will liquidate any such reserves within an appropriate period of time based on Amazon's business judgment.

        k.      Participant acknowledges that Amazon may distribute or exploit the Picture with other motion pictures on a flat sale or other basis that requires allocation of receipts and that Amazon may deem it appropriate, from time to time, to allocate receipts and expenses across multiple motion pictures including the Picture for purposes of this Schedule. Amazon will be entitled to allocate receipts and expenses as it deems appropriate for purposes of this Schedule, in its sole business judgment.

## SCHEDULE A-1
## CONSUMER VIDEO DISTRIBUTION RECEIPTS

1.    Calculation of Consumer Video Distribution Receipts.  "Consumer Video Distribution Receipts" means:

a.    In the event Amazon or its Affiliate licenses the right to produce, manufacture, develop or sell Consumer Videos to a third party (an "Unrelated Consumer Video Distributor"), Consumer Video Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received in respect of the licensing, sales, or assignment of those rights by Amazon or Affiliate of Amazon, as applicable, from such Unrelated Consumer Video Distributor (the "Unrelated Consumer Distributor Distribution Receipts").

b.    In the event Amazon or its Affiliate itself distributes and sells Consumer Videos (i.e., the rights are not licensed and the seller is not a third party) (a "Related Consumer Video Distributor"):

(1)    for electronic sell-through and electronic rental of the Picture on Amazon Platforms ("TVOD"): (x) 70% of non-refundable net retail revenue actually received by Amazon or its Affiliates from TVOD from during the first 12 months following theatrical release of the Picture in the Territory, and (y) thereafter, 60% of non-refundable net retail revenue actually received by Amazon or its Affiliates from Amazon TVOD; or

(2)    for sales of hard good home video media by Amazon or its Affiliates to retail customers: the wholesale price paid to Amazon by third party retailers for that media.

2.    Definitions.

a.    "Consumer Video Distribution" means distribution of Consumer Videos.

b.    "Related Consumer Video Distributor Expenses" means all actual costs and expenses incurred, paid or payable in connection with the development, advertising, marketing, manufacturing, production, packaging, distribution, licensing or other exploitation of any Consumer Videos, including, but not limited to, any royalties or shares payable to any third party. Amazon will in no event double deduct any Related Consumer Video Distributor Expenses with any Distribution Expenses.

c.    "Consumer Videos" means the Picture (and not a Picture Derivative) that are being sold via electronic sell through (where customers pay a one-time "purchase" or similar fee for ongoing access to the Picture), electronic rental (where customers pay a one-time "rental" or similar fee for limited term access to the Picture, but not including NVOD, SVOD), video disc or other physical media sale (where a copy of the Picture recorded on a disc or other physical medium of any variety (whether now known or hereafter invented) is sold to customers) and video disc or other physical media rental (where a copy of the Picture recorded on a disc or other physical medium of any variety (whether now know or hereafter invented) is rented to customers for limited term use).

13

## SCHEDULE A-2
## MUSIC PUBLISHING DISTRIBUTION RECEIPTS

1.     Calculation of Music Publishing Distribution Receipts. "Music Publishing Distribution Receipts" means:

a.     In the event Amazon or its Affiliate licenses the right to exploit the Musical Compositions to a third party (an "Unrelated Music Publisher"), Music Publishing Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received in respect of the licensing, sales, or assignment of those rights by Amazon or Affiliate of Amazon, as applicable, from such Unrelated Music Publisher (the "Unrelated Music Publisher Distribution Receipts"), less an administration fee equal to 15% of the applicable Unrelated Music Publisher Distribution Receipts.

b.     In the event Amazon or its Affiliate exploits the Musical Compositions (a "Related Music Publisher"):

(1)     at retail, Music Publishing Distribution Receipts is deemed to be an amount equal to 50% of the receipts actually earned and received by the Related Music Publisher in connection with such retail sales, less all Related Music Publisher Expenses; or

(2)     at wholesale, Music Publishing Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received by the Related Music Publisher in connection with such wholesale sales, less all Related Music Publisher Expenses.

2.     Definitions.

a.     "Related Music Publisher Expenses" means all actual costs and expenses incurred, paid or payable in connection with the exploitation of any Musical Compositions, including, but not limited to, any royalties or shares payable to any third party. Amazon will in no event double deduct any Related Music Publisher Expenses with any Distribution Expenses.

b.     "Musical Compositions" means the music and lyrics originally composed specifically for and synchronized in the Picture (but not any Picture Derivative). Sound Recordings are not Musical Compositions.

14

## SCHEDULE A-3
## SOUND RECORDING DISTRIBUTION RECEIPTS

1.   Calculation of Sound Recording Distribution Receipts. **"Sound Recording Distribution Receipts"** means:

a.    In the event Amazon or its Affiliate licenses the right to produce, manufacture, develop or sell Sound Recordings to a third party (an **"Unrelated Record Label"**), Sound Recording Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received in respect of the licensing, sales, or assignment of those rights by Amazon or Affiliate of Amazon, as applicable, from such Unrelated Record Label (the "**Unrelated Record Label Distribution Receipts**"), less an administration fee equal to 15% of the applicable Unrelated Record Label Distribution Receipts.

b.    In the event Amazon or its Affiliate (i) produces, manufactures, or develops, and (ii) distributes and sells Sound Recordings (a **"Related Record Label"**):

(1)    at retail:

(A)    in the United States, Sound Recording Distribution Receipts is deemed to be an amount equal to 10% of 90% of the receipts actually earned and received by the Related Record Label in connection with such retail sales, less all Related Record Label Expenses; or

(B)    outside the United States, Sound Recording Distribution Receipts is deemed to be an amount equal to 5% of 90% of the receipts actually earned and received by the Related Record Label in connection with such retail sales, less all Related Record Label Expenses.

(2)    at wholesale, Sound Recording Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received by the Related Record Label in connection with such wholesale sales, less all Related Record Label Expenses.

2.    Definitions.

a.    **"Related Record Label Expenses"** means all actual costs and expenses incurred, paid or payable in connection with the development, advertising, marketing, manufacturing, production, packaging, distribution, licensing or other exploitation of any Sound Recording, including, but not limited to, any royalties or shares payable to any third party, expenses related to the manufacturing of the applicable Sound Recording, including recording costs, re-use fees, re-recording fees, union and guild payments, and re-mixing and re-mastering costs customary in the phonograph recording industry. Amazon will in no event double deduct any Related Record Label Expenses with any Distribution Expenses.

b.    **"Sound Recording"** means any sound records based on the Picture (but not on any Picture Derivative) manufactured for sale to the public, which embody music or dialogue as taken from the actual soundtrack of the Picture or a re-recording of all or a portion of the soundtrack of the Picture performed by the same artist who originally performed that portion of the actual soundtrack. Musical Compositions are not Sound Recordings.

## SCHEDULE A-4
## GAMES DISTRIBUTION RECEIPTS

1.    Calculation of Games Distribution Receipts. **"Games Distribution Receipts"** means:

a.    In the event Amazon or its Affiliate licenses the right to produce, manufacture, developer or sell Games to a third party (an **"Unrelated Games Distributor"**), Games Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received in respect of the licensing, sales, or assignment of those rights by Amazon or Affiliate of Amazon, as applicable, from such Unrelated Games Distributor (the **"Unrelated Games Distributor Distribution Receipts"**), less an administration fee equal to 25% of the applicable Unrelated Games Distributor Distribution Receipts.

b.    In the event Amazon or its Affiliate (i) produces, manufactures, or develops, and (ii) distributes and sells Games (a **"Related Games Distributor"**):

(1)    at retail, Games Distribution Receipts is deemed to be an amount equal to 75% of the receipts actually earned and received by the Related Games Distributor in connection with such retail sales, less all Related Games Distributor Expenses; or

(2)    at wholesale, Games Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received by the Related Games Distributor in connection with such wholesale sales, less all Related Games Distributor Expenses.

2.    Definitions.

a.    **"Related Games Distributor Expenses"** means all actual costs and expenses incurred, paid or payable in connection with the development, advertising, marketing, manufacturing, production, packaging, distribution, licensing or other exploitation of any Games, including, but not limited to, any royalties or shares payable to any third party. Amazon will in no event double deduct any Related Games Distributor Expenses with any Distribution Expenses.

b.    **"Games"** means any form of video games, mobile games, applications or other interactive software products based on the Picture (but not any Picture Derivative) which may be exploited on any system, method or medium of distribution, display or delivery, whether now known or hereafter invented or discovered, including, without limitation: (i) any videogame cartridge (including, without limitation, all Sega, Nintendo and Sony platforms), magnetic diskette, CD-ROM (including, without limitation, Macintosh, PC and related platforms), DVD and other magnetic and optical types of storage for use on all types of computer or other electronic systems and video game entertainment console and/or portable operating systems and environments, whether existing as of the date hereof or hereafter developed; and (ii) mobile or on-line computer database systems and networks (including, without limitation, the Internet) and all mobile, broadcast, cable, telephone-line, radio, cellular, optical, wireless or similar communication networks, whether existing as of the date hereof or hereafter developed. As used in this subparagraph, "Games" includes distribution of any electronic game, software or software-driven device based on the Picture (but not any Picture Derivative) and designed for entertainment, instruction or other purpose, whereby the user(s) can affect the content, form, timing, duration, sequence or other characteristics of the audio-visual displays, user interface or other behavior or output of the software, by means of direct or remote user input (including, without limitation, commands, queries, selections, responses or data entry) accomplished by any input device now known or hereafter developed (e.g., smart phone, keyboard, mouse, joystick, voice or input sensor).

16

## SCHEDULE A-5
## MERCHANDISING DISTRIBUTION RECEIPTS

1.    Calculation of Merchandising Distribution Receipts.    "Merchandising Distribution Receipts" means:

a.    In the event Amazon or its Affiliate licenses the right to produce, manufacture, develop or sell Merchandise to a third party (an "**Unrelated Merchandising Distributor**"), Merchandising Distribution Receipts is deemed to be an amount equal to 100% of the receipts actually earned and received in respect of the licensing, sales, or assignment of those rights by Producer or Affiliate of Producer, as applicable, from such Unrelated Merchandising Distributor (the "**Unrelated Merchandising Distributor Distribution Receipts**"), less an administration fee equal to 25% of the applicable Unrelated Merchandising Distributor Distribution Receipts.

b.    In the event Amazon or its Affiliate (i) produces, manufactures, or develops, and (ii) distributes and sells Merchandise (a "**Related Merchandising Distributor**"):

(1)    at retail, 50% of the receipts actually earned and received by the Related Merchandising Distributor in connection with such retail sales, less all Related Merchandising Distributor Expenses; or

(2)    at wholesale, 100% of the receipts actually earned and received by the Related Merchandising Distributor in connection with such wholesale sales, less all Related Merchandising Distributor Expenses.

2.    Definitions.

a.    "**Related Merchandising Distributor Expenses**" means all actual costs and expenses incurred, paid or payable in connection with the development, advertising, marketing, manufacturing, production, packaging, distribution, licensing or other exploitation of any Merchandise, including, but not limited to, any royalties or shares payable to any third party. Amazon will in no event double deduct any Related Merchandising Distributor Expenses with any Distribution Expenses.

b.    "**Merchandise**" means merchandise, novelization and/or publications based on the Picture, provided that the following is not Merchandise: (i) the Picture itself or any Picture Derivative itself, or clips thereof, or any trailers, promotional films, or other advertising in connection therewith, in each case in any medium now know or hereafter devised, including, without limitation, in any media in which the Picture or any Picture Derivative may be embodied for playback, such as DVDs, Blu-ray discs, CD-ROMS, CDI, laser discs and memory cards; (ii) any Sound Recording, or Game; and (iii) any advertisement, product or promotional material that is not intended for sale by or on behalf of Amazon, its Affiliates, or its or their licensing agent for sale to customers on a standalone, transactional basis (including, without limitation, posters made available to exhibitors; one-sheets; jackets for, covers of and inserts in book publications or videodiscs; hats, t-shirts, or other promotional merchandise that is distributed to the public free of charge; and free souvenir programs and soundtrack recordings from the Picture or any Picture Derivative).

17

## SCHEDULE C

### COPYRIGHT MORTGAGE AND ASSIGNMENT

Gravier Productions, Inc., a company organized under the laws of [_____] ("Mortgagor") and Amazon Content Services, LLC, a Delaware limited liability company ("Mortgagee"), are party to that certain Acquisition Agreement, as amended, supplemented or otherwise modified from time to time (the "Distribution Agreement") concerning the motion picture currently entitled "Untitled Woody Allen Picture" (the "Picture"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Distribution Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, pursuant to the Distribution Agreement, Mortgagor hereby mortgages, assigns, transfers, sets over, conveys, grants and delivers to Mortgagee and its successors and assigns, as security for all of the rights and entitlements granted to Mortgagee under the Distribution Agreement and the full and timely performance by Mortgagor of all of its obligations thereunder, a continuing first priority security interest, copyright mortgage and lien in and to all of Mortgagor's right, title and interest in and to the collateral described on Schedule 1 hereto (subject only to customary guild liens), whether now in existence or hereafter created, and whether now owned or hereafter acquired (the "Collateral").

Mortgagor agrees that if any person, firm or corporation shall do or perform any acts which Mortgagee believes to constitute a copyright infringement of the Collateral or constitute a plagiarism, or violate or infringe any rights of Mortgagor or Mortgagee therein, or if any person, firm or corporation shall do or perform any acts which Mortgagee, believes to constitute an unauthorized or unlawful distribution, exhibition, or use of the Collateral or any rights therein, then and in any such event, Mortgagee may and shall have the right to take such steps and institute such suits or proceedings as Mortgagee may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable or necessary or proper for the full protection of the rights of the parties. Mortgagee may take such steps or institute such suits or proceedings in its own name or in the name of Mortgagor or in the names of the parties jointly.

Mortgagor further agrees that the rights and remedies of Mortgagee with respect to the security interest and copyright mortgage granted hereby are as more fully set forth in the Distribution Agreement.

In order to effectuate the rights described herein, Mortgagor hereby irrevocably constitutes and appoints Mortgagee its lawful attorney-in-fact to do all acts and things permitted or contemplated by the terms hereof. Without limiting the generality of the foregoing, the aforesaid conveyance and assignment includes with respect to the rights granted all prior choses-in-action, at law, in equity and otherwise, the right to recover all damages and other sums, and the right to other relief allowed or awarded at law, in equity, by statute or otherwise.

This Copyright Mortgage and Assignment shall be governed by, and construed in accordance with, the laws of the State of California, excluding (to the fullest extent a California court would permit) any rule of law that would cause application of the laws of any jurisdiction other than the State of California.

This Copyright Mortgage and Assignment is made and entered into with effect as of_____, 2016.

[signature page follows]

22

IN WITNESS WHEREOF, Mortgagor has caused this Copyright Mortgage and Assignment to be duly executed and delivered as of the date first above written.

GRAVIER PRODUCTIONS, INC.

By: _____

Name: _Letty Aronson_

Title: _Vice - Pres._

ELAINE ALCANTARA
Notary Public - State of New York
No. 01AL6136558
Qualified in Bronx County
My Commission Expires November 14, 20__17

ACCEPTED AND AGREED:

AMAZON CONTENT SERVICES, LLC

By: _____

Name: _____

Title: _____

23

IN WITNESS WHEREOF, Mortgagor has caused this Copyright Mortgage and Assignment to be duly executed and delivered as of the date first above written.

**GRAVIER PRODUCTIONS, INC.**

By: _____

Name: _____

Title: _____


ACCEPTED AND AGREED:

**AMAZON CONTENT SERVICES, LLC**

By: _____

Albert Cheng
Name: _____

Title: Vice President

CONFIDENTIAL
NON-PRECEDENTIAL

State of ~~California~~ New York
County of New York )

On 22 nd of July, 2016.
before me, Elaine Alcantara a notary public in and for the State of
DATE            NAME
~~California~~, personally appeared Lethy Aronson
New York                          NAME(S) OF SIGNER(S)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State ~~of California~~ that the foregoing
paragraph is true and correct.                          New York

WITNESS my hand and official seal.

Elaine Alcantara _____ (Seal)

Signature of Notary Public

ELAINE ALCANTARA
Notary Public - State of New York
No. 01AL6128653
Qualified in Bronx County
My Commission Expires November 14, 20 17

24

# EXHIBIT A-3

CONFIDENTIAL

Exhibit B

Top Sheet for Budget

WOODY ALLEN SUMMER PROJECT 2017
WORKING BUDGET DATED AUGUST 21, 2017

Shoot: 30 days in NY                                                                    Budget Date 8/21/16

Unions:  NYIA Majors, 817,DGA, SAG, WGA                                    Shooting Locations:  NY

                                                                                           Prepared By:Helen Robin, Steve Guilbaud

| Acct# | Category Description | Page | Total |
|---|---|---|---|
| 1101 | STORY, RIGHTS & CONTINUITY | 1 | 0 |
| 1200 | PRODUCERS UNIT | 1 | 0 |
| 1300 | DIRECTION | 1 | 0 |
| 1400 | CAST | 2 | 0 |
| 1500 | ATL TRAVEL & LIVING COSTS | 4 | 0 |
|  | Total Fringes |  | 0 |
|  | Total Above-The-Line |  | 0 |
| 2000 | PRODUCTION STAFF | 6 | 0 |
| 2100 | EXTRA TALENT | 12 | 0 |
| 2200 | SET DESIGN | 12 | 0 |
| 2300 | SET CONSTRUCTION | 14 | 0 |
| 2500 | SET OPERATIONS | 17 | 0 |
| 2600 | SFX | 20 | 0 |
| 2700 | SET DRESSING | 21 | 0 |
| 2800 | PROPERTY | 24 | 0 |
| 2900 | WARDROBE | 25 | 0 |
| 3100 | MAKEUP & HAIR | 27 | 0 |
| 3200 | LIGHTING | 29 | 0 |
| 3300 | CAMERA | 31 | 0 |
| 3400 | PRODUCTION SOUND | 33 | 0 |
| 3500 | TRANSPORTATION | 35 | 0 |
| 3600 | LOCATION | 43 | 0 |
| 3700 | BTL TRAVEL & LIVING | 45 | 0 |
| 3800 | FILM & LABORATORY | 47 | 0 |
| 4100 | DP/MUP/HAIR/WARD TESTS | 47 | 0 |
|  | Total Fringes |  | 0 |
|  | Total Production |  | 0 |
| 4400 | VISUAL EFFECTS | 49 | 0 |
| 4500 | FILM EDITING | 49 | 0 |
| 4600 | MUSIC | 50 | 0 |
| 4700 | POST PRODUCTION SOUND | 50 | 0 |
| 4800 | FILM & LABORATORY | 51 | 0 |
| 4900 | DELIVERABLES | 51 | 0 |
|  | Total Fringes |  | 0 |
|  | Total Below-The-Line Post |  | 0 |
| 6500 | PUBLICITY | 53 | 0 |
| 6700 | INSURANCE | 53 | 0 |
| 6800 | GENERAL EXPENSE | 53 | 0 |
|  | Total Below-The-Line Other |  | 0 |
|  | Contingency |  | 0 |
|  | Total Other |  | 0 |

| Acct# | Category Description | Page | Total |
|-------|---------------------|------|-------|
| | Total Above-The-Line | | 0 |
| | Total Below-The-Line | | 0 |
| | Total Above and Below-The-Line | | 0 |
| | Grand Total | | 0 |

# EXHIBIT A-4

CONFIDENTIAL

Exhibit C

Approved Subdistributors

| Territory | Previous Woody Distributor | Additional Approved Distributors |
|---|---|---|
| Airlines | Captive Ent | Terry Steiner, EIM |
| Australia/NZ | E One | Roadshow |
| Benelux | Paradiso Film | The Searchers |
| Bulgaria | | ProFilms, Tandem |
| Canada | | Mongrel, eOne |
| China | | |
| CIS | Volga Films | |
| Czech/Slovak | AQS | Freeman |
| Ex-Yugo | Cinemania | Blitz |
| France | Mars | |
| Germany | Warner Bros | Tobis |
| Greece | Odeon | |
| Hong Kong | Golden Scene | Edko |
| Hungary | Cinetel | |
| Iceland | | |
| India | | |
| Indonesia | | |
| Israel | LEV Cinemas | |
| Italy | Lucky Red | Leone |
| Japan | Longride | Kadokawa |
| Latin America | Imagem | Telefilms |
| Malaysia | | |
| Middle East | | |
| Philippines | | |
| Poland | Kinoswiat | Monolith/Freeman |
| Portugal | Nos Lusomundo | |
| Romania | | |
| Scandinavia | Scanbox | |
| Singapore | Shaw Renters | |
| South Africa | Ster Kinekor | |
| South Korea | Green Narae | |
| Spain | Acontracorriente | |
| Switzerland | Frenetic | Elite |
| Taiwan | Applause | |
| Thailand | M Pictures | |
| Turkey | Yeni Bir Film | The Moments |
| United Kingdom | Warner Bros | eOne, StudioCanal |